IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MADELINE RIGGILADEZ, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>HON. FRANCIS J. HARVEY, )<br>Secretary of the Army, )<br>)<br>Defendant. )<br>) | Civil Action No. 06-1337 (RJL) |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS
<u>WHICH ARE NOT IN GENUINE DISPUTE</u>**

Pursuant to LCvR 7(h) and in support of Defendant's Motion to dismiss, or in the alternative, Motion for Summary Judgment, Defendant respectfully submits this statement of material facts as to which there are no genuine disputes.

1. The Plaintiff, Madeline Riggiladez, was employed as a Clinical Nurse, GS-610-11, with the Walter Reed Army Medical Center (WRAMC), in Washington, D.C. from December 2002 through February 20, 2005. Complt. 5, 17

2. Plaintiff was assigned to the Critical Care Nursing Service in the Cardiothoracic Ward, known as Ward 46. Ward 46 is a 14-bed ward with an average daily census of 9 patients, offering complex medical surgical nursing care to transitioning cardiothoracic pre- and postoperative patients. Defense Exhibit 1, Report of Investigation (hereinafter "ROI") p. 143.

3. Major Lillian Peterson, Ward 46 Head Nurse, was Plaintiff's first level supervisor as of July 2003. Compt. 5.; Defense Exhibit 2, Hearing Transcript (hereinafter "TR") p. 205.

4. Ms. Danielle Rodondi, Registered Nurse, GS-12, served as the interim/acting Ward 46

Head. TR., 208

    5. Lieutenant Colonel Rosemary Ann Edinger, Chief of Critical Care Nursing, was Plaintiff's second level supervisor. TR p. 337.

    6. According to her resume, Plaintiff began her nursing career in August 1993 in a nursing home environment. Prior to accepting her position at WRAMC, Plaintiff was employed with three different hospitals between September 1998 and November 2001. ROI p. 260.

    7. Ward 46 was staffed with a mix of civilian (4) and active duty nurses (8) and support staff. Many of the nurses were young Army lieutenants in their twenties or thirties. TR. pp. 215, 370.

    8. Between the date she began work at WRAMC and April 2004, Plaintiff primarily worked the night shift on Ward 46, which was her preference. TR., pp. 11, 214.

    9. Between December 2002 and July 2003, Plaintiff reported to her initial first line supervisor, Major Walker, and to Ms. Rodondi, while serving as interim head nurse, a few instances of age-related comments made to, or about her, by co-workers. Major Walker had the co-worker apologize to Plaintiff for the first instance. TR. p. 55.

    10. After Major Peterson arrived, Plaintiff mentioned to her that some comments were being made about her age. In response, Peterson scheduled anti-discrimination training for the Ward 46 staff. TR. pp. 234 - 236.

    11. After the training, the only other age-related concern Plaintiff raised with Peterson was she felt she was being excluded from social conversations among the younger, single nurses. TR. p. 236.

    12. In response, Peterson told the younger lieutenant nurses to limit socializing to break

times. TR. p. 237.

13. Plaintiff had particular difficulty getting along with one of the military nurses, Second Lieutenant (2LT) Vanderlinden, who was in her mid-twenties. TR. p. 243 -244.

14. On October 26, 2003, Plaintiff and 2LT Vanderlinden yelled at each other in the break room on Ward 46. Other staff members and patients could hear the argument. Major Peterson counseled Plaintiff in writing about her role in this incident. ROI 123 - 124; TR. 244 - 246.

15. Due to concerns with Plaintiff's level of performance of clinical skills and critical thinking skills, Major Peterson asked Major Berger, the senior clinical nurse and the assistant head nurse, to observe Plaintiff's performance between October 22 and December 23, 2003. ROI 126 - 129.

16. Based on Major Berger's evaluation and her own concerns, on January 20, 2004, Major Peterson counseled Plaintiff in writing that she was not performing at an acceptable level as a clinical nurse. Peterson informed Plaintiff she had decided to implement a performance improvement plan, and that it would be "the final opportunity to raise [her] level of performance to an acceptable level." ROI, pp. 126 - 127; TR p. 220.

17. Shortly after this counseling, on January 31, 2004, Plaintiff reported an unwitnessed on-the-job injury from a fall, causing injury to her right knee, eye and a tooth. TR. pp. 217; Compt.. Para 6.

18. Plaintiff's physician cleared her to return to work on March 27, 2004, with the following temporary restrictions related to her right knee pain: Limited squatting; No lifting over 15 lbs; Limited standing. These restrictions were in effect until April 30, 2004. ROI, p. 104.

19. Upon Plaintiff's return to work, Major Peterson told Plaintiff that she still needed to discuss her performance issues; however, Plaintiff became very emotional, expressing that she felt like she was being picked on. Major Peterson decided "it was best . . . to just back away and leave it alone at that time." TR p. 220 - 221.

20. In light of Peterson's concerns, Plaintiff generally was given responsibility for the least critical patients. TR. p. 272.

21. On April 2, Major Peterson initiated the Performance Improvement Plan (PIP) referenced in her January 26, 2004, counseling document. ROI, pp. 133 - 134.

22. Major Peterson expressed her concern about the Plaintiff's "ability to provide the level of care required by the patient population that is typically admitted to ward 46." ROI, p. 133.

23. Plaintiff was informed that the she would be switched from the night shift to the day shift for 45 days for the PIP following April 2, 2004, and that Ms. Rodondi would serve as her preceptor. ROI, p, 133.

24. In order to cover for absences of other staff, Plaintiff occasionally was scheduled to work overtime on the night shift during the PIP period. TR. pp. 74, 77- 78, 240

25. On May 17, 2004, Major Peterson determined that "the PIP did not yield the expected results. In spite of providing guidance and a supportive environment, employee failed to meet acceptable standards." ROI, p. 134.

26. Plaintiff worked the day shift on May 23, 2004. TR. pp. 102 - 103

27. Major Peterson was not present for duty that day because she was on a two-week temporary duty assignment at Fort Dix between May 22 and June 5, 2004. Ms. Rodondi was the

acting head nurse for Ward 46 during Major Peterson's absence.  ROI, p. 179.

28.  During the May 23rd day shift, Plaintiff was responsible for the care of a 72-year old female patient recovering from surgery to repair an aneurysm involving the aortic valve. ROI, p. 148-50.

29.  This surgery placed the patient at high risk for a life-threatening heart rhythm.   ROI, p. 148-150

30.  At the night shift change, Lieutenant Beam, the nurse taking over the patient's care, noted that the patient was having a episode of irregular heart beats ("trigeminy") as reflected on the monitoring equipment ("telemetry monitor").  Pursuant to the standard of care, Beam called the physician on duty to report this information.  ROI, p. 148-50.

31.  Lieutenant Beam then reviewed the telemetry monitor record for the preceding shift and noted the patient had been "in and out of trigeminy numerous times throughout the day." ROI, p 150.

32.  There was no record that Plaintiff had either reviewed the patient's telemetry report during her shift nor reported the patient's irregular heartbeat incidents to the duty physician, as required.  ROI, p. 150.

33.  On May 24, 2004, Ms. Rodondi, the Acting Head Nurse, called Plaintiff to inquire about the events of the preceding day.  Plaintiff denied seeing any events on the telemetry monitor.  ROI, p. 220.

34.  Major Peterson also called Plaintiff to discuss the matter in the course of her investigation of the incident.  Plaintiff "became very emotional, complaining - and accusing people of being out to get her. That none of this was true, that she did everything she was

supposed to do. That she was a good nurse, why didn't people like her?" TR. pp. 222, 281-282

35. On May 25, 2004, Plaintiff called Rodondi to request sick leave, citing a problem with her knee. ROI, p. 179

36. By May 28th, Plaintiff had not returned to work. That date, Rodondi called Plaintiff to discuss the need to bring documentation from her doctor for clearance to return to work. Plaintiff reported that she had been injured during her May 23rd shift while trying to reposition the same 72-year old patient without assistance. Plaintiff told Rodondi she had been diagnosed with a hernia. Rodondi asked Plaintiff if she had followed required procedures for reporting the incident/injury, and Plaintiff admitted she had not. ROI, p. 175

37. Plaintiff later reported that she had re-injured her right knee and injured her lower back and groin on May 23rd. TR. pp. 27 - 29

38. On June 4, 2004, Plaintiff reported to the WRAMC Worker's Compensation representative, Ms. Ribas, to file a claim under the Federal Employee's Compensation Act (FECA) for her claimed May 23rd injury. ROI, p. 188

39. During the meeting with Ms. Ribas, Plaintiff produced a note from her physician saying she would be unable to work until July 1, 2004. Plaintiff, however, had not provided the note to her supervisor. ROI, p. 188

40. Plaintiff called Ward 46 on June 4, 2004, and spoke with Lieutenant Mooney (now Rinker). Plaintiff stated that she would not be back to work "for a while" and was on worker's compensation benefits. ROI, p. 190

41. Plaintiff did not return to work, nor did she provide documentation to Major Peterson to justify her absence or request leave, despite Peterson's telephonic requests to Plaintiff, so

6

Plaintiff he was carried as absent without leave (AWOL).   TR. pp. 227 - 232

TR., p. 394

    42.  When Peterson tried to call Plaintiff to enquire as to her status, Plaintiff would tell Peterson that she felt as though Peterson was "hassling" and "harassing" her.  TR, pp. 259 - 260

    43.  In the face of the May 23, 2004 incident and Plaintiff's undocumented absences, on or about, July 6, 2004, Peterson sought the assistance of the Management Employees Relations (MER) office to take action concerning plaintiff's employment.   ROI, p. 192 - 194.

    44.  The MER Office of the Civilian Personnel Advisory Center (CPAC) was headed by Mr. Irvin Henderson. TR. p. 333.

    45.  Henderson worked with his subordinate specialist on both phases of the personnel action involving the Plaintiff, and felt that the circumstances were sufficient to warrant removal. TR. pp. 338, 346

    46.  Prior to September 10, 2004, Major Peterson issued to the Plaintiff an undated Notice of Proposed Removal that had been developed with the MER Office's assistance.  She sent it by mail because Plaintiff still had not returned to work.  The basis of the proposed action was plaintiff's negligence in performance of duties where safety of a patient is endangered, based on the May 23rd incident.  Plaintiff was informed that she had the right to reply orally and/or in writing to Colonel Edinger within 15 days of her receipt of the notice.  ROI, pp. 210 - 212.

    47.  On September 10, 2004, Plaintiff acknowledged her receipt of the Notice of Proposed Removal when she called Major Peterson to discuss it.   ROI, p. 208; TR. p. 238

    48.  Plaintiff asserts that she had been medically cleared sometime in September 2004 to return to work by early October 2004; however, she did not directly inform Peterson or Edinger

about this development.  TR., p. 42, 382

49.  In September and October, 2004, Plaintiff received from Edinger two telephonic verbal extensions of the 15 days to reply to the Notice.  TR., pp. 383 - 384

50.  Plaintiff's current attorney, Jason H. Ehrenberg, notified Colonel Edinger on October 22, 2004, that he had been retained by Plaintiff to represent her concerning the removal notice. ROI, p. 222.

51.  On October 22, 2004, Edinger denied Plaintiff's request for an extension beyond November 1 but granted her until October 29 to reply to the notice. ROI, p. 224.

52.  Plaintiff, through her attorney, provided a written reply to Colonel Edinger on October 29, 2004.  Plaintiff generally denied that she had been negligent on May 23, 2004, stating that she that "had no record of poor performance prior to her return from medical leave in February 2004." ROI, p.   228 - 230

53.  On November 8, 2004, Plaintiff's attorney sent to the WRAMC Equal Employment Opportunity (EEO) Office a completed "EEO Inquiry Form."  The form alleged she had been discriminated against based on her age, perceived disability/illness, and race, citing October 22, 2004, as the date of the most recent discriminatory incident.  Attached was a copy of the Plaintiff's reply to the notice of proposed removal.   ROI, pp. 21 - 25.

54.  Plaintiff received a Notice of Right to File a Formal Complaint on January 14, 2004. ROI, pp. 49 - 50.

55.  Through her attorney, Plaintiff filed a formal complaint of discrimination on January 25, 2005.  ROI, pp. 2 - 10.

56.  Plaintiff's attorney wrote to the WRAMC legal representative on February 1, 2005, to

state that Plaintiff was wished to resign from her Clinical Nurse position effective February 15, 2005.

57. On February 9, 2005, Colonel Edinger issued her Notice of Decision on the Proposed Removal. She decided to impose the proposed penalty of removal, to be effective January 20, 2005. ROI, pp. 237 - 238

58. On February 10, 2005, the Defendant's legal representative responded to Plaintiff's attorney, enclosing a copy of the Decision Notice and informing him that Plaintiff was free to resign at any time but that she needed to convey personally her request to the Defendant. This correspondence also indicated that January 5, 2005, was the "date on which the Agency believes [Plaintiff] first indicated her intention to return to work after deciding not to pursue her [worker's compensation] claim." ROI, p. 241.

59. Plaintiff never tendered her resignation to the Defendant; therefore, her removal was effective on January 20, 2005. ROI, p. 249.

60. The Defendant investigated Plaintiff's EEO complaint via a fact-finding conference conducted on July 26, 2005. The Plaintiff, represented by her attorney, provided sworn testimony in support of her complaint. Major Peterson and Colonel Edinger also testified and were subject to questioning by Plaintiff's attorney, resulting in a 425-page transcript. In addition, the investigator gathered 344 pages of other supporting documentation.

Respectfully submitted

_____/s_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s_____
RUDOLPH CONTRERAS D.C. Bar # 434122
Assistant United States Attorney


_____/s_____
STEVEN M. RANIERI
Special Assistant U.S. Attorney
555 Fourth Street, N.W.,
Washington, D.C. 20530
(202) 353-9895

OF COUNSEL:
Louise Schmidt
U.S. Army Litigation Division
901 N. Stuart Street, Suite 400