**FAILS:** Fails to respond appropriately to emergency situations. Needs much encouragement and direction during emergencies. Fails to display appropriate level of professionalism and calmness during emergencies. Fails to attend training for emergencies. Two (2) negative counseling statements during this rating period related, to this standard.

**6. Innovative/Professional Responsibilities:** Demonstrates support of professional practice and growth by maintaining licensure, BLS, Departmental and Section CBO and continuing education by presenting unit in-services, attending staff meetings, obtaining 20 contact hours per rating period.

**EXCELLENCE:** Presents two (2) or more in-services. Attends all staff meetings and actively participates. Maintains licensure, BLS, CBO and BMAR requirements. Obtains more than 20 contact hours of continuing education during this rating period. Submits a support form with significant contributions to supervisor before 31 OCT of each rating year.

**SUCCESS:** Presents one (1) in-service. Attends 75% of staff meetings. Maintains licensure, BLS, CBO and BMAR requirements. Obtains 20 contact hours of continuing education during this rating period. Submits a support form with significant contributions to supervisor on 31 Oct of each rating year.

**NEEDS IMPROVEMENT:** Fails to present in-service. Attends 50% of staff meetings. Maintains licensure, BLS, CBO and BMAR. Obtains 18 contact hours of continuing education during the rating period. After reminders and encouragement, provides support form and significant contributions to supervisor by 15 November.

**FAILS:** Fails to present an in-service. Attends less than 50% staff meetings. Does not maintain licensure, BLS, CBO and/or BMAR. Obtains less than 18 contact hours of continuing education during the rating period. Does not provide support form with significant contributions to supervisor by 15 November.

**7. Working Relationships/Communication/Customer Service:** Demonstrates a friendly, sensitive and caring attitude. Uses professional and courteous communication and treats patients, staff, families and visitors with dignity and respect. Answers telephone in the WRAMC approved manner. Protects the privacy and confidentiality of patient information (HIPAA). Does not engage in verbal disagreements with patients, family members, visitors or staff. Responds to members of the health care team with positive interpersonal skills to create a cooperative and positive working environment. Uses appropriate chain of command. Uses available resources to acquire personnel when short staffed Initiates and reports unusual occurrences to Head Nurse by using an incident report (1811). Maintains an AKO and Outlook account for electronic mail. Ensures that personal contact information is correct and updated in unit records for essential employee status.

**EXCELLENCE:** Leads by example. Complies with the spirit as well as the words of this standard. Acts as role model in providing customer service. Fosters an environment in which customer service is an integral part of the day-to-day work ethic of the unit. Intercedes and or acts as a mediator to resolve disagreements and or problems between patients, family members, visitors and staff. Recognized for outstanding customer service and working relationships on numerous occasions. No negative counseling related to this standard during the rated period.

**SUCCESS:** Consistently complies with this standard, remains professional in all interactions. Does not initiate or participate in conflicts with staff, patients, family members, and/or visitors. Demonstrates adequate work ethic. Recognized for superior customer service and working relationships on one (1) or more occasions. One (1) negative counseling related to this standard during the rated period.

4

*138*

**NEEDS IMPROVEMENT:** *Complies with the words, but not the spirit of the standard. Inconsistent with compliance of this standard.  Has conflicts with staff, patients, family members, and/or visitors. Demonstrate an inconsistent work ethic. Conducts self appropriately but is not recognized for superior customer service. Two (2) negative counseling statements for noncompliance with this standard.*

**FAILS:** *Fails to comply with the spirit and or the words of this standard. Frequently found in conflict with staff, patients, family members and visitors. Demonstrates poor work ethic. Does not read or maintain an Outlook account.  Does not ensure personal contact information is updated.  Contributes to declining unit morale. More than two (>2) patient and staff complaints.*

Staff Member's signature & date                    Supervisor's signature & date

In addition:

RN's will demonstrate knowledge and compliance with:

ANA standards of practice
JCAHO
Patient Specific Standards (ie ortho patients—orthopedic nursing standards)
Infection Control (APIC) standards
National Patient Safety Goals (IOM)
MEDCOM/NARMC guidance
Applicable AR's and policy letters pertaining to Patient Care

**WEEK 1:  Focus on telemetry strips basic knowledge, improvement of interpersonal skills, and attention to detail:**

Friday, 4/2 (6)

Tues, 4/6 (6)

Thurs, 4/8 (6)

**WEEK 2:  Continue to work on interpersonal skills, time management and attention to details:**

Sat, 4/10 (6)

Sun, 4/11 (6)

Mon, 4/12 (6)

Thurs, 4/15 (1) Scheduled for BLS class to recertify

**WEEK 3:  Began to utilize professional assertion:**

Fri, 4/16 (6)

Tues, 4/20 (6)

Wed, 4/21 (6)

**WEEK 4:  Time Management:**

Sat, 4/24 (6)

Sun, 4/25 (6)

Wed, 4/28 (6)

Thurs, 4/29 (6)

**WEEK 5:  Become familiar with nursing policies and capabilities of the ancillary personnel and contact personnel:**

Fri, 4/30  8hr. scheduled AL

Tues, 5/4 (6)

Wed, 5/5  (6)

**WEEK 6:  Patient assessment, cardiovascular and respiratory system:**

Sat, 5/8 (6)

Sun, 5/9 (6)

*Rotated to night shift*

Wed, 5/12 (7)
Thurs, 5/13 (7)

**WEEK 7:   Continue to develop assessment skills, EKG interpretation, interpersonal skills:**

Fri, 5/14 (3)


*Rotated to day shift*


Tues, 5/18 (6)


End of assessment program.  Head nurse and employee (MAJ Peterson and Ms. Riggiladez) will meet with section supervisor (COL Edinger) to discuss final evaluation

## SCOPE OF PATIENT CARE AND SERVICE
## DEPARTMENT OF NURSING

**1. TITLE: WARD 46, Cardiothoracic Ward**

**2. DESCRIPTION:** Ward 46 is a 14 bed Cardiothoracic Ward with an average daily census of 9 patients. Our average daily workload consists of 166 Nursing Care Hours.

**3. PATIENT POPULATION SERVED:**

Age specific care is provided to the adult patient population ranging from age 18 to 90 years. The complexity of patients range from pre and post operative cardiothoracic patients to cardiology patients and medical patients who require telemetry monitoring and close observation.

**4. CONDITIONS AND DIAGNOSES TREATED:**

The Cardiothoracic step-down unit offers complex medical and surgical nursing care to the transitioning cardiothoracic pre and postoperative patient. Patient care processes and procedures performed consist of nursing care of post-operative coronary artery bypass patients, pre and post operative thoracotomy patients, esophageal, mediastinal and general chest diseases. Common clinical procedures include wound management of coronary artery bypass patients, placement and monitoring of chest tubes, interpretation of advanced cardiac rhythms, pre and post operative testing and preparation for complex cardiothoracic and medical procedures, and post operative cardiac catheterization recovery.

Mechanisms used to identify patient care needs are determined through morning patient rounds, weekly multidisciplinary meetings and the integrated patient documentation record. Families are involved with all aspects of care to provide a holistic approach to achieve patient outcomes. If the patient's acuity level exceeds the nursing capacity of this unit, patients are transferred to the Intermediate Care Unit, Coronary Care Unit, Surgical Intensive Care Unit or the Medical Intensive Care Unit.

### a. High Volume:

1) Coronary Artery Disease
2) R/O Myocardial Infarction
3) Lung Cancer
4) Aortic or Mitral Valve Replacement
5) Staging for Lung CA

143

## 7. PERSONNEL PROVIDING CARE:

### a. Nursing:

All licensed personnel perform cardiovascular assessments every eight hours. Unit Level Competencies include: Basic Life Support, Basic Arrhythmia Interpretation, Post Operative Wound Care, and Chest Tube Management.

    (1) Registered nurses: 9
    (2) Licensed practical nurses: 4
    (3) Nursing Assistants: 4
    (4) Medical Records Technicians: 2

### b. Other Personnel:

    (1) Physicians: Five Staff Cardiothoracic Surgeons
    (2) Physician Assistants: 4
    (3) Physical Therapists: 2
    (4) Occupational Therapist: 1
    (5) Social Worker: 1
    (6) Pharmacist: 1
    (7) Dietitian: 1
    (8) Respiratory therapy: 1
    (9) Radiology technicians: 1
    (10) Chaplain

### c. Staffing Management:

1) Each unit's overall minimal essential staffing requirements are defined by the Automated Staffing Assessment Model (ASAM), based on medical planning factors and historical workload. Determination of manpower requirements is a continuous process in which requirements are established, increased, decreased, and eliminated in response to changes in a unit's workload, missions, programs, procedures, technology, and leadership philosophy. Daily measurement and determination of workload is accomplished through the Workload Management System for Nursing (WMSN) on inpatient areas.

2) WMSN is a management tool used to assess nursing personnel staffing based on patients' nursing care needs. Nurses classify patients according to an assessment of their nursing care needs for the next 24 hour period and determine the total number of nursing care hours (NCH) a unit's patients will require. This system provides solid factors to begin planning for patient care. The WMSN cannot stand as a single method for determining staffing requirements but the WMSN can provide a good starting point for assessing the staffing needs of the unit when used in conjunction with other staffing variables.

**b. High Risk:**

1) Post operative coronary artery bypass surgery
2) Post operative lung surgery
3) Externally paced patients
4) New Onset Atrial Fibrillation

**c. Problem Prone:**

1) Anticoagulation therapy for valvular heart disease
2) Heparin therapy for new onset atrial fibrillation

**d. High Cost:**

1) Cardiac procedures
2) Thoracotomy complications
3) Tracheostomies
4) Long-term patients requiring sub acute placement

**e. Excluded Patients/Services:**

1) Pediatric patients
2) Patients requiring hemodialysis at the bedside


**5. STANDARDS OR GUIDELINES FOR PRACTICE:**

   a. WRAMC Regulations
   b. WRAMC Nursing Policies
   c. Critical Care Nursing Section Policies
   d. Ward 46 Policies
   e. Lippincott Manual for Nursing Practice
   f. Cardiothoracic Nursing Textbook


**6. TREATMENTS AND ACTIVITIES PERFORMED:**

   All nursing activities are performed in accordance with the Scope of Practice and Competency Based Orientation. Common clinical activities include: admission assessments, chest tube management, patient and family teaching, venipunctures, peripheral intravenous therapy, finger stick blood glucose monitoring, blood transfusions, medication administration, urinary catheterization, nasogastric tube insertion, tube feedings, oral or nasogastric suctioning, dressing and wound care, respiratory treatments, oxygen therapy, cardiac monitoring, vital signs monitoring, pain management, and ongoing assessments and documentation of nursing and medical intervention.


*145*

08/25/04  WED 13:11 FAX                                                                ☑01

3)  The Head Nurse and NCOIC formulate a unit core staffing plan, defining the number and mix of nursing personnel required in accordance with professional judgment and current patient care needs.  Staffing plans take into consideration the American Nurses Association "Principles for Nursing Staffing" and are contingent upon patient care, unit, staff, and organization variables.  Patient care variables are reflected in the WMSN, and include number of patients, level of acuity, and additional factors that may impact patient needs.  Unit variables include characteristics of the unit's care intensity, configuration and delivery support functions.  Staff related variables reflect the specific needs of patient populations and determine the appropriate clinical competencies required of the nursing staff.  Organization related variables include areas such as support services (clerical, transport, housekeeping, laboratory) and access to timely, relevant and accurate information.

4)  Staffing is also adjusted based on patient need, staff expertise and experience when additional staff are required to respond to increased patient care demands, augmentation is accomplished by detailing individuals from one area to another, supplementing core staff with contract employees or adjusting staffing schedules by initiating the "on call" roster or soliciting volunteers from the permanent staff to work overtime.

5)  Unit core staffing plan

| Ward 46 | | ASAM Authorizations TDA 0902 | | Weekday Staffing Matrix (excluding Head Nurse and Wardmaster) | | | Weekend Staffing Matrix (excluding Head Nurse and Wardmaster) | | |
|---|---|---|---|---|---|---|---|---|---|
| Staffing | Military | Civilian | Day | Evening | Night | Day | Evening | Night |
| RN | 8 | 4 | 3 | 2 | 2 | 2 | 2 | 2 |
| LPN | 7 | 0 | 1 | 1 | 1 | 1 | 1 | 1 |
| NA | 6 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| MRT | | 2 | 1 | 1 | | | | |

6)  As of 1 July 2002, staffing effectiveness is also evaluated by analysis of data from human resource and clinical indicators.  The two human resource indicators selected by the WRAMC DON are Nursing Care Hours per Patient Day (NCHPPD) and Skill Mix.  The two clinical indicators selected by the organization are patient falls and medication errors.  While unit level data will be provided to Head Nurses for review, at this time, it is too early to determine what effect these data will have on staffing decisions.  It is anticipated that these data will be part of the combination of factors used to make staffing decision on both the unit and department level in the near future.

8.  **HOURS OF SERVICE:**  (24 hours per day)

9.  **LOCATION:**  Ward 46

146

MCHL-CCNS-WARD 46                              25 May 2004

MEMORANDUM FOR RECORD

SUBJECT: Case evaluation of potentially fatal incident

1. 72 year old white female patient was transferred from SICU to Ward 46 on 21
   May 04. At that time the patient was post op day 16 from emergent bentall
   procedure (aneurysm repair involving the aortic valve), post op day 14 from
   mediastinal washout, and post op day 3 from drainage of pericardial effusion. The
   patient had various rhythm changes throughout her stay in the SICU. Due to the
   presence of a St. Jude's Valve, the patient was being anticoagulated with heparin.
   Since her transfer, the patient's rhythm was 80% sinus bradicardia with episodes
   of atrial flutter and atrial fibrillation. The patient continued with a heparin drip.
   After midnight 23 May 04, patient was reported to have 15 beat run of
   asymptomatic ventricular tachycardia. Interventions included notifying physician,
   obtaining labs and getting a 12-lead EKD. After receiving results, magnesium and
   potassium were given.  Approximately two hours later, patient complaint of pain
   to sternal incisional site.  Following evaluation by physician, patient was
   medicated with Percocet.  At 0500, on 23 May 2004, patient's telemetry monitor
   showed normal sinus rhythm.

2. The following is a sequence of events, for this patient, during the next shift (0645-
   1915) for May 23, 2004. Note that there is no documentation to report that patient
   was symptomatic throughout any of the events, however, due to the nature of the
   disease process, the possibilities of adverse effects were high.  Evidence of events
   were obtained from telemetry monitor history and documentation by the nurse
   (Ms. Riggiladez) in the patient's chart (CIS):


   645    Change of shift report given.

   0800   Nurse (Ms. Riggiladez) documents patient's heart rate 89, blood
          pressure 120/79 in a sinus arrhythmia with rare unifocal premature ventricular
          contractions.

   925    Nurse (Ms. Riggiladez) documents in a progress note, "MD ordered
          EKG, was done at 0900 Sinus Tachycardia with 2nd degree AV Block,
          Mobitz 1. HR 68." This is the exact wording taken from the
          interpretation of the EKG machine.  It is very common for the
          interpretation of the machine to be incorrect.  The clue for error here is
          '…sinus tachycardia…HR (heart rate) 68."

   0940   Telemetry history reports yellow alarm due to the patient's rhythm,
          which shows trigeminy. The episode lasted for 16 minutes.

148

**1150**  Telemetry history reports yellow alarm due to the patient's rhythm, which shows trigeminy. The episode lasted for 7 minutes. Heart rate at the time was in the mid 70's.

**1200**  Nurse (Ms. Riggiladez) documents vital signs for patient. Heart rate is 85, blood pressure 112/70 and rhythm is documented as "sinus arrhythmia with rare unifocal premature ventricular contractions."

**1206**  Telemetry history reports several yellow alarms up to1218 for frequent PVC's, couplets and Trigeminy with a heart rate of 80.

**1226**  Telemetry history reports yellow alarms for the next 6 minutes due to the patient's rhythm showing premature atrial contractions approximately every other beat. Heart rate is 66.

**1259**  Telemetry history reports yellow alarm for run of Trigeminy with a heart rate of 74.

**1348**  Telemetry history reports yellow alarm for run of Trigeminy with a heart rate of 86.

**1443**  Telemetry history reports yellow alarm for run of Trigeminy with a heart rate of 88.

**1456**  Telemetry history reports yellow alarm for run of Trigeminy, which lasted 14 minutes.

**1554**  Telemetry history reports yellow alarm for run of Trigeminy, which lasted 11 minutes. Heart rate recorded as 91.

**1637**  Nurse (Ms. Riggiladez) documents shift nursing assessment stating, " patient has S1, S2, and rhythm is regular and no ectopy."

**1645**  Telemetry history reports yellow alarm for run of Trigeminy, which lasted 48 minutes. Heart rate recorded in the mid 80's.

**1738**  Telemetry history reports yellow alarm for run of Trigeminy, which lasted 35 minutes. Hear rate recorded in the mid 80's.

**1744**  Nurse (Ms. Riggiladez) documents vital signs. Heart rate of 92, blood pressure of 113/72, and documents, patient in sinus arrhythmia with rare unifocal premature ventricular contractions."

**1840**  Telemetry history reports yellow alarm for run of Trigeminy, which lasted approximately 20 minutes.

149

**1845**   Night shift nurse (2LT Beam) arrives on shift and notices patient having episode of trigeminy.  He also reviews patient's alarm history and finds patient has been in and out of trigeminy numerous times throughout the day. Night shift nurse (2LT Beam) informs ASOD of findings, Physician orders an EKG, vital and labs. Lab results are as follows: potassium 4.1, chloride 102, magnesium 2.6, phos 2.4 and calcium of 9.4.

**2108**   Night shift nurse (2LT Beam) documents in a progress note, "Patient displayed 2 episodes of bigeminy on the monitor. Although the patient has been in and out of trigeminy all day long, this was the first onset of bigeminy. The first episode was at 1954 and lasted approx. 7 seconds. The second episode was at 2008 and lasted approx 10 secs. The asod was called and Dr. Kreishman came and pushed lopressor 5mg IV. Vitals were HR 93, BP 115/73, RR 20 and 02 97%. Vitals after lopressor were HR 66, BP 110/67."

**2116**   No further ectopy was documented on telemetry history or by the nurse (2LT Beam) through 0700 24 May 04.

3.  Issues:

**Issue:** Telemetry history reports numerous yellow alarms on the patient throughout the day. Primary care nurse (Ms. Riggiladez) reports never hearing the alarm or silencing the alarms.

**Recommendation:** 1.  Assess equipment for proper functioning. 2. Interview all staff working on the day shift of 23 my 2004 to investigate if alarms were heard and if any staff member is silencing screen without reviewing alarm history.

**Action:** All staff interviewed, working that day, report that alarm was not heard nor did they see any rhythm changes on the screen. Further investigation reports that when MD came to see patient in the evening, at approximately 2100, he found that the telemetry monitor's volume had been adjusted to level 1.  The default setting is level 6.  Several nurses assessed the telemetry equipment. When a patient has a yellow alarm, the monitor beeps four times and the patient's screen will turn blue. The screen will remain blue for approximately 2-3 minutes and then go back to the normal black screen. The blue screen can be taken off by silencing alarm. The telemetry pagers do not go off for yellow alarms.
The agilent technician honored our request and came to the unit to discuss our issues. It was determined that the unit was properly functioning and they recommended software upgrades.

**Issue:** Ms. Riggiladez demonstrated negligence when she did not report the dysrhythmia changes to the physician.  The patient has recently received surgery that involved her cardiovascular system and that subsequently placed her at high risk for

3

*150*

development of a life-threatening rhythm. Ms. Riggiladez improperly reported the
patient's cardiac rhythm. Ms. Riggiladez failed to review the patient's alarm history,
which would have revealed the multiple changes that occurred during the day.

**Recommendation:** Ms. Riggiladez has attended the Basic Cardiac Dysrhythmia
Class and 12 Lead Interpretation for Nurses Class. I have loaned her my personal
nursing manuals in an attempt to assist her with expansion of her nursing knowledge
base. Ms. Riggiladez has not demonstrated the ability to grasp basic concepts
required to work on a telemetry unit. Recommend removal from critical care nursing
section.

LILLIAN M. PETERSON
MAJ, AN
HEAD NURSE, WARD 46

4

151

MCHL-CCNS-WARD 46                          2 June 2004

MEMORANDUM FOR RECORD

SUBJECT: SICK LEAVE REQUIREMENTS

1. On 28 May 2004, I telephoned Ms. Riggiladez RN regarding policy for sick leave. I telephoned Ms. Riggiladez to instruct her that because she called out sick with complaints of knee problems on 25, 27, and 28 May 2004, according to policy when you call out sick for three working days in a row you need to bring documentation from a Doctor to Occupation health for clearance prior to working. Ms. Riggiladez stated she understood and would bring documentation in on Monday.

2. During the telephone conversation, Ms. Riggiladez reported to me that on the weekend of 22 May 2004 she stated that while helping a patient she got a hernia. I asked Ms. Riggiladez if she filled out an 1811 about the incident, notified the charge nurse, supervisor and visited the ER. Ms. Riggiladez stated she did not fill out an 1811, did not notify the charge nurse or supervisor and did not go to the ER. I than asked Ms. Riggiladez if she knew the policy and she stated she did know she was suppose to fill out an 1811 for job related injury. Ms. Riggiladez stated she would come in on 1 June 2004 with documentation from an MD and was coming to fill out FECA claim.

3. On 1 June 2004, Ms. Riggiladez called ward approximately 0930 and told me she was going to the doctor this am and would try to make it in the afternoon. She called out sick for the night of 1 June 2004. Ms. Riggiladez did not come in the afternoon of 1 June 2004.

Danielle Rodondi RN GS-12

*No 1811 needed*
*No Witnesses needed*
*all tag as they feel within 45 days in which*

Feca Lead
JUN 0 3 2004
K.a.

175

 

MCHL-CCNS-WARD 46                                          2 June 2004

MEMORANDUM FOR RECORD

SUBJECT: TIMELINE

1. Per request of the FECA office, I am providing background timeline for events regarding a FECA Claim by Ms. Riggiladez RN. I am acting as Head Nurse from 22 May 2004- 5 June 2004. Maj. Peterson, the Head Nurse on Ward 46, is TDY.

2. 2 April 2004 to 17 May 2004 Ms. Riggiladez has been on a Performance Improvement Plan to assess Ms. Riggiladez ability to provide the level of care required by the patient population on Ward 46. Evaluation information can be obtained from Maj. Peterson upon return from TDY.

3. On 24 May 2004 I had a telephone conversation with Ms. Riggiladez about unnoticed rhythm changes on the patient she cared for on 23 May 2004. See attached Memorandum for Record for further information.

4. On 25 May 2004 Ms. Riggiladez directly spoke with me via phone and stated she was calling out sick for the night shift due to knee problems.

5. On 25 May 2004 Col. Edinger, Chief of CCNS, requested information regarding the days Ms. Riggiladez had called out sick or used leave. The information was obtained from old schedules. See attached Memorandum for Record regarding leave information.

6. On 27 May 2004 Ms. Riggiladez called out sick. I did not speak to her directly.

7. On 28 May 2004 I telephoned Ms. Riggiladez who informed me she would not be in that night. I informed her of the policy regarding sick leave and bringing documentation to occupation health. See attached Memorandum. During this conversation Ms. Riggiladez stated that while helping a patient she got a hernia on 23 May 2004. Although Ms. Riggiladez informed me she understood the measures of writing an 1811, notifying charge nurse, supervisor and going to the ER when hurt on the job she did not report incident. I instructed Ms. Riggiladez if she comes in 1 June 2004 that SSG Reece, the Wardmaster, and myself would direct her with filing FECA claim.

8. On 1 June 2004, Ms. Riggiladez called approximately 0930 to inform me she would not be working that night, she stated she had a doctor's appointment in the am and would try to come in the afternoon.

9. On 2 June 2004, Ms. Riggiladez and husband arrived for guidance with filing FECA claim. During conversation Ms. Riggiladez stated that she did tell Lt Pearson-Jackson that she hurt herself that day. Lt Pearson-Jackson was called into the office with SSG Reece, Ms. Riggiladez, her husband and myself. I asked Lt Pearson-Jackson if Ms. Riggiladez reported to you that she hurt herself at work on Sunday 23 May 2004. Lt Pearson-Jackson stated no, but at one point during the shift Ms. Riggiladez came out of the patient's room, sat down at the desk, was perspiring and stated that she was tired.

*179*

MCHL-CCNS-WARD 46                              4 June 2004

MEMORANDUM FOR RECORD

SUBJECT: WORK STATUS

1.  Ms. Riggiladez RN was to report to the FECA office on 4 June 2004 to
    discuss claim. I was not notified to come over to fill out the supervisory
    section.

2.  At 1330 I called Ms. Ribas in the FECA office to ask if I was needed. Ms.
    Ribas informed me that Ms. Riggiladez and husband did come to the office
    and will wait to file a claim with Maj. Peterson on 8 June 2004.

3.  Via e-mail and on during the telephone conversation, Ms. Ribas stated that at
    the meeting on 4 June 2004 Ms. Riggiladez "produced a note from her
    physician saying she will be unable to work until July 1, 2004."

4.  As of 1500 4 June 2004, Ms. Riggiladez has not informed management on
    Ward 46 about the doctor's note. As of 1500 4 June 2004 Ms. Riggiladez has
    not called in sick. Ms. Riggiladez is scheduled to work 4 June 2004 at 2300.

5.  Due to Ms. Riggiladez's statement to SSG Reece that she does not want me
    involved in the situation, I did not call her to inform her that Ms. Ebiringa
    from the Civilian Personal Advisory Center stated on 3 June 2004 that
    showing the employee their personal file is at the discretion of the supervisor.
    I will brief Maj. Peterson upon return from TDY 7 June 2004.

Danielle Rodondi RN GS-12

*188*

4 June 2004

MEMORANDUM FOR RECORD

      Today at approx 1515, Ms. Riggadez called Ward 46 to speak to the charge nurse for the day. I spoke with her concerning her shift for tonight from 11pm-7am. She stated that she would not "be in for a while", that "she was on FICA, and would not be working for a few weeks". I asked her how long should I take her off the schedule, she said that "she figured I knew what was going on", and that she "had been to EO, JAG, and FICA today and am getting this whole mess taken care of". I repeated and asked her should I take her off the schedule for a day, a week, a month and she stated to take her off until Monday, when "Maj Peterson would return and straighten this whole mess out"

Sarah Mooney 2LT, AN

*190*

**REQUEST FOR MER INTERVENTION**          Date: 6 JULY 2004_____

**I. Information about the Directorate and the managers involved in this intervention**

    a. Directorate and Division  WRAMC, DON, CCNS, Ward 46

    b. Employee's first-line supervisor/proposing official  ~~William~~ *Lillian* Peterson MAJ,AN

    c. His/**Her** SSN and race (for data reporting requirements          Black American

    d. His/**Her** exact title (title, series and grade) and name as it should appear in a signature block    MAJ, AN, Head Nurse, Ward 46

    e. His/**Her** telephone number, FAX number, and pager number  202-782-1446;  202- 782-8253; 877-394-0292
    f. Employee's second-line supervisor/deciding official   Rosemarie Edinger, COL,AN
    g. His/**Her** SSN and race (for data reporting requirements          Caucasian

    h. His/**Her** exact title (title, series and grade) and name as it should appear in a signature

block   COL, AN Chief, Critical Care Nursing Section

    i. His/**Her** telephone number, FAX number, and pager number 202-782-2828; 202-782-5386; 877-394-0307
**II. Information about the Employee**

    a. His/**Her** name Madeline L. Riggiladez

    b. His/**Her** SSN and race (for data reporting requirements Hispanic Origin
    c. His/**Her** title, series and grade  GS0610-11
    d. How long as **s/he** been in this organization?  1years, 7months

**MER ACTION COORDINATION LOG**


Proposal draft to SJA _____

SJA coordinated draft to CPAC _____

Coordinated draft to manager _____

Decision memo draft to SJA_____

SJA coordinated decision memo to CPAC_____

Coordinated decision memo to manager_____
**REQUEST FOR MER INTERVENTION**  cont.


*192*

e. Has this employee ever been disciplined? X Yes ____No If yes, list ALL prior disciplinary episodes, with dates, including official reprimands and suspensions:

| DATE | PENALTY IMPOSED | REASON FOR DISCIPLINARY ACTION |
|------|-----------------|-------------------------------|
| 26 Oct 03 | Written reprimand | Violation of professional standards of behavior + code |
| 2 April 04 | performance improvement plan | poor performance |

f. Is the employee currently working within the boundaries of a proper job description? X Yes ____No If no, explain_____

_____

g. Is the employee covered under a negotiated labor agreement (i.e., AFGE, IAM&AW)?_____ Yes _____ No

h. Is the employee in a probationary period? (_) Yes  ( X ) No

i. Does the employee have any active complaint(s) with: ____EEO ____IG

____Chief of Staff ____Commander ____ Administrative Grievance Procedures

____WRAMC Mediation Unit  x FECA Claim ____Other, Congressman, etc.

j. If yes, explain_____

_____

_____

**III. Information about the Intervention**

a. Check only one of the disciplinary/adverse actions listed below. (For written reprimand, indicate the period the reprimand is to remain in the employee's Official Personnel File. For suspensions, indicate number of days the employee is to be suspended.)

____Written Reprimand ( ) 1 Year ( ) 2 Years ( ) 3 Years
____Suspension (   )Days
____Demotion From Grade ____ to Grade ____
____Removal

**REQUEST FOR MER INTERVENTION** cont.

2

*193*

b.  Give details  <u>see attached memorandum</u>

_____
_____
_____
_____
_____

c.  The employee's misconduct adversely affected this organization by: _ <u>see attached</u>
<u>memorandum</u>
_____

d.  This incident of misconduct was witnessed by the following people (Attach a witness statement from each witness):  See attached memorandum

NAME       JOB TITLE          DUTY PHONE     ORGANIZATION

_____
_____
_____

(Use additional sheets if necessary)

e.  Other pertinent information_____
_____
_____

f.  The deciding of official is aware of my planned course of action, but has not directed me to take this action.   <u>x</u> Yes ( ) No


_Lilian M. Peterman Masson_                    _7 July 2004_
SIGNATURE                                      DATE

3

*194*

MCHL-CCNS-WD46                                              10 September 2004

MEMORANDUM FOR RECORD

SUBJECT:  Telephone Call  from Madeline Riggiladez.

1.  On 10 September, 2004 at approximately 1300 hours, I received a telephone call
    from Ms. Riggiladez  in regard to some official correspondence.

2.  A proposal to remove from employment was sent via certified return receipt.  Ms.
    Riggiladez informed me that her husband signed for the letter and that she was
    concerned about the contents.

3.  After informing Ms. Riggiladez that she should contact COL Edinger if she had
    any questions or responses, she began to speak in very loud and hostile tones.
    She accused me of "ruining" her and her "whole family".  She informed me that
    she was scheduled to have surgery and asked me if her insurance would cover it.
    After I told her I did not have any knowledge of her insurance coverage, she
    began to yell again and said she did not have money for an attorney and that
    myself and Ms. Rodondi (the assistant head nurse) were "trying to destroy" her.

4.  I instructed Ms. Riggiladez to contact the references listed and COL Edinger to
    discuss her concerns.  Ms. Riggiladez  sounded like she was crying and stated,
    "God is gonna get you for this".  She continued to sound tearful and her speech
    was unclear.  She then hung up.

5.  This is another episode when Ms. Riggiladez's behavior has been inappropriate.


LILLIAN PETERSON
MAJ,AN
HEAD NURSE, WARD 46.

*208*



**DEPARTMENT OF THE ARMY**
WALTER REED ARMY MEDICAL CENTER
WALTER REED HEALTH CARE SYSTEM
WASHINGTON, DC 20307-5001

MCHL-CCNS- WARD 46 (690-700a)

MEMORANDUM FOR Madeline L. Riggiladez, Critical Care Nursing Service, Ward 46,
Walter Reed Army Medical Center, Washington, DC 20307-5001

SUBJECT: Notice of Proposed Removal   (4134)

1. This memorandum provides you advance written notification that I am proposing to remove
you from your current position as Clinical Nurse, GS-0610-11, and from the Federal Service no
earlier than thirty (30) calendar days from the date you receive this memorandum.

2. The CHARGE AND SPECIFICATION FOR this action is:

    Negligence in Performance of Duties where safety to a patient is endangered.

SPECIFICATION: On 23 May 2004 at Ward 46, Walter Reed Army Medical Center, you were
negligent in the performance of your duties in a manner that endangered patient safety in that
you had a duty to closely monitor the electrocardiogram (EKG) of a 72 year old female patient
for episodes of cardiac dysrhythmia in order to call for appropriate intervention. You were
negligent in the performance of that duty in that you failed to take note of more than ten
incidents of cardiac dysrhythmia resulting in yellow alarms or to call for appropriate intervention
as a result of the same, thereby placing the patient in danger of cardiac arrest, stroke, heart attack
and brain damage.

3. Because of the privacy rules related to medical information, I cannot identify the patient
referred to in the above specification by name, but I am sure you are well aware of the patient I
am referring to. Because of the nature of care provided on Ward 46, close monitoring of patients
is a necessity. This is why we keep the nurse to patient ratio as low as possible. On the day in
question you had only two patients to monitor. You were certainly aware of your responsibility
to monitor this patient and you have assured others and myself on numerous occasions that you
possess the knowledge and skills to perform this task. Nevertheless, you failed to note over ten
instances of cardiac dysrhythmia that resulted in yellow alarms and, as a result, failed to call for
appropriate intervention. As you are well aware, cardiac dysrhythmia can result in cardiac arrest
and blood clotting that can lead to heart attack or stroke and brain damage due to oxygen
deprivation to the brain. Any of these occurrences could result in the severe injury or death of
the patient. I am aware of evidence that the audible alarm on the monitoring equipment was set
to the lowest volume level, however this is no excuse for your negligence. Dysrhythmias result
in both audible and visual alarms that must be turned off manually. Moreover, you are expected
to pull and review the paper tape recording the cardiac rhythm at some time during your shift and

*210*

 

MCHL-CCNS WARD 46 (690-700a)
SUBJECT: Notice of Proposed Removal  (4134)

place it in the chart.  There was no paper tape with the chart at change of shift on this occasion.
With these multiple means to detect dysrhythmias, I can only conclude that you simply were not
paying close enough attention to your duties on this occasion and that a patient's life and well-
being were placed in jeopardy as a result.

4. Although not a basis for this proposed action, in determining the appropriate penalty, I have
taken into consideration the following:

   a.  Your job description, as a clinical nurse, GS-11, states that you must possess, "knowledge
of a wide variety of medical disorders and surgical procedures, the normal course of treatment,
anticipated complications, and indicated therapeutic interventions."  You demonstrated
negligence when you failed to take the necessary interventions to prevent further deterioration of
the patient's cardiac condition.  You failed to recognize the cardiac rhythm changes and their
impact on the patient's condition.  You neglected to report the dysrhythmias (abnormalities in an
otherwise normal rhythmic pattern) to the physician or the nurse that assumed care of the patient
following your shift.

   b.  Prior experiences, listed in your resume, include 7 months on a Progressive Coronary
Care Unit, and 18 months on a telemetry Unit.  For both of these positions, you state that it was a
requirement to read and interpret cardiac rhythm strips.

5.  Your negligence and failure to correctly perform proper interventions, while this patient was
in your care, is unacceptable.  It has adversely affected this organization, and is believed that it is
a high probability that you will endanger the life of other patients.

6.  In view of the charges and specification, and in consideration of the penalty guidelines for
these offenses, I have concluded that this proposed action is the appropriate penalty necessary to
assure that patients receive quality and safe nursing care at all times.

7.  You have the right to reply to this memorandum personally and/or in writing and to submit
any and all reasons, including statements of witnesses and affidavits, why you believe this
proposed removal should not be effected.  You will have fifteen (15) calendar days from the date
of receipt of this memorandum for preparation and return of a written reply, and/or for requesting
and making a personal reply, to COL Rosemarie Edinger, Walter Reed Army Medical Center,
Critical Care Nursing Service, 6900 Georgia Avenue, NW, Bldg 2, Room 3L60, Washington,
DC 20307-5001. COL Edinger will issue a written decision whether or not you reply to this
notice.  In addition, consideration will be given to extending the reply period if your reasons for
requesting such an extension are valid.  However, you must make your request for an extension
in writing to COL Edinger before the expiration of the reply period and give reasons for desiring
more time. You have the right to select a representative of your choosing to assist you in your
appeal.  You may also contact a representative of the American Federation of Government
Employees (AFGE), Local 2 to assist you in preparing and presenting your reply.  You and your

2

MCHL-CCNS Ward 46 (690-700a)
SUBJECT: Proposed Removal (4134)

representative, if he/she is an Army employee, are entitled to reasonable amounts of official duty time in preparing and presenting your appeal if you are in an active duty status. Requests for this time will be made in advance to your respective supervisor(s). Please notify me in writing with the name of your representative, if any. You have a right to submit any and all evidence you feel is relevant to the case, including affidavits you feel should be considered prior to a final decision. You must present your response(s) to the Deciding Official, COL Rosemarie Edinger. She is located in Room 3L60, Building 2 and her telephone number is (202) 782-2828. If you wish to reply orally, you should contact COL Edinger's office to schedule an appointment. She will consider extending the time limit for submitting your response if you request the extension in writing and explain your reasons for needing more time.

8. You and/or your representative have the right to review the material used as a basis for this removal action at the U.S. Army Civilian Personnel Advisory Center, Building 11, Walter Reed Army Medical Center. Ms. Barbie Daughtry, Human Resources Specialist, will assist you by making available the pertinent regulations and material used as the basis for this action. Ms. Daughtry may be contacted at (202) 782-0967 for an appointment.

9. Counseling services are available through the Employee Assistance Program (EAP) if you wish to discuss with a trained counselor any personal problems that may be related to your actions. Your supervisor can provide you an opportunity to visit the EAP counselor on duty time or you may call the EAP Coordinator, telephone (202) 782-8013/15 to arrange an appointment for yourself.

10. You are requested to sign and date the acknowledgement copy of this letter, which will be forward to Management Employee Relations, Walter Reed Army Medical Center, for inclusion in your official records. Your signature on the acknowledgement copy of this letter in no way forfeits any of your rights as previously mentioned in this letter nor admits your agreement with its content. Your refusals to sign the acknowledgement copy in no way voids the contents of this letter.

MAJ Lillian M. Peterson
Head Nurse, Ward 46


RECEIPT ACKNOWLEDGED:


DATE:

3

212

 

MCHL-CCNS                                        21 October 2004

MEMORANDUM FOR Chief, Critical Care Nursing Section

SUBJECT: Ms. Riggiladez, telemetry case review

   1. On 23 May 2004 Ms. Riggiladez was assigned primary care of a 72
      year-old female patient s/p Bentall procedure. Patient had a
      history of medical complications and rhythm changes while in the
      SICU.  Ms. Riggiladez documented no significant rhythm
      abnormalities for this patient during the 12-hour shift. At shift
      change, the oncoming nurse noticed that the patient was in
      trigeminy and performed an alarm review. At that time it was
      noted that patient had multiple and prolonged episodes of
      Trigeminy throughout the day. Episodes ranged in duration from 6
      to 48 minutes. Upon discovery, the physician on call was notified
      and treatment was provided.

   2. When telephonically questioned by Ms. Rodandi the following day,
      Ms. Riggiladez stated that she did not see any dysrhythmia events
      on this patient and did not silence any alarms during the shift.
      She stated she was watching the monitor when she was not
      providing care to the patient. Other staff members working that
      day were also interviewed and denied seeing rhythm changes or
      hearing alarms.

   3. A subsequent review of the telemetry system revealed that the
      alarm volume had been turned down to a level of 1, which would
      have significantly affected the staff's ability to hear the
      alarms. However, when a yellow alarm (such as trigeminy) occurs
      the screen turns blue for 3 minutes initially, then for 10
      minutes with subsequent alarms. A telemetry trained nurse
      monitoring his/her patients at the central station should have
      been able to easily identify the change in patients rhythm and/or
      notice that an alarm had occurred with the color change on the
      monitoring screen and performed a review.

   4. Ms. Riggiladez's duty performance placed patient at risk and did
      not meet standard of care. Technology and unit
      processes/procedures were also a contributing factor.


                         Pamela F. Godinez
                         MAJ, AN
                         Critical Care Clinical Nurse Specialist

**BAILEY & EHRENBERG** PLLC
COUNSELORS AT LAW  WASHINGTON, D.C.  TELEPHONE  FACSIMILE

Jason H. Ehrenberg
(202) 466-4720
jhe@becounsel.com

October 22, 2004

Col. Rosemarie Edinger, Deciding Officer
Department of the Army
Walter Reed Army Medical Center
Walter Reed Health Care System
Washington, D.C.  20307-5001

Re:   Notice of Proposed Removal – Madeline L. Riggiladez

Dear Colonel Edinger:

I left you a voicemail earlier today, but did not hear back from you, so I am
following up with this letter.

Please be advised that Madeline L. Riggiladez has retained this firm to represent
her interests in the above-referenced matter. Ms. Riggiladez informs us that you were
kind enough to reschedule a previous hearing on her Notice of Proposed Removal from
early October until Monday, October 25, 2004. Unfortunately, despite our client's
attempts to contact you in the past few days, your office has neither (1) provided Ms.
Riggiladez with a designated time for the hearing on October 25, 2004, nor (2) otherwise
responded to her phone calls.

In light of the above, we ask that refrain from holding any hearing involving our
client until our firm has had an opportunity to speak with you or another representative
from your office. If you decide to proceed with the hearing on October 25, 2004, we
would expect that someone from your office will contact us by close of business today
with a specific time and location.

Please call me at your earliest convenience.

Sincerely,

*Jason H. Ehrenberg*

Jason H. Ehrenberg

222



**DEPARTMENT OF THE ARMY**
WALTER REED ARMY MEDICAL CENTER
WALTER REED HEALTH CARE SYSTEM
WASHINGTON, DC 20307-5001

REPLY TO
ATTENTION OF

22 October 2004

Madeline L. Riggiladez
5793 Burke Town Court
Burke, Virginia 22015

Dear Ms. Riggiladez

On 10 September 2004 you received a Notice of Proposed Removal. The notice contained a deadline of 15 Days within which to submit any documents you wished me to consider and to respond verbally and/or in writing to the Notice of Proposed Removal. You requested and were granted and extension of this deadline until Friday October 22, 2004. You have since requested an additional extension until after your 1 November 2004 surgery and recovery. This request is denied. You have already had 5 weeks to respond to the Notice of Propose Removal; this is ample time within which to respond. I do grant you an extension until 29 October 2004. If you wish to submit any documents or statements for my consideration, they must be delivered by that date. If you wish to make a verbal reply as well, you must do so on or before that date. I have set aside 45 minutes blocks on 26 October 2004 at 8:00 or 1000, 27 Oct 2004 0800, or 1000 at Critical Care Conference Room 3M01 (3rd floor-behind Cardiology Clinic) and to receive your verbal presentation should you wish to make one. If you wish to make a verbal presentation, please pick one of these times and call Dianne Long at (202) 782-6401 by 25th October 2004 before close of business to book the appointment. If you have conflict with all of these time please call Dianne Long and she will arrange another time prior to the deadline. Your verbal response need not be in person, but can be made over the telephone if you wish.

Rosemarie A. Edinger
COL, AN
Chief, CCNS

224

Feb-10-05   04:20pm   From-Office Center Judge Advocate            2027820977           T-754  P.084/006  F-660

*9 Feb 04*

MCHL-CCNS – WARD 46 (690-700a)

MEMORANDUM FOR Madeline Riggiladez, Critical Care Nursing Services, Ward 46, Walter Reed Army Medical Center, Washington, DC 20307-5001

SUBJECT: Notice of Decision on Proposed Removal - (4134)

1.  The Notice of Proposed Removal, forwarded to you on 10 September 2004, notified you of the proposal to remove you from your current position as a Clinical Nurse, GS-0610-11, and from Federal Service, for your Negligence in Performance of Duties where safety to a patient is endangered. In addition to the formal written replies dated 22 and 29 October 2004 from your legal representative to me, I have also considered the 29 December 2004, 4 and 5 January, and 1 February 2005 correspondence from your legal representative. Additionally, I have given consideration to the relevant Douglas Factors to include the nature and seriousness of the offense, your past work record, and the effect your Negligence in Performance of Duties where safety to a patient is endangered has on the organization. I find the charge of Negligence in Performance of Duties where safety to a patient is endangered to be warranted given the evidence, details of which were provided in the proposed removal.

2.  Accordingly, I have decided that removal from the Federal Service will serve the best interest of the Department of the Army (DA) by increasing the efficiency of the service. Your removal from Federal Service will become effective on Sunday, 20 February 2005. A copy of the Notification of Personnel Action effecting your removal will be sent to you separately. You will remain in a duty status up to the date of your removal, unless approved leave is granted at your request. You are also required to return any equipment belonging to the Federal government still in your possession immediately or face further action.

3.  You may appeal your removal directly to the Merit Systems Protection Board (MSPB) as explained in the enclosure, which includes a copy of the appeal form, and the MSPB appeal regulations. Your appeal must be filed no later than 30 days after the effective date of this action, or 30 days after the date of receipt of this decision, whichever is later. File your MSPB appeal by personal delivery during normal business hours, or by certified mail addressed to the following office: Regional Director, Merit Systems Protection Board, Washington Regional Office, 1800 Diagonal Road, Suite 205, Alexandria, Virginia 22314. Or, you may file electronically at the Board's website: www.mspb.gov/e-appeal.html. Where you and your employer mutually agree in writing to attempt to resolve this dispute through an alternative dispute resolution process prior to the timely filing of an appeal, the time limit for filing the appeal is extended by an additional 30 days—for a total of 60 days.

237

Feb-10-05   04:30pm   From-Office Center Judge Advocate      2027820077      T-754  P.005/006  F-560

MCHL-CCNS – WARD 46 (690-700a)
SUBJECT: Notice of Decision on Proposed Removal - (4134)

4. If you believe that this personnel action discriminated against you on the basis of your race, color, religion, sex, national origin, age, physical or mental handicap, and/or reprisal, you may file a complaint of discrimination with the Equal Employment Opportunity (EEO) Commission, 1400 L Street N.W., Suite 200, Washington DC, 20005, or you may file an appeal with the MSPB, as previously described. You may not, however, file both. Should you elect to file a complaint of discrimination, your complaint will be processed in accordance with EEO Commission regulations at Title 29, Code of Federal Regulations (CFR), Section 1614.

5. You have the right to select a representative of your choosing to assist you in your appeal. You and your representative, if he/she is an Army employee, are entitled to reasonable amounts of official duty time in preparing and presenting your appeal if you are in an active duty status. Requests for this time will be made in advance to your respective supervisor(s). Please notify me in writing with the name of your representative, if any.

6. Please acknowledge receipt of this memorandum by signing and dating the record copy provided.

Encl
as

ROSEMARIE EDINGER
COL, AN
Chief, Critical Care Nursing Section

RECEIPT ACKNOWLEDGED:

DATE:

2

*238*



Walter Reed Army Medical Center
6900 Georgia Avenue
Washington, DC 20307-5001

NURSING

234

U.S. Postal Service
CERTIFIED MAIL. RECEIPT

OFFICIAL USE

WALTER REED A

Postage    $    1.53

Certified Fee    2.30

WALTER REED AMC    NOV 8 2005

SEP 15 2005    POSTAL SECTIC

Total Postage & Fees

POSTAL SECTION Rigglades

5793 Burke Towne Ct

Burke, Virginia 22015-3140

Madeline Rigglades
5793 Burke Towne Ct
Burke, Virginia 22015-3140

CERTIFIED MAIL

F-10-05    04:28pm    From-Office Center Judge Advocate    2027828977    T-754   P.002/008   F-580



**DEPARTMENT OF THE ARMY**
Walter Reed Army Medical Center
6900 Georgia Ave, NW
Washington, DC 20307-4

10 February 2005

Jason H. Ehrenberg, esq.
Bailey & Ehrenberg PLLC
1155 Connecticut Avenue, NW, Suite 1100
Washington, D.C. 20036

FROM: Office of the Center Judge Advocate (Mr. Claypool)

Subject: Your Letter of Feb. 1, 2005, Re: Letter of Resignation – Madeline Riggiladez

Dear Mr. Ehrenberg

1. I am writing in response to your letter of February 1, 2005 in which you convey Ms Riggiladez's desire to resign her position with this Agency effective February 15, 2005. While the Agency certainly accepts your declaration that you represent Ms. Riggiladez, I'm sure you understand that we are not comfortable accepting a resignation from a third party but need to hear from Ms. Riggiladez herself regarding this topic.

2. Enclosed with this letter you will find a copy of a letter from COL Edinger notifying Ms. Riggiladez of COL Edinger's decision to remove Ms. Riggiladez from her position effective at the end of the current pay period. This letter has been mailed to Ms. Riggiladez by certified mail. Of course a federal employee is free to resign at any time. If Ms. Riggiladez wishes to resign her position effective February 15, 2005, she need only communicate that desire to her immediate supervisor, MAJ Lillian Peterson, at (202) 782-9347, or to the Civilian Personnel Advisory Center (CPAC) by contacting Mr. Charles Henderson at 202-782-7724. She may communicate her resignation verbally or in writing, but it should come directly from her and, if in writing, must be signed by her. If she resigns, Ms. Riggiladez's stated reason for resigning will be documented. You should be advised, however, that if Ms. Riggiladez resigns the Standard Form 50 documenting her resignation will also contain a remark to the effect that she resigned in lieu of removal. You should also be advised that, if Ms. Riggiladez resigns and subsequently appeals her termination to the Merit Systems Protection Board, the Agency will take the position that her voluntary resignation divests the Board of jurisdiction over her appeal.

3. As I stated to you earlier, Ms. Riggiladez will be carried in an administrative leave status, which is a paid status, from January 5, 2005 until the effective date of her termination, whether that is the effective date of her removal or earlier resignation. January 5 has been picked as the beginning date for this status because it is the date on which the Agency believes Ms. Riggiladez first indicated her intention to return to work after deciding not to pursue her FECA claim. I realize that Ms. Riggiladez takes the position that she indicated a desire to return to work much earlier. I've addressed this with the CPAC and Ms Riggiladez's supervisory chain. I've been unable to verify any contact other than one or two phone calls to the FECA office, in which the

FECA office says Ms. Riggiladez sought to further pursue her FECA claim rather than communicating a desire to return to work. If Ms. Riggiladez can provide further information, for instance who she spoke with when she expressed a desire to return to work, we will investigate further and, if warranted, reconsider the beginning date of her administrative leave status.

4. Your letters indicate that Ms. Riggiladez has made claims regarding alleged discrimination, a hostile work environment and constructive discharge. In fact, COL Edinger has looked into the claims made in your letter of October 29, 2004 and found them to be unsubstantiated. Although the Agency denies these allegations, your client is free to pursue them in the EEO process or MSPB process, should the MSPB have jurisdiction, even after the effective date of her termination.

5. I appreciate your attention; if you have any questions or wish to discuss this matter further, please call me at the number below.

Sincerely,

DAVID W. CLAYPOOL
Lead Attorney Advisor
WRAMC, Office of the Center Judge Advocate
6900 Georgia Avenue
Washington DC 20307
(202) 782-5811 DSN 662
FAX (202) 782-0977

Encl. Notice of Decision to Remove

7-28-05:10:03   :wramc                                         :2027824920          # 20/ 31

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| IGGILADEZ, MADELINE L. | | | 02-20-2005 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code 330 | 5-B. Nature of Action Removal | 6-A. Code | 6-B. Nature of Action |
| 5-C. Code V6J | 5-D. Legal Authority 5 U.S.C. 75 Postappt | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| CLINICAL NURSE 0050 - 364396 | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 0610 | 11 | 05 | $59,464.00 | PA | | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $58,811.00 | $653.00 | $59,464.00 | | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| WALTER REED ARMY MEDICAL CENTER<br>DEPARTMENT OF NURSING<br>CRITICAL CARE NURSING SERVICE<br>STEP DOWN - WARD 46   XYQF<br>WASHINGTON, DC 20307 | |

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 - None  3 - 10-Point/Disability  5 - 10-Point/Other<br>2 - 5-Point  4 - 10-Point/Compensable  6 - 10-Point/Compensable/30%<br>**1** | 0 - None  2 - Conditional<br>1 - Permanent  3 - Indefinite<br>**2** | | YES  **X**  NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| F5  Basic + Option A + Option C (5x) | 9  Not Applicable | 6 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K  FERS and FICA | 12-16-2002 | F  Full-Time | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 - Competitive Service  3 - SES General<br>2 - Excepted Service  4 - SES Career Reserved<br>**1** | E - Exempt<br>N - Nonexempt<br>**E** | 84770012HBB | 7777 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 0010001 | WASHINGTON / DISTRICT OF COLUMBIA / DISTRICT OF COLUMBIA |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | PON# OA | | | TDA DATA MC/W2DHAA/463N/51 |

45. Remarks

Forwarding address: 5793 Burke Towne Ct, Burke, VA 22015-3140.

Special rate under 5 U.S.C. 5305.

Lump-sum payment to be made for any unused annual leave.

SF 2819 was provided. Life insurance coverage is extended for 31 days during which you are eligible to convert to an individual policy (nongroup contract).

Health benefits coverage is extended for 31 days during which you are eligible to convert to an individual policy (nongroup contract).You are also eligible for temporary continuation of your FEHB coverage for up to 18 months.

Reason(s) for removal: Negligence in performance of duties where safety to a patient is endangered..

Not entitled to severance pay.

| 46. Employing Department or Agency Army Medical Command (ARMC) | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| 47. Agency Code RMC | 48. Personnel Office ID 2241 | 49. Approval Date 03-18-2005 | Harry E. Spaulding II<br>AUTHORIZING OFFICIAL |

5-Part 50-316                    TURN OVER FOR IMPORTANT INFORMATION

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6238

*Enclosure 4*

249

  *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*

# MADELINE MARSHALL RIGGILADEZ, RN
*5793 Burke Towne Court, Burke • Virginia 22015 • 703-250-1677*

## OBJECTIVE
Highlights of Qualifications
•Consciously deals with a sensitive population in a professional and concerned manner.
•Able to work independently  and as cooperative team member.
•Experienced and competent RN in managing long term, assisted living, and short-term sub-acute unit
•Practice included acute care with pre and post surgical patient and intravenous therapy management.
•More than ten years of Nursing experience in both Geriatric and Hospital  environment
•Former American Red Cross Nurse CPR instructor.

## EDUCATION
Associates Degree in Applied Science, Northampton College, Bethlehem Pennsylvania
May , 1992

## NURSING EXPERIENCE
FAIRFAX HOSPITAL, *Falls Church, VA  22042*                    April 1, 2001- November 1, 2001    *1 yr*

*Progressive Coronary Care Unit*
•Assessing patients for acute on set of illness
•Monitoring telemetry strips and assessing for complications
•Pre and Post Op of CABG, angioplasty, pacemaker, care of Heart Transplants patient's
•Offered position of evening Charge Nurse 30 bed unit.

ARLINGTON HOSPITAL, *Arlington, Virginia 22205*                    October, 1999-  April,  2001  *1 1/2 yr*

*Telemetry Unit*
•Monitor cardiac patients, assessing telemetry stripe and IV therapy
•Pre and Post Op patients, Open Heart Surgery

ST. LUKES HOSPITAL, *Allentown, Pennsylvania 18104*                    September 1998- March 1999  *7 yr*

*Med Surge Unit*
•Primary Nursing Care
•Acute-Care
•Orthopedic and Intravenous therapy Management

CARE CENTER OF BRAKELEY PARK, *Phillipsburg, New Jersey*                    August, 1993- December, 1997  *4 yrs*

*Assisted Living, Long term, and Sub Acute Unit*
•Nursing Supervisor  (promoted to Supervisor after six months)
•Responsible for 125 residents and 17 Bed Residential Community, including Sub-Acute Unit, 30 beds.
•In charge of staffing and management of LPNs and CNAs
•Implemented Educational In-Services, I.e. CNAs programs, hire programs, OSHA programs, HIV programs.
•Communicated with Physicians and Hospital in emergency situations
•Charge Nurse; administered meds to 65 residents. Executed and implemented Physician orders.
Supervised and worked with Alzheimer's Residents, Treatments of De cub and Wound Therapy, G-Tubes, Foley, Supra-Pubic, Catheterizations, Insertion and care. Oxygen and Orthopedic Therapies .
•Supervised Nurses Aides. Assessment of Patient/Care Plans/MDS
•Acting ADON for a time frame of six months

## NURSING SEMINARS
Certification for Gerontology, Skills with difficult employees.
In-service Seminars:
Pharmacology, when to use restraints and when not to.
IV certification, HIV Train the Trainer, Survey Certification for LTC, New enforcement ruling, How to handle People with Tact and Skill, Friendly Care Provider, 1998 Positive Outcomes in Dermal Wound Management.

## OTHER EXPERIENCE
AMERICAN EXPRESS PUBLISHING CO., TRAVEL AND LEISURE MAGAZINE, *New York, NY*        1978-1982
Assistant to the  Director of Sales in the placement of Print Media. Coordinated Business Placement Functions. Directed Employee Seminars.

*260*