Department of Defense
Civilian Personnel Management Service
Office of Complaint Investigations
National Capital Area

```
                                    :
In re:                              :
                                    :
MADELINE L. RIGGILADEZ,             :
                                    :
          Complainant,              :
                                    :          Activity Number:
     vs.                            :          ARWRAMC04NOV07148
                                    :
U.S. DEPARTMENT OF THE ARMY,        :
                                    :
          Respondent.               :
                                    :
```

Tuesday,
July 26, 2005

PURSUANT TO NOTICE, the above-entitled

matter convened at 9:05 a.m., in the EEO conference

room at Walter Reed Army Medical Center, 6900 Georgia

Avenue, N.W., Washington, D.C. 20307.


BEFORE:

　　　　BARBARA EVES
　　　　Complaint Investigator
　　　　OCI-Columbia
　　　　Columbia Corporate Park 1
　　　　8850 Stanford Boulevard, Suite 3200
　　　　Columbia, Maryland 21045-4753

APPEARANCES:

　　　　DARYL T. STOTTLEMYER, ESQUIRE
　　　　Labor Counselor
　　　　Center Judge Advocate General's Office
　　　　Walter Reed Army Medical Center
　　　　6900 Georgia Avenue, N.W.
　　　　Washington D.C. 20307
　　　　(Appearing on behalf of the Respondent)

2

APPEARANCES CONTINUED:

**MR. JASON EHRENBERG, ESQUIRE**
**Bailey and Ehrenberg PLLC**
**1155 Connecticut Avenue, N.W.**
**Suite 1100**
**Washington, D.C. 20036**
**(Appearing on behalf of the Complainant)**

3

## I N D E X

| WITNESSES | EXAMINATION | FURTHER EXAMINATION |
|---|---|---|
| **MS. MADELINE RIGGILADEZ** | | |
| By Ms. Eves | 9 | 148,160,195 |
| By Mr. Ehrenberg | 121 | 154,199 |
| By Mr. Stottlemyer | 155 | |
| **MAJOR LILLIAN PETERSON** | | |
| By Ms. Eves | 203 | |
| By Mr. Ehrenberg | 284 | |
| By Mr. Stottlemyer | 266 | |
| **MS BETTY CALVERT** | | |
| By Ms. Eves | 307 | |
| By Mr. Ehrenberg | 330 | |
| By Mr. Stottlemyer | 324 | |
| **MR. CHARLES HENDERSON** | | |
| By Ms. Eves | 332 | |
| By Mr. Ehrenberg | 346 | |
| By Mr. Stottlemyer | 344 | |
| **LT SARAH RINKER** | | |
| By Ms. Eves | 355 | |
| By Mr. Ehrenberg | 368 | |
| By Mr. Stottlemyer | 363 | |
| **COLONEL ROSEMARIE EDINGER** | | |
| By Ms. Eves | 375 | |
| By Mr. Ehrenberg | 406 | |
| By Mr. Stottlemyer | 401 | |

**PRETEXT STATEMENT** — PAGE
By Ms. Riggiladez — 424

**CLOSING STATEMENT**
By Mr. Ehrenberg — 425

ALPHA INTERNATIONAL REPORTING, INC.
(202) 488-8417

1                    P R O C E E D I N G S

2          MS. EVES:    Let's go on the record at 9:05 a.m.,

3    on Tuesday July 26, 2005, at the Walter Reed Army Medical

4    Center, Washington, D.C., in the investigation of the

5    Discrimination Complaint of Ms. Madeline Riggiladez,

6    Agency Docket Number ARWRAMC04NOV07148.

7          I am Barbara Eves, Investigator with the

8    Department of Defense, Civilian Personnel Management

9    Service, Office of Complaint Investigations, Columbia,

10    Maryland.

11          This proceeding is an administrative

12    investigation conducted in accordance with Section 1614 of

13    Title 29 of the Code of Federal Regulations.

14          Its purpose is to establish a record of evidence

15    relevant to the Claims accepted for investigations and to

16    do so in a manner that affords both parties a fair

17    opportunity to present the facts and their positions in

18    the record.

19          The following individuals are participants in the

20    process and are now present: the Complainant, Ms. Madeline

21    Riggiladez, the Complainant's representative, Mr. Jason

22    Ehrenberg, and the Agency representative, Mr. Todd

23    Stottlemyer.

1          Since the Complainant's allegation is made

2     against the Agency, Mr. Stottlemyer is here to represent

3     the Agency and not any specific Management official.

4          The Management officials who will respond to the

5     Complainant's allegations today are Major Lillian Peterson

6     and Colonel Rosemarie Edinger.

7          The Complainant, the Complainant's

8     representative, and the Agency representative will be

9     present for the testimony of the Management officials and

10    all other witnesses.

11         Our Court Reporter is Ms. Phyllis Edwards who

12    will record the verbatim testimony.

13         Witnesses to be called later are Lieutenant Sarah

14    Mooney, Ms. Betty Calvert, and Mr. Charles Henderson.

15         A brief preliminary meeting was held prior to the

16    conference to explain the procedural aspects and to

17    explore the possibility of a resolution, a settlement.

18    This attempt was not successful.  I want to encourage the

19    parties to resume settlement discussions at any point it

20    appears they would be meaningful.

21         I will now administer the oath.  Ms. Riggiladez,

22    Colonel Edinger, and Major Peterson, do any of you object

23    to swearing to the truth of your testimony based on your

1  belief in God?

2          MS. RIGGILADEZ:    No.

3          COLONEL EDIGNER:    No.

4          MAJOR PETERSON:    No.

5              (Witnesses were sworn en masse)

6      MS. EVES:    Have you each read or had read to

7  you the Privacy Act Statement?

8          MS. RIGGILADEZ:    Yes.

9          COLONEL EDIGNER:    Yes.

10         MAJOR PETERSON:    Yes.

11     MS. EVES:    Thank you.  I'm now going to read

12  the Complaint into the record.

13         By letter dated June 29, 2005, the Agency

14  accepted for investigation the Complainant's allegation

15  that based on her race, African American, disability, and

16  what she's explained was perceived disability by the

17  Agency when she returned from her injury in February of

18  2004, age, 56 years old, and/or reprisal when returning to

19  duty in February of 2004 after the on-the-job injury, she

20  was subjected to ongoing harassment and discriminatory

21  treatment as follows:

22         1.  Random and unnecessary changes in her shifts

23             by the Department of Nursing supervisor,

1          nights to days and days to nights at two-week

2          intervals.

3      2.  Derogatory statements from coworkers with

4          regard to the Complainant's age.

5      3.  Unfounded accusations of wrongdoing and poor

6          performance, including accusations of

7          improperly handling her duties when the

8          Complainant was not even present for work.

9      4.  When the Complainant received a letter from

10         the Agency dated 10 February 2005, the letter

11         stated that the Agency would not accept the

12         Complainant's letter of resignation submitted

13         by her attorney on her behalf.

14      5.  On February 8, 2005, the Complainant was

15         terminated from the Agency.

16      6.  The Complainant received no salary from

17         October 2004 through February 2005.

18     MS. EVES:    Complainant, is that accurate?

19     MS. RIGGILADEZ:    Yes.

20     MS. EVES:    Thank you.  Relief sought: we

21  reviewed prior to going on the record, the Complainant's

22  articulated request in the record, and she is now saying

23  that she does not want to be returned to her former

1  position.  She wants to be compensated for the period of

2  time when she did not receive any salary before being

3  removed, and she wants some amount of comp damages.

4  Complainant, is that accurate.

5      MS. RIGGILADEZ:    Yes, ma'am.

6      MS. EVES:    Thank you.  The ultimate burden of

7  proving discrimination occurred rests with the

8  Complainant.  I'll be asking you to prove your

9  allegations.

10      After the Complainant testifies the Management

11  officials will then have the opportunity to present

12  legitimate non-discriminatory reasons for the actions at

13  issue.

14      Testimony will be taken from witnesses as their

15  testimony is considered relevant to the Claim, after which

16  the Complainant will be asked to demonstrate why the

17  reasons given by Management are not the real reasons but a

18  pretext or a cover up for discrimination.

19      Mr. Ehrenberg, do you wish to make an Opening

20  Statement?

21      MR. EHRENBERG:    No.

22      MS. EVES:    Mr. Stottlemyer, do you wish to make

23  an Opening Statement?

1       A       I was a GS-11.

2       Q       Clinical nurse?

3       A       Yes.

4       Q       And did you hold that same position the whole

5       time you worked here?

6       A       Yes, ma'am.

7       Q       Which shift did you work when you were first

8       hired?

9       A       Night shift.

10      Q       Did you work that same shift until you were

11      removed?

12      A       I worked that same shift -- no, I worked that

13      same shift for a while and then they brought me down to

14      day shift, even though after a meeting -- can I explain?

15      Q       No, I'm just looking for time periods.

16      A       Okay.

17      Q       Did you work night shift until you were injured

18      in January?

19      A       Yes.

20      Q       And when you came back from that, was your shift

21      changed then?

22      A       A month or two later I think.

23      Q       Okay.  We'll go into that when we get to that.

1    And I went into her room and I said what's the

2    problem?  She says well I'm having a little hard time

3    breathing because of -- I need to be pulled up.

4    I came out of the room looking for help and I

5    asked the secretary, I said do you know where the nurses

6    are?  I didn't shout down the hallway, I called down, you

7    know, whoever was working with me that night and no one

8    answered.

9    I even asked the secretary, do you think you

10   could help me and she says my shoulder's killing me, I

11   can't do that, Madeline.  I said, you know, that's -- I

12   shouldn't have asked you, that's right.

13   I went back into the room.  The lady looked like

14   I could manage her by lifting her up.  I climbed my -- I

15   put my knee on the bed, on the metal part of the bed, all

16   right?  I found a space and I tried to lift her up into

17   the bed because I was extremely worried about her

18   breathing.

19   I did try to get someone to help me but I was

20   very concerned about her breathing.  She did have I guess

21   respiratory problems and I didn't want her being

22   uncomfortable.  She needed to be lifted so she could

23   breathe better.

1          I did roll the bed down, you know, to help me

2     lift her up but I couldn't keep her down there that long

3     because we like to keep them at a 35 degree, 40 degree

4     angle and (inaudible).

5          THE REPORTER:  Excuse me, keep your voice up.

6          MS. EVES:    Repeat that, please.

7          THE WITNESS:   I'm sorry.  We like to keep them

8     at a 35 or 40 degree angle because of the -- you know, the

9     lungs are open and it helps them breathe.  I think this

10    was the patient that I had the problem with.

11         BY MS. EVES:

12    Q    So you're saying that you pulled yourself up

13    on --

14    A    On the bed itself and lifted, and as I turned I

15    hurt my lower part of my back.  My groin area was

16    bothering me.

17         And that was another thing.  On the first

18    accident I had hurt my groin area also.

19    Q    So you had a patient who had said to you that she

20    had difficulty breathing.  You moved the bed down so you

21    could put your knee on it, hiked yourself up and then

22    pulled her up --

23    A    Pulled her up like that by turning, but using my

1    knee as a balancing point, as a point where I could get

2    her --

3        Q    Okay.  So I understand you said that you also

4    then hurt your back and pulled your groin area doing that.

5    You said something about moving the bed down but you had

6    to move it back up.  I didn't understand that.

7        A    The head of the bed.

8        Q    Oh, you moved the head of the bed down?

9        A    The head of the bed down because sometimes when

10   you move the head of the bed down it's easier to move the

11   patient up into the bed.

12       Q    So you moved it down so you could get to her?

13       A    Yes.

14       Q    And then you moved it back up once you got her in

15   position.

16       A    Right, but I didn't move it all the way down.  I

17   just moved it down enough to make her comfortable.

18       Q    And then you moved her, and moved the bed back up

19   into the position it was in before.

20       A    Yes.  And when I came out I sat on the chair and

21   I don't remember her name, it was a Lieutenant there, and

22   I turned around and I said -- the sweat was pouring off me

23   and she looked at me and she said, Madeline, what's wrong

1    Q    Okay, we'll go into that but let's get back on

2    the medical track.

3         You say in September of 2004 your physician said

4    you were able to go back to work.

5    A    Yes.

6    Q    Did you convey that information to your Activity,

7    to the hospital?

8    A    I don't remember.  I had talked to so many --

9    FECA.

10   Q    You told FECA that you could go back to work.

11   A    Yes, yes, verbally over the phone.

12   Q    Did you ever tell your supervisors, Major

13   Peterson or Colonel Edinger?

14   A    They had told me that I had to speak to them, and

15   that they would speak to my supervisors.

16   Q    The representative of FECA said you had to tell

17   them and they would tell --

18   A    Yes.

19   Q    And who was that?

20   A    I don't have the names.

21   Q    Do you know if they did tell Major Peterson and

22   Colonel Edinger that you were ready to return?

23   A    No.  I had spoken to a friend, well not a friend

1    and because of that, something else happened.  What was

2    that initial act?

3        A    Talking about my age.

4        Q    Did you go to EO and talk about your age?

5        A    Yeah, I did come to EEO -- that people had

6    complained that -- well the second day I was hired, Major

7    Walker had to speak to one of her Lieutenants because she

8    had said -- she was on the phone and she said, the new

9    lady, you know, the old one is here.  The old lady is

10   here.

11       Q    And that was way back when you were first hired?

12       A    When I was first hired.  And Major Walker called

13   this Lieutenant in and she had to apologize to me.  And

14   the reason why this lady said that is because I asked her

15   to help me move a patient on a gurney around the corner

16   and she was on the phone.  This was the second day I was

17   hired.  I ignored that because I said, you know, this is

18   her age, but I did report that to my boss at that time,

19   who was Major Walker.

20       Q    Who took care of it.

21       A    Who took care of it immediately.

22       Q    Concerning this Complaint, when did you first

23   object to discrimination?

1    Q    During that month --

2    A    Month, yeah.

3    Q    There were a couple of times when you actually

4    had to work nights.

5    A    Work nights, yeah.

6    Q    Do you remember how many times and what happened

7    to cause that?

8    A    No, there was never an explanation.  And then at

9    the end I had saw that for two weeks I was going to work

10   nights and -- before my accident, but I had worked days

11   all the way up to May.

12        MR. STOTTLEMYER:    Ma'am, I didn't follow what

13   she said.

14        MS. EVES:    I didn't either so I'm going to try

15   to clarify it.

16        BY MS. EVES:

17   Q    So you came back to work in January, and probably

18   around April sometime, Major Peterson told you, you're

19   going to be working days for a period of time so she could

20   evaluate you.

21   A    Right.

22   Q    While you were working days there were a couple

23   of times when she actually moved you to nights for --

1      A      No.

2      Q      Are you saying she made the decision because of

3      your medical condition that she might have perceived to be

4      a disability?

5      A      No.

6      Q      Are you saying that she did that because of your

7      age, that she put you on days?

8      A      I think she was evaluating my -- how I worked and

9      how -- if my -- she never said that to me, but I feel that

10     way, if I could keep up, because she did use words, keep

11     up with the -- you couldn't even keep up with answering

12     the phone.  If I wasn't there to answer the phone, you

13     wouldn't have gotten that information for that patient,

14     when at any other time she'd answer the phone for other

15     people and that was never said.

16     Q      Am I correct that you're saying that you believe

17     she was motivated by your age because of your work

18     performance, in order to evaluate you?

19     A      Right, uh-huh.

20     Q      And is that the reason she put you back on nights

21     occasionally to cover for some people who were not there?

22     A      Yes.

23     Q      Because of your age?

1    A    No, I think she just needed somebody and I was

2    there and let's put her up there.

3    Q    Do you think that she was motivated by the fact

4    that you had complained to her about people complaining

5    about your age when she scheduled you?

6    A    I don't know about that.

7    Q    Do you have anything to add about that specific

8    allegation?

9    A    Age?

10    Q    No, about the allegation of changing your

11    schedule.

12    A    Like I said, I was told -- once I was told

13    permanently in front of 15 people that I was -- it was an

14    employee meeting and the second -- and when I came back

15    from the accident, that's when things seemed to be

16    changing for me with that same group of people.

17    I think -- I don't know why they would be angry

18    but I think they were, that I wasn't being flipped back

19    and forth, you know, like some of the other people were

20    being -- the Army, the Lieutenants.

21    Q    The military nurses?

22    A    Nurses, right.

23    Q    What about the civilian nurses?  Were they

1    back outside and they said my God -- the head nurse -- not

2    the head nurse, the charge nurse said, Madeline, the

3    monitor is off.  I said what do you mean the monitor is

4    off?  There's usually ringings, okay, to let you know if

5    there's a problem with the patient and those bells never

6    went off, all right.

7         Then I was told that there was something wrong

8    with the machine itself.  Ms. Rodondi reported to me that

9    Colonel Edinger said that a bad thing -- the patient --

10   nothing happened to the patient, all right?  She wasn't

11   sent back to ICU, nothing happened to the patient.

12        But something good happened, that they were

13   thinking of getting EKG techs to monitor the monitor after

14   this incident because we were having problems with

15   monitors, people turning the monitor off, ringings, and

16   everything going on.

17   Q    Okay.  The day that this occurred was also the

18   day that you were injured, correct?

19   A    Yes.

20   Q    And you said you were not injured at the end of

21   day.  You had said earlier you were injured during the

22   shift.

23   A    During the shift.

103

1    Q    And that was the day shift?

2    A    Yes.

3    Q    You're now telling me that the monitor for this

4    particular patient also monitored other patients.

5    A    Yes.

6    Q    Okay.  So am I to understand it wasn't right by

7    the patient?

8    A    No.

9    Q    It was in some kind of nurses station?

10   A    Yes.

11   Q    How many patients were hooked up to this system?

12   A    Anybody who had a heart problem.

13   Q    Approximately, two, five?

14   A    Five -- as many --

15   Q    Five or more?

16   A    Yeah.

17   Q    So each of those patients had their own nurse?

18   A    Yes.

19   Q    And you were responsible for only your own

20   patient?

21   A    I was responsible for -- you're responsible for

22   your patient but if you see some other patient -- if you

23   have like a code, everybody runs in for a code, even

1    currently assigned to Walter Reed, is that correct?

2        A    That's correct.

3        Q    What are you now assigned?

4        A    I'm currently assigned to Fort Lenerwood Army

5    Medical Center in Fort Lenerwood, Missouri.

6        Q    How long have you been assigned there?

7        A    I signed in here on the 1st of June 2005.

8        Q    And before that where were you assigned?

9        A    I was at Walter Reed on Ward 46.

10       Q    When were you first assigned here to Walter Reed?

11       A    I was first assigned to Walter Reed in February

12   of -- in January of 2003.  I had been at Walter Reed

13   approximately a week and a half, almost two weeks when I

14   was deployed with the 86th CASH to Iraq.  When I came back

15   in June of 2003 I took leave.  I took two weeks leave --

16   or three weeks leave, excuse me, and then I reported as

17   the head nurse of Ward 46 in July of 2003.

18       Q    Were you assigned to that position before you

19   left?

20       A    No, before I left for Iraq I had been assigned as

21   an ICU nurse in the MICU, in the Medical Intensive Care

22   Unit.

23       Q    Thank you.  Are you currently a Major?

1  acclimate and attend the class and then go back to

2  whatever shift --

3    A    Yes, unless they requested that they not do that

4  time.  Many of them said to me that they could do -- as

5  long as they had a day off before that time -- if they

6  could have the day off, then they could come in for the

7  class for that time and then have the next day off, then

8  they would be all right for staying on night shift.  So

9  for those who had requested that, I did that.

10    Q    And that was for training.  If they had a day off

11  before the training they could do the training and then --

12    A    Right, and then have the day off after the

13  training.  So they would be off a day, they might work

14  night shift, then have a day off, then come on day shift

15  for training, then have a day off and then go back on

16  their night shift.

17    Q    Okay.  What was your organizational relationship

18  to Ms. Rodondi?  What was your organizational to her?

19    A    I was her boss.  She was the interim head nurse

20  when I was first came to Walter Reed in July.  When I came

21  to that position in July, Major Walker had been the head

22  nurse at that time and she deployed to Iraq in February of

23  2003.  So from February to July, Ms. Rodondi was the

1    I was evaluating her on days, and since she had stated

2    that she wanted to go back on nights, I had made

3    arrangements to go back and work on nights also so that I

4    could evaluate her in that environment.

5        So if my plan was to eventually have her be able

6    to work night shift, then I needed to be able to evaluate

7    her in that environment.

8    Q    Was your plan to have her work night shift if

9    possible?

10   A    If she was able to successfully complete her plan

11   I felt that she would have been able to go back and work

12   night shift.

13   Q    So are you saying there would have been no

14   difficulty as long as she completed her plan, to allow her

15   to work nights?

16   A    If she had successfully completed her plan we

17   would have been able to put her back on nights.

18   Q    So did you do an evaluation for that period of

19   time then?

20   A    On the night shift?

21   Q    No, from the whole period, October --

22   A    No, she did not complete her Performance

23   Improvement Plan.

1  Q   So you didn't do an evaluation, total evaluation?

2  A   Right.

3  Q   Okay.  When you were working there you said Ms.

4  Rodondi had been the interim chief until you arrived.

5  A   Correct.

6  Q   When you arrived, what shift did she work on

7  then?

8  A   She worked on day shift until I got through my

9  orientation and then she rotated as needed like everyone

10  else.

11  Q   Was she a civilian or military?

12  A   Civilian.

13  Q   You said she rotated like everybody else, but the

14  Complainant wasn't rotating.

15  A   Right.  There were those who if they preferred --

16  night shift was a harder shift for me to fill because I

17  had more military nurses who had to be away for various

18  trainings.  And night shift was a harder shift for me to

19  fill.

20      She wanted to work the night shift so that made

21  it easier for everybody.  She was working the shift that

22  she wanted to work and -- so that was one less fill that I

23  had to put a nurse back on night shift.

1  her where she was born, and how old she was, I believe,

2  but specifically what her race was.  Do you know why he

3  would have done that?

4      A    No, ma'am.  I'm not aware of that conversation.

5      Q    Do you consider yourself disabled?

6      A    No, ma'am.

7      Q    You heard the Complainant testify about her

8  injuries.  Were you there when she fell in December of

9  2003?

10     A    Yes, ma'am.

11     Q    Did she report it to you immediately?  Did you

12  see it?  What do you know about it?

13     A    No one saw it.  It was an un-witnessed accident.

14  We had her go down to the Emergency Room.  The policy is

15  if someone is injured on their job, they immediately go to

16  either Occupational Health or they go to the Emergency

17  Room, depending on if Occupational Health is open.

18     Q    Was it obvious that she had been injured?

19     A    No.

20     Q    It was not obvious?

21     A    No.

22     Q    Did she come to you first and tell you what

23  happened or what?

1    hamper into the room per -- that's the Infection Control
2    policy, that you don't carry dirty linen down the hallway.
3            So according to our Infection Control policy,
4    hampers are supposed to be outside the room so that dirty
5    linen can be placed into the hamper and then transported
6    into the back room.
7            At the time that this occurred I was doing some
8    counseling with Ms. Riggiladez concerning her performance
9    and she incurred that injury before we could follow
10   through on that counseling issue.
11       Q    What did you start the counseling about?
12       A    About her performance.  Her documentation was --
13   there was a part of the documentation that was not being
14   performed to standards and so I was counseling her about
15   her documentation.
16       Q    And was there supposed to be follow-up
17   counseling?
18       A    Yes.
19       Q    And so did that continue then after she came back
20   after the 14 days?
21       A    Right, after she came back to work I told her we
22   still needed to discuss some of those counseling issues.
23   She became very emotional, she felt like she was being

1    picked on so I thought it was best for me to just back

2    away and leave it alone at that time.

3        Q    The Complainant testified also to her second

4    injury on May 23rd. Were you there when that injury

5    occurred?

6        A    No.

7        Q    What do you know about it?

8        A    I had to go to Fort Dix for two weeks TDY for

9    military training. We were doing her Performance

10   Improvement Plan at that time. It was scheduled for us to

11   do it on the two weeks when I came back from Fort Dix.

12   That's when we were going to do the two weeks night shift.

13        However prior to that we had to stop the

14   Performance Improvement Plan, and when I came back there

15   was -- Ms. Rodondi was the interim head nurse. She told

16   me -- informed me that something had -- an occurrence had

17   -- something occurred and -- they gave me the information

18   what had happened.

19        I decided I needed -- you know, part of my job is

20   to investigate that stuff, not just take their word for

21   it, because of the severity of the complaint.

22        So at that time I began to investigate what was

23   going on by asking questions. I did call and ask Ms.

1    Riggiladez if she could explain to me what had occurred

2    during that period of time.

3         She became very emotional, complaining -- and

4    accusing people of being out to get her.  That none of

5    that was true, that she did everything she was supposed to

6    do.  That she was a good nurse, why didn't people like

7    her.

8         At that time the conversation wasn't going

9    forward.  I was not getting the information that I was

10   trying to gather so I got off -- I ended the conversation.

11        I took the information that I had after I

12   finished my investigation.  I wrote the memorandum of

13   record that you all have for the 25th of May.  I took that

14   and I submitted that to Colonel Edinger for review.

15        This was my reason -- this memorandum for record

16   was just a request to have Ms. Riggiladez transferred from

17   Ward 41 -- 46, excuse me.  Actually it was to have her

18   removed from the Critical Care Section.

19   Q    Okay, let's go back to that same day of the

20   medical incident.  The Complainant said that she was

21   injured that day.  What do you know about that?

22   A    When I came -- well they came back from -- the

23   FECA Claim -- and I asked Ms. Rodondi why had she not

1    Q    Now when the Complainant was injured the second

2    time you weren't there.  The Complainant didn't submit the

3    FECA Claim until you came back.  You forwarded it on, and

4    then what happened?  Did she have to have send in

5    information to you and/or to FECA on any regular basis?

6    A    In May?

7    Q    Yes.

8    A    Yes, she was supposed to submit her medical

9    documentation and also to request either her sick leave or

10   her annual leave.  If you don't submit sick leave -- you

11   have to request annual leave, sick leave, or leave without

12   pay.  If you don't request any of those then the procedure

13   is we mark you AWOL.

14         I had a medical documentation from her physician

15   saying that she needed to be off duty related to her

16   injuries for 14 days.  At that time I called her again and

17   asked her what did she request.  At that time she had very

18   little leave accumulated but we knew from -- our directive

19   from Personnel is while they're working, waiting on a FECA

20   Claim then for us to submit, there's a code that you put

21   into their timecards.  I don't know because I don't do the

22   timecards but when they're awaiting a FECA Claim they put

23   in a code into their pay records.

1    Q    And that insures that they get paid?  Do you

2    know?

3    A    They get some type of compensation.  I don't know

4    if it's full pay, or part time pay, or whatever but this

5    -- by them sending us the documentation and the directive

6    from FECA is they have a Claim pending, then the coding

7    that we put into the charting, alludes -- notifies Finance

8    that they're receiving -- they're waiting -- I don't know,

9    whatever kind of compensation they get, but it excuses

10    them from having to use their annual leave or their sick

11    leave.

12         Now when she filed the first time I called her

13    and I asked her because I had no directives from FECA as

14    to whether or not she had a case pending.  I knew we had

15    submitted the paperwork but Ms. Rebas instructed -- Ms.

16    Rebas was the person -- is the FECA Claims nurse and she

17    said that --

18    Q    Excuse me on second, there's someone at door.

19    I'm sorry, please proceed.

20    A    Ms. Rebas said at that time that she was still

21    awaiting documentation from Ms. Riggiladez and that Ms.

22    Riggiladez -- said she had not followed through with the

23    proper documentation and that we could not use that code.

1   So that's when I ask Ms. Riggiladez which type leave did

2   she want us to use so that she could get paid.

3       Q    And this was for the first one or the second?

4       A    This was for the first one.

5       Q    For the first one.

6       A    Right.  For the second one we received that

7   medical --

8       Q    Okay, one second.  So indeed she got sick leave

9   for the first one, is that correct?

10      A    Right, until we got notification from FECA that

11  they had the Claim and they had all the necessary

12  documentation.  And then at that time Sergeant Reece who

13  was the Ward Master went back and reentered the codes for

14  her filing a FECA Claim.

15      Q    And that adjusted her first period from sick

16  leave to the FECA Claim.

17      A    To the FECA Claim, correct.

18      Q    Now on to the second one.

19      A    To the second one, they gave us the code after

20  she followed -- all the medical documentation was in and

21  we had the same issue, and then they told us, okay, they

22  had got the documentation and then we put her in for that

23  code with FECA.

1    Q    And then did she have to come back and do follow-

2    up with medical to you and/or to FECA?

3    A    She was supposed to send me documentation each

4    time she -- her physician would say she's off duty from

5    period A to period B.  When the end of period B came, she

6    was to resubmit to me medical documentation excusing her

7    from duties for the next period of time, from period B to

8    period C.

9         I got two or three documentations that Ms.

10    Riggiladez faxed to me, and I made sure I was in there so

11    that nobody else saw them, her medical statements and the

12    doctor telling me she would -- you know, to excuse her

13    from work from one period of time to the next period of

14    time.

15         After that I got no medical documentation.  I

16    called Ms. Riggiladez.  I asked her to please submit her

17    information to me concerning her -- you know, her medical

18    time off.  She said that she was sending everything to the

19    FECA Office.

20         I tried to explain to her that the things that

21    she sent to the FECA Office were for her to get her

22    Workman's Compensation, but for me I needed to have that

23    information to put in justifying why she was not on duty

1    from one time period to another time period, that I don't

2    work with the FECA Office in that relationship.

3           She got emotional again and said that I wasn't

4    trying to understand her.  She started telling me that she

5    had all these -- you know, telling me all the other stuff

6    that was going on.

7           I tried to explain to her that I just needed to

8    have the medical documentation in my records the way the

9    policy says so that I could justify keeping her on my

10   books and showing why she was not AWOL, that she was

11   indeed out on a medical reason.  And she never sent me the

12   information.

13   Q    When she gave you the first two or three faxed

14   forms, did you then send them on to FECA?

15   A    No, because I don't send my forms to FECA.  She's

16   supposed -- the way the policy is, she's supposed to send

17   a medical documentation to FECA, which is for her

18   Workman's Claim, and then she's supposed to also send me

19   medical documentation saying that she will be off work

20   from period A to period B.

21   Q    Did she ever then follow-up with information so

22   that she could be paid?

23   A    No.  She never sent me any more information after

1    that.  Sergeant -- the only way we could do it was to call

2    FECA.  Now our responsibility is to put her on that time

3    that she has medical documentation through a code that we

4    get from FECA.

5         If I don't receive that medical documentation

6    then I have no way of documenting that.  We don't work

7    with the Department of Labor or with FECA to get people

8    paid.  We just follow their directives and the code to use

9    for them to get paid.

10        Q    So you're saying you called FECA when she wasn't

11   submitting the documentation?

12        A    Well I called them and I said can you give me the

13   information because she's not sending me the information,

14   and Ms. Rebas' instructions were she's supposed to send

15   that information to you.  What she sends to this office is

16   for this office.  The two offices -- you know, her office

17   and my office don't work together.  That would look like

18   we were collaborating on something.

19        Q    Okay.  Would you say that person's name again?

20   Is it Reevis?

21        A    Rebas, R-E-B-A-S.

22        Q    R-E-B-A-S.

23        A    Yes, ma'am.

1   about filing a Discrimination Complaint anytime before

2   that?

3       A    She had mentioned to me that some comments were

4   being made about her age or her race.  Part of our

5   training is we go to EEO quarterly training and we also

6   have them as we need -- if we feel like there's a need to

7   have an additional training on our unit, then we have

8   that.

9            I stated to everyone at that time that if they

10  really felt like they needed to file -- and this was

11  during a staff meeting, if they needed -- an EO Complaint,

12  that was their right to file an EO Complaint.  They did

13  not have to worry about me doing anything because I was

14  not afraid of an EO Complaint.  If that's what they felt

15  like they needed to do, then that was their right to do

16  that.

17      Q    While you were there was there any group EEO

18  training conducted?

19      A    Yes.

20      Q    When?

21      A    I don't recall the exact month but shortly after

22  I got there Ms. Riggiladez had some issues.  She felt like

23  they were having some issues about her age and her race.

1          I had a Sergeant Hayes come in to do an

2     additional training about discrimination for -- about any

3     thing -- and those things that can be considered

4     discrimination.

5          It's not about you actually doing it.  If the

6     other person is perceiving it to be discrimination -- and

7     that you should first try to resolve it between yourself,

8     if not then you bring in the first line supervisor, which

9     is myself, and then after that you can go to -- you know,

10    then you should file an EO Complaint.  That is the

11    preferred way to do but you don't have to do it that way.

12          And so they did a lot of team building exercises.

13    This training -- I always have things that change a shift

14    -- either change in the morning or change a shift in the

15    evening so that we can catch the majority of people who

16    are there.

17    Q    And you said this was shortly after you became

18    the head nurse and that was July of '03?

19    A    Right.

20    Q    Did the Complainant come to you then after you

21    had that training to complain again about people

22    insinuating things about her age or her race?

23    A    No.  There was not anything specific about race

1    or age.  She just felt like they were out to get her.

2    That was her exact terminology.

3        Q    What did she tell you made her think that?

4        A    Well she told me that no matter what she did, it

5    was not good enough for them.  I told her at the time if

6    she was meeting the standard and doing what was required

7    to be done, then she didn't have to prove anything to

8    anyone individually.

9        Now her major concern was that when the young

10   nurses would get together and talk, she felt like she was

11   being excluded.  The first time she brought that to my

12   attention I called the nurses that she had talked about,

13   which was Lieutenant Mooney, Lieutenant Vanderlinen, and

14   there was another Lieutenant there, and she felt like they

15   were discriminating and excluding -- I mean that she felt

16   like were excluding her.

17       And their comments to me were, they were single

18   women in their twenties and they just had nothing in

19   common to talk about because she was married, a

20   grandmother, and, you know, their life was just so

21   different from hers, and she felt like -- they felt like

22   outside of work they really had nothing in common.

23       So I went back and I told Ms. Riggiladez, I said,

1    you know, what do you have in common with them other then

2    work, and she said it wasn't that, it was just that she

3    felt like she was being excluded.

4            So I told them that they needed to socialize only

5    during break time.

6        Q    And did these three Lieutenants work with the

7    Complainant on the night shift?

8        A    At various times, yes.

9        Q    But in a group normally or not normally?

10       A    Sometimes they did, but it wasn't that rare -- I

11   mean it wasn't that common that they were all -- the three

12   of them were the only ones on night shift.

13       Q    So as I understand your testimony, you told the

14   group in a staff meeting that they were free to file a

15   Discrimination Complaint if they felt there was

16   discrimination.

17       A    Yes.

18       Q    But you didn't know the Complainant had filed a

19   formal Complaint at that time?

20       A    She had not done it at that time.

21       Q    And did you find out when she did it?  When did

22   you find out she had done it?

23       A    I found out after she filed and Ms. -- and

1    was on days so you could evaluate her, she said a couple

2    of times that she was put back on nights to accommodate

3    other peoples leave.  Is that correct?

4        A    That's not correct.

5        Q    Was she put back on nights at all?

6        A    I don't have the schedule in front of me but

7    during her Performance Plan she was not rotated back to

8    nights.  She was not put on the schedule to go back to

9    work nights.

10            There was -- I take that back.  There were two

11   shifts where she went back to work night shift because I

12   had nurses -- civilian nurses that were sick or something

13   had come up.  I needed someone to fill that shift and she

14   volunteered to work because she was off.  She was -- she

15   had some time off in between and she said she would go

16   back and work that shift.

17       Q    So that didn't replace her days, that was just

18   extra time?

19       A    Yes.

20       Q    And was it your decision to put her on days

21   initially?

22       A    Yes.

23       Q    Were you motivated by her race to do that?

1   make comments about her performance.  She said Lieutenant

2   Vanderlinen would make comments about her age, about her

3   race.  She would make comments about when she sat down,

4   when she stood up.

5        It was a constant thing between her and

6   Lieutenant Vanderlinen is all I can say, because

7   Lieutenant Vanderlinen would bring me the same complaints

8   but she would put them in writing.

9        I told -- and I would show them to Madeline and

10  Madeline would just say, this is not true, this is not

11  true.  And then I would say Madeline let's talk about it.

12       And she would go out of my office and approach

13  Lieutenant Vanderlinen about spreading lies about her and

14  telling her boss, trying to get her fired.  But then when

15  I would ask her to put her complaints in writing she would

16  not do it.

17       Q    Did you ever ask the Complainant if she had any

18  witnesses to these specific incidents?

19       A    Yes.

20       Q    Did she ever tell you that there were?

21       A    No.  There was only one incident where these two

22  had an altercation where there were witnesses and that's

23  when I recommended both of them to get intervention.

1    Q    What happened then?

2    A    Both of them were scheduled to go see a Major

3    McLaughlin who was the psych clinical nurse specialist.

4    And I sent her an e-mail, explained to her the altercation

5    that had occurred between these two the night before on

6    the ward in front of patients and other staff members, and

7    that I felt that there was some underlying personality

8    issues, and if she could address them and offer me some

9    recommendations on how to help these two to at least

10    coexist in the work environment, or if she felt like they

11    couldn't or whatever.

12        And both of them were scheduled to go see her.

13    Initially Major McLaughlin called me back and said neither

14    one had followed through on their appointment.   I

15    counseled both of them and told them that they were

16    directed to go see Major McLaughlin like I had suggested

17    and they did.

18        At that time she was just to offer me some

19    suggestions.  She felt that both of them needed some

20    intervention because they both had some serious underlying

21    issues, without telling me, you know, what they said --

22    you know, what they said because what they said to her was

23    confidential.

1           I at that time suggested that Lieutenant

2    Vanderlinen find some help through the military system and

3    I suggested to Ms. Riggiladez that she go see the

4    Employees Assistance -- you know, that she enter the

5    Employees Assistance Program.

6        Q    Did they both follow up on your advice?

7        A    Yes, ma'am.

8        Q    Did it make it better?

9        A    No, ma'am.  They -- well they didn't do it

10   publicly.  They did not confront one another publicly.

11   Ms. Riggiladez did stop telling me things that Lieutenant

12   Vanderlinen had said or done, and Lieutenant Vanderlinen

13   stopped telling me things that Ms. Riggiladez had said or

14   done, but the tensionness was still there.

15           What I did was I tried not to rotate Ms. --

16   Lieutenant Vanderlinen onto nights unless I -- you know,

17   except when I really had to, and I always made sure that I

18   had someone else back on night shift to be charge, that

19   could handle any issues that might arise.  And then when I

20   brought Ms. Riggiladez on day shift I put Lieutenant

21   Vanderlinen back on nights.

22       Q    And when was the intervention?  Do you remember

23   when the event was, the altercation between them?

1    someone from the EO Office came over and told -- came to

2    my office and said that there had been a -- that Ms.

3    Riggiladez had filed a Discrimination Complaint and that

4    they needed certain documentation.  And that's what I did

5    -- that's how I found out because they were asking me for

6    the documentation.

7        Q    Do you remember when that was?

8        A    That's why I said February/March timeframe.  I

9    know it was before I left.  I was getting ready to leave,

10   right before I got my order to go here.

11       Q    February/March of '05?

12       A    Yes, ma'am.

13       Q    Was it after you had initiated the proposed

14   removal?

15       A    Oh, yes, ma'am.  This is way past then.  I sent

16   the proposal to remove in the earlier part of September.

17   In fact on the 10th of September I sent -- I have a

18   memorandum of record that Ms. Riggiladez called me.

19           So that's how I know she received the proposal to

20   remove on the 10th of September because she called me and

21   explained to me how upset she was about getting this

22   letter, and a lot of stuff was said and she was very

23   emotional.  I just let her get it out and then she just

1     A     That's correct?

2     Q     How did it get from that to the proposed removal?

3     A     Okay.  I had to follow up on the 1811

4     recommendations for what had occurred and that's why I put

5     this on there.  This is why you see her name now in this

6     memorandum for record through -- Risk Management said this

7     was a potential fatal incident.  That's why it's -- the

8     subject is Case Evaluation of a Potential Fatal Incident.

9     And then I wrote the whole thing down.

10          At this time I had to put the nurse's name -- you

11    know, put peoples names in there and give a step-by-step

12    account of what had happened and what was my

13    recommendation.

14    Q     Your recommendation was not to remove her.

15    A     No, it was remove her from Ward -- from the

16    fourth floor.  Then after that we had -- she never came

17    back to work so I had to make a decision what I was going

18    to do so my proposal was to remove her.  And I used this

19    plus the other stuff that I put in for my proposal to

20    remove, and this was one of the reasons why.

21    Q     Are you saying that because she wasn't coming

22    back to work that was a motivator for you to remove her?

23    A     Well I had to take some action.  She was not

1    coming to work.  I wasn't getting any medial documentation

2    from her.  I didn't know what was happening.  When I tried

3    to call her she felt like I was hassling her and I was

4    harassing her and, you know, I'm not going to be hassling

5    and harassing her.

6          Where am I going to get the information from?  So

7    I had to make a decision about a nurse who's not coming to

8    work, who is not sending me any medical documentation.  So

9    my proposal was to remove her.

10   Q    Did you get advice from the Human Resources

11   Office or I think they call it the CPAC here, Civilian

12   Personnel Advisory Center?

13   A    Yes.  Initially it was -- when I started the

14   action, the proposal to remove, I talked with a Barbie

15   Dotrie and Mr. Henderson, and explained to them what was

16   going on, what the situation was, and they told me what

17   documents to complete.

18   Q    When did you first contact them about the

19   removal?

20   A    Oh, my gosh, I don't remember.  It was maybe --

21   July maybe of '04.  July or August sometime -- timeframe

22   because I know I mailed it to her -- it took a while

23   because, you know, I had to -- after I do the initial

1    situation, play into your final decision to propose the

2    Complainant's removal?  Is that correct, Mr. Stottlemyer?

3         MR. STOTTLEMYER:    Yes.

4         THE WITNESS:    About 75 percent.

5         MS. EVES:    Seventy-five percent.

6         THE WITNESS:    Yes.

7         BY MR. STOTTLEMYER:

8    Q    What was the other 25 percent?

9    A    The other 25 percent was that on numerous

10   occasions trying to help Ms. Riggiladez learn -- increase

11   her knowledge base of nursing and to improve on some of

12   her performance issues.  It was also my opinion of her

13   being able to perform the work, and my opinion as to would

14   she potentially repeat this same type of behavior.

15   Q    When you say ability to perform the work, what do

16   you mean?

17   A    Her ability to take care of the same patients

18   that everyone else was expected to take care.  For several

19   months Ms. Riggiladez was given the least critical

20   patients to take care of, which my question to my head

21   nurse was why was she given this patient to take care of

22   in the first place.

23   Q    Was this assessment, this 25 percent assessment

1          Now if I wasn't there, Ms. Rodondi was the acting

2     head nurse, then they knew they could call her.  She could

3     come, do her assessment and say you're absolutely right,

4     we need to do something for this patient and then she

5     could pursue it.  So you never just say, okay, well the

6     doctor didn't want to do it.  That's shrugging off our

7     responsibility to the patient.

8          Q     So did you ask the Complainant what her side of

9     the story was regarding the incident on May 23rd and why

10    there were so many yellow codes not documented?

11         A     Yes, when I got back from Fort Dix, I had this --

12    and I had to do this through the Risk Assessment because

13    Ms. Rodondi told me that an 1811 had been sent because of

14    this incident.

15         When I got the information then I started asking

16    what had happened.  I started looking at the records.  I

17    called Ms. Riggiladez, asked her what had happened and she

18    felt -- you know, she started to tell me what was

19    happening and then she got upset.

20         I was trying to tell her to calm down.  She felt

21    like I was patronizing her, and things just -- I mean, I

22    could barely -- she was crying and carrying on so I just

23    got off the phone.  She just hung up eventually because

1    she couldn't -- I couldn't understand what she was saying

2    and it wasn't making sense to me so --

3        Q    Did she tell you that the doctor had been around

4    three times?

5        A    She told me -- she said I told the doctor.  He

6    told me to leave it alone.  And I said well Madeline did

7    you document that you had told the doctor?  I don't see

8    any documentation here that you told the doctor, and who

9    did you follow up with?

10           And then she felt like I wasn't hearing what she

11   said and I wasn't going to believe what she said anyway.

12   I didn't trust her and all this other stuff, so we weren't

13   getting anywhere.  I just got off the phone.

14       Q    How long would it take for a nurse to review the

15   strip coming out of the machine to see all these episodes

16   of tri-jeminie?

17       A    Okay, we have two different machines.  We have

18   one strip machine that prints out just one little strip,

19   and then we have a central monitor that will show you the

20   whole history and it will show you the whole history on a

21   24-hour period, and then you can put the cursor on and

22   pick out one portion of each -- that you want to evaluate.

23           So it will give you like a whole 24-hour history

```
1    full name.

2       A    Irvin Charles Henderson, Jr.

3       Q    And what is your race?

4       A    Black.

5       Q    What's your date of birth?

6       A    20 December 1950.

7       Q    How old are you?

8       A    Fifty-three -- I'm sorry, 54.

9       Q    Do you consider yourself disabled?

10      A    No, I do not.

11      Q    Where are you currently employed?

12      A    The CPAC, Walter Reed CPAC.

13      Q    Civilian Personnel Advisory Center?

14      A    That's correct.

15      Q    How long have you been employed there?

16      A    About three years now.

17      Q    And what's your title?

18      A    Chief of Management Employee Relations.

19      Q    And what is your series and grade?

20      A    GS-201, grade 13.

21      Q    And how long have you held that position?

22      A    For about three years.

23      Q    Who's your first level supervisor?
```

1    receiving a proposed removal she should have been

2    counseled, warned, and Management should not have just

3    moved to the decision about proposing a removal based on

4    what had occurred.  What is the general guidance on that?

5        A    The proposed removal as I recall -- and I don't

6    have it in front of me now.

7        Q    I can give you a copy.

8        A    Sure.  It would depend on the circumstances.  Now

9    there's two ways a proposed removal can evolve.  One would

10   be through conduct and the other would be through

11   performance.

12           Yes, to be totally honest, this one really is

13   dealing mostly with conduct because she's calling it

14   negligent performance of duty so it would have been

15   something specific, an event in time.

16           And in that case should there have been

17   counseling?  Yes, I'll agree there should have been

18   counseling but I'll contend that generally Management will

19   counsel as a matter of course.

20           I'd have to know specifically -- what are we

21   saying, that there was no counseling, they were just given

22   a letter? If that's what's being said, I'll admit that

23   then yes, there should have been counseling but I'm not

1    going to verify whether it could -- was or not.  But sure,

2    I think that as a general rule it's good to counsel your

3    employees.

4        Q    Do you know enough about this particular proposal

5    and the decision to remove her to tell us whether or not

6    you think the action was warranted?

7        A    I personally worked with the specialist in

8    putting this action together because they were in training

9    at the time so I'm a major player in the production of

10   this product and I can tell you from my review of it, I

11   felt in my professional opinion that the circumstances

12   were sufficient to warrant this action.

13       Q    The action complied with the Table of Penalties

14   and other federal regulations and guidance on taking

15   disciplinary actions?

16       A    Yes, ma'am, I fully concur and believe that they

17   did -- that they were in compliance with the DA Table of

18   Penalties and other guidelines.

19       Q    To the best of your knowledge was the action

20   consistent with other disciplinary actions taken against

21   other employees in the same or similar circumstances?

22       A    Absolutely.

23       Q    Do you have any reason to believe that Major

1    process.

2        Q    Is she hard to get a hold of?

3        A    On occasions because of the nature of her work.

4        Q    It seems like she's very busy?

5        A    Yes, very busy, but I've been able to find her

6    either through paging or through just the system of

7    finding -- of going to her office.

8        Q    Now has she been involved with you on lots of

9    removals of civilian employees?

10       A    Yes, quite a few, quite a few.

11       Q    Have they been people of all races?

12       A    Yes, they have.

13       Q    Have they been young and old?

14       A    Yes, all ages.

15            MR. STOTTLEMYER:    That's all, ma'am.

16            MS. EVES:    Thank you.  Mr. Ehrenberg.

17                         EXAMINATION

18            BY MR. EHRENBERG:

19       Q    Did you state earlier that you had some part in

20    the Notice of Proposed Removal or you did not have any

21    role in that?

22       A    I had a role in both documents.  The specialist

23    that actually produced the document is one of my employees

1    or not?

2        A    I don't know what that means.

3        Q    Is there a rating level like when you get your

4    review between --

5        A    Ours -- we have bar, above bar, and below bar.

6        Q    You have different stuff?

7        A    Yes.

8        Q    So you wouldn't know if a civilian had certain

9    numbers or not?

10       A    No, not unless they told me themselves.

11       Q    Okay.  How old did you say you are?

12       A    Twenty-five.

13       Q    And would you say that you're closer to the

14   average age on the unit than Ms. Riggiladez is or was?

15       A    I believe at the time that may be true, yes.

16       Q    For the most part, are most of the nurses on the

17   unit within a certain age, like in their twenties or

18   thirties?

19       A    Right now I believe, yeah.  We have twenties --

20   late twenties, thirties, and forties and fifties right now

21   too.  We have some older nurses now that were not there

22   when she was there.

23       Q    At the time that she was there, would you say

1    A    No.

2    Q    After her second injury in May and her FECA Claim

3    then, was your office ever informed that she was able to

4    come back to work from her injury?

5    A    No, Madeline, after the incident got perpetuated

6    -- we talked about the telemetry reading.  She called in

7    sick the next day.  Was asked to give her statement on the

8    phone about what happened, and did not see Madeline from

9    that day on.

10   Q    Did you ever hear from her or from FECA that she

11   was supposed to return to work because she was well enough

12   to return to work?

13   A    No.

14   Q    You heard the Complainant testify that she told

15   FECA that her doctor had released her to come to work and

16   she was expected to come to work in either September or

17   October.  Were you ever made aware of that?

18   A    No.

19   Q    Did she ever tell you?

20   A    No, she did not.

21   Q    So why did you think she wasn't at work?

22   A    No idea.  She's supposed -- the employee is

23   supposed to supply us with documentation.

1        I do know when she was scheduled for her surgery

2    -- after the letter was mailed to Madeline she called and

3    asked for an extension.  I granted that.

4        And between the second extension -- she called me

5    and said I need to have some surgery.  I'm stressed.  The

6    surgery is scheduled for this date.  I cannot answer the

7    Complaint.  I said well that's understandable.  I know

8    you're stressed.  Do you mind telling me what the issue

9    is.  She said I'm scheduled to see my physician.  She'll

10   call me back.

11       When she went to her pre-anesthetic appointment

12   she was found to have asthma at that time so the surgery

13   was postponed.  She called me quite upset at the new

14   diagnosis of asthma and surgery date.  So I told her to

15   keep me informed.  Was just never kept informed after

16   that.

17       Q    Do you recall when her surgery was or when she

18   told you it was going to be?

19       A    Just today I think we heard it was in early

20   November.

21       Q    Or December she said.

22       A    Or in December.

23       Q    Do you recall when it was she contacted you for

1    the second extension for responding to proposal?

2        A    October, yes.

3        Q    And did you ever receive a response from her or

4    through her attorney on the proposed removal?

5        A    I think we got a letter from her attorney.

6        Q    Do you remember when that was?

7        A    No, I do not.  My sense would be the

8    October/November timeframe.

9        Q    Did the Complainant ever come back to you to tell

10   you that her surgery was complete or anything?

11       A    No.

12       Q    Do you know if she was being paid up to the point

13   where she was removed?

14       A    I know now that she was not but I did not know

15   then.

16       Q    When the Complainant came back from her first

17   injury in February of 2004, did she talk to you about her

18   medical condition at that time?

19       A    No, she did not.

20       Q    Did you ever understand that she had a vision

21   problem?

22       A    No, I did not.

23       Q    Or a problem with aches and pains?

1    into question.  It was a composite picture of Madeline.

2          She was not able to return to work or did not

3    return to work.  After her surgery we never heard whether

4    she was coming back to work or not.  I've never -- I've

5    been in civil service a long time.  I've never had an

6    employee not call and say what their response -- was going

7    to do.

8          Q    The Complainant testified earlier that the

9    incident on May the 23rd, which was key to the removal,

10   that other people as well could have noted the yellow

11   alarm on that particular patient.  Is that true.

12         A    That's correct.  That is true, yes.  Madeline was

13   the nurse responsible for that one particular patient,

14   which is the issue here.

15         Yes, any nurse -- and Madeline is correct, the

16   volume was turned down very low on that monitor.  That

17   should never have happened, but if as Madeline says, she

18   was monitoring that patient all day, some of these -- this

19   patient was in a rhythm for 46 minutes, some as long as

20   six minutes -- or as short as six minutes, some as long as

21   48.  A nurse would have noted that.

22         The alarm changes colors.  We do have a policy

23   that every four hours you're supposed to pull out your