**FAILS:** Fails to respond appropriately to emergency situations. Needs much encouragement and direction during emergencies. Fails to display appropriate level of professionalism and calmness during emergencies. Fails to attend training for emergencies. Two (2) negative counseling statements during this rating period related, to this standard.

**6. Innovative/Professional Responsibilities:** Demonstrates support of professional practice and growth by maintaining licensure, BLS, Departmental and Section CBO and continuing education by presenting unit in-services, attending staff meetings, obtaining 20 contact hours per rating period.

**EXCELLENCE:** Presents two (2) or more in-services. Attends all staff meetings and actively participates. Maintains licensure, BLS, CBO and BMAR requirements. Obtains more than 20 contact hours of continuing education during this rating period. Submits a support form with significant contributions to supervisor before 31 OCT of each rating year.

**SUCCESS:** Presents one (1) in-service. Attends 75% of staff meetings. Maintains licensure, BLS, CBO and BMAR requirements. Obtains 20 contact hours of continuing education during this rating period. Submits a support form with significant contributions to supervisor on 31 Oct of each rating year.

**NEEDS IMPROVEMENT:** Fails to present in-service. Attends 50% of staff meetings. Maintains licensure, BLS, CBO and BMAR. Obtains 18 contact hours of continuing education during the rating period. After reminders and encouragement, provides support form and significant contributions to supervisor by 15 November.

**FAILS:** Fails to present an in-service. Attends less than 50% staff meetings. Does not maintain licensure, BLS, CBO and/or BMAR. Obtains less than 18 contact hours of continuing education during the rating period. Does not provide support form with significant contributions to supervisor by 15 November.

**7. Working Relationships/Communication/Customer Service:** Demonstrates a friendly, sensitive and caring attitude. Uses professional and courteous communication and treats patients, staff, families and visitors with dignity and respect. Answers telephone in the WRAMC approved manner. Protects the privacy and confidentiality of patient information (HIPAA). Does not engage in verbal disagreements with patients, family members, visitors or staff. Responds to members of the health care team with positive interpersonal skills to create a cooperative and positive working environment. Uses appropriate chain of command. Uses available resources to acquire personnel when short staffed Initiates and reports unusual occurrences to Head Nurse by using an incident report (1811). Maintains an AKO and Outlook account for electronic mail. Ensures that personal contact information is correct and updated in unit records for essential employee status.

**EXCELLENCE:** Leads by example. Complies with the spirit as well as the words of this standard. Acts as role model in providing customer service. Fosters an environment in which customer service is an integral part of the day-to-day work ethic of the unit. Intercedes and or acts as a mediator to resolve disagreements and or problems between patients, family members, visitors and staff. Recognized for outstanding customer service and working relationships on numerous occasions. No negative counseling related to this standard during the rated period.

**SUCCESS:** Consistently complies with this standard, remains professional in all interactions. Does not initiate or participate in conflicts with staff, patients, family members, and/or visitors. Demonstrates adequate work ethic. Recognized for superior customer service and working relationships on one (1) or more occasions. One (1) negative counseling related to this standard during the rated period.

4

*/38*

**NEEDS IMPROVEMENT:** *Complies with the words, but not the spirit of the standard. Inconsistent with compliance of this standard. Has conflicts with staff, patients, family members, and/or visitors. Demonstrates an inconsistent work ethic. Conducts self appropriately but is not recognized for superior customer service. Two (2) negative counseling statements for noncompliance with this standard.*

**FAILS:** *Fails to comply with the spirit and or the words of this standard. Frequently found in conflict with staff, patients, family members and visitors. Demonstrates poor work ethic. Does not read or maintain an Outlook account. Does not ensure personal contact information is updated. Contributes to declining unit morale. More than two (>2) patient and staff complaints.*

Staff Member's signature & date                         Supervisor's signature & date

In addition:

RN's will demonstrate knowledge and compliance with:

ANA standards of practice
JCAHO
Patient Specific Standards (ie ortho patients—orthopedic nursing standards)
Infection Control (APIC) standards
National Patient Safety Goals (IOM)
MEDCOM/NARMC guidance
Applicable AR's and policy letters pertaining to Patient Care

*139*

**WEEK I:  Focus on telemetry strips basic knowledge, improvement of interpersonal skills, and attention to detail:**

Friday, 4/2 (6)

Tues, 4/6 (6)

Thurs, 4/8 (6)

**WEEK 2:  Continue to work on interpersonal skills, time management and attention to details:**

Sat, 4/10 (6)

Sun, 4/11 (6)

Mon, 4/12 (6)

Thurs, 4/15 (1) Scheduled for BLS class to recertify

**WEEK 3:  Began to utilize professional assertion:**

Fri, 4/16 (6)

Tues, 4/20 (6)

Wed, 4/21 (6)

**WEEK 4:  Time Management:**

Sat, 4/24 (6)

Sun, 4/25 (6)

Wed, 4/28 (6)

Thurs, 4/29 (6)

**WEEK 5:  Become familiar with nursing policies and capabilities of the ancillary personnel and contact personnel:**

Fri, 4/30  8hr. scheduled AL

Tues, 5/4 (6)

Wed, 5/5  (6)

**WEEK 6:  Patient assessment, cardiovascular and respiratory system:**

Sat, 5/8 (6)

Sun, 5/9 (6)

*Rotated to night shift*

Wed, 5/12 (7)
Thurs, 5/13 (7)

**WEEK 7:   Continue to develop assessment skills, EKG interpretation, interpersonal skills:**

Fri, 5/14 (3)


*Rotated to day shift*


Tues, 5/18 (6)


End of assessment program.  Head nurse and employee (MAJ Peterson and Ms. Riggiladez) will meet with section supervisor (COL Edinger) to discuss final evaluation

# SCOPE OF PATIENT CARE AND SERVICE
## DEPARTMENT OF NURSING

**1. TITLE: WARD 46, Cardiothoracic Ward**

**2. DESCRIPTION:** Ward 46 is a 14 bed Cardiothoracic Ward with an average daily census of 9 patients. Our average daily workload consists of 166 Nursing Care Hours.

**3. PATIENT POPULATION SERVED:**

   Age specific care is provided to the adult patient population ranging from age 18 to 90 years. The complexity of patients range from pre and post operative cardiothoracic patients to cardiology patients and medical patients who require telemetry monitoring and close observation.

**4. CONDITIONS AND DIAGNOSES TREATED:**

   The Cardiothoracic step-down unit offers complex medical and surgical nursing care to the transitioning cardiothoracic pre and postoperative patient. Patient care processes and procedures performed consist of nursing care of post-operative coronary artery bypass patients, pre and post operative thoracotomy patients, esophageal, mediastinal and general chest diseases. Common clinical procedures include wound management of coronary artery bypass patients, placement and monitoring of chest tubes, interpretation of advanced cardiac rhythms, pre and post operative testing and preparation for complex cardiothoracic and medical procedures, and post operative cardiac catheterization recovery.

   Mechanisms used to identify patient care needs are determined through morning patient rounds, weekly multidisciplinary meetings and the integrated patient documentation record. Families are involved with all aspects of care to provide a holistic approach to achieve patient outcomes. If the patient's acuity level exceeds the nursing capacity of this unit, patients are transferred to the Intermediate Care Unit, Coronary Care Unit, Surgical Intensive Care Unit or the Medical Intensive Care Unit.

### a. High Volume:

1) Coronary Artery Disease
2) R/O Myocardial Infarction
3) Lung Cancer
4) Aortic or Mitral Valve Replacement
5) Staging for Lung CA

143

## 7. PERSONNEL PROVIDING CARE:

### a. Nursing:

All licensed personnel perform cardiovascular assessments every eight hours. Unit Level Competencies include: Basic Life Support, Basic Arrhythmia Interpretation, Post Operative Wound Care, and Chest Tube Management.
   (1) Registered nurses: 9
   (2) Licensed practical nurses: 4
   (3) Nursing Assistants: 4
   (4) Medical Records Technicians: 2

### b. Other Personnel:

   (1) Physicians: Five Staff Cardiothoracic Surgeons
   (2) Physician Assistants: 4
   (3) Physical Therapists: 2
   (4) Occupational Therapist: 1
   (5) Social Worker: 1
   (6) Pharmacist: 1
   (7) Dietitian: 1
   (8) Respiratory therapy: 1
   (9) Radiology technicians: 1
   (10) Chaplain

### c. Staffing Management:

1) Each unit's overall minimal essential staffing requirements are defined by the Automated Staffing Assessment Model (ASAM), based on medical planning factors and historical workload. Determination of manpower requirements is a continuous process in which requirements are established, increased, decreased, and eliminated in response to changes in a unit's workload, missions, programs, procedures, technology, and leadership philosophy. Daily measurement and determination of workload is accomplished through the Workload Management System for Nursing (WMSN) on inpatient areas.

2)   WMSN is a management tool used to assess nursing personnel staffing based on patients' nursing care needs. Nurses classify patients according to an assessment of their nursing care needs for the next 24 hour period and determine the total number of nursing care hours (NCH) a unit's patients will require. This system provides solid factors to begin planning for patient care. The WMSN cannot stand as a single method for determining staffing requirements but the WMSN can provide a good starting point for assessing the staffing needs of the unit when used in conjunction with other staffing variables.

144

**b. High Risk:**

1) Post operative coronary artery bypass surgery
2) Post operative lung surgery
3) Externally paced patients
4) New Onset Atrial Fibrillation

**c. Problem Prone:**

1) Anticoagulation therapy for valvular heart disease
2) Heparin therapy for new onset atrial fibrillation

**d. High Cost:**

1) Cardiac procedures
2) Thoracotomy complications
3) Tracheostomies
4) Long-term patients requiring sub acute placement

**e. Excluded Patients/Services:**

1) Pediatric patients
2) Patients requiring hemodialysis at the bedside

## 5. STANDARDS OR GUIDELINES FOR PRACTICE:

    a. WRAMC Regulations
    b. WRAMC Nursing Policies
    c. Critical Care Nursing Section Policies
    d. Ward 46 Policies
    e. Lippincott Manual for Nursing Practice
    f. Cardiothoracic Nursing Textbook

## 6. TREATMENTS AND ACTIVITIES PERFORMED:

All nursing activities are performed in accordance with the Scope of Practice and Competency Based Orientation. Common clinical activities include: admission assessments, chest tube management, patient and family teaching, venipunctures, peripheral intravenous therapy, finger stick blood glucose monitoring, blood transfusions, medication administration, urinary catheterization, nasogastric tube insertion, tube feedings, oral or nasogastric suctioning, dressing and wound care, respiratory treatments, oxygen therapy, cardiac monitoring, vital signs monitoring, pain management, and ongoing assessments and documentation of nursing and medical intervention.

3)   The Head Nurse and NCOIC formulate a unit core staffing plan, defining the number and mix of nursing personnel required in accordance with professional judgment and current patient care needs.  Staffing plans take into consideration the American Nurses Association "Principles for Nursing Staffing" and are contingent upon patient care, unit, staff, and organization variables.  Patient care variables are reflected in the WMSN, and include number of patients, level of acuity, and additional factors that may impact patient needs.  Unit variables include characteristics of the unit's care intensity, configuration and delivery support functions.  Staff related variables reflect the specific needs of patient populations and determine the appropriate clinical competencies required of the nursing staff.  Organization related variables include areas such as support services (clerical, transport, housekeeping, laboratory) and access to timely, relevant and accurate information.

4)   Staffing is also adjusted based on patient need, staff expertise and experience when additional staff are required to respond to increased patient care demands, augmentation is accomplished by detailing individuals from one area to another, supplementing core staff with contract employees or adjusting staffing schedules by initiating the "on call" roster or soliciting volunteers from the permanent staff to work overtime.

5)   Unit core staffing plan

| Ward 46 | | ASAM Authorizations TDA 0902 | | Weekday Staffing Matrix (excluding Head Nurse and Wardmaster) | | | Weekend Staffing Matrix (excluding Head Nurse and Wardmaster) | | |
|---|---|---|---|---|---|---|---|---|---|
| Staffing | Military | Civilian | Day | Evening | Night | Day | Evening | Night |
| RN | 8 | 4 | 3 | 2 | 2 | 2 | 2 | 2 |
| LPN | 7 | 0 | 1 | 1 | 1 | 1 | 1 | 1 |
| NA | 6 | 1. | 1 | 1 | 1 | 1 | 1 | 1 |
| MRT | | 2 | 1 | 1 | | | | |

6)   As of 1 July 2002, staffing effectiveness is also evaluated by analysis of data from human resource and clinical indicators.  The two human resource indicators selected by the WRAMC DON are Nursing Care Hours per Patient Day (NCHPPD) and Skill Mix.  The two clinical indicators selected by the organization are patient falls and medication errors.  While unit level data will be provided to Head Nurses for review, at this time, it is too early to determine what effect these data will have on staffing decisions.  It is anticipated that these data will be part of the combination of factors used to make staffing decision on both the unit and department level in the near future.

**8.  HOURS OF SERVICE:**  (24 hours per day)

**9.  LOCATION:**  Ward 46

146

MCHL-CCNS-WARD 46                          25 May 2004

MEMORANDUM FOR RECORD

SUBJECT: Case evaluation of potentially fatal incident

1.  72 year old white female patient was transferred from SICU to Ward 46 on 21
    May 04. At that time the patient was post op day 16 from emergent bentall
    procedure (aneurysm repair involving the aortic valve), post op day 14 from
    mediastinal washout, and post op day 3 from drainage of pericardial effusion. The
    patient had various rhythm changes throughout her stay in the SICU. Due to the
    presence of a St. Jude's Valve, the patient was being anticoagulated with heparin.
    Since her transfer, the patient's rhythm was 80% sinus bradicardia with episodes
    of atrial flutter and atrial fibrillation. The patient continued with a heparin drip.
    After midnight 23 May 04, patient was reported to have 15 beat run of
    asymptomatic ventricular tachycardia. Interventions included notifying physician,
    obtaining labs and getting a 12-lead EKD. After receiving results, magnesium and
    potassium were given. Approximately two hours later, patient complaint of pain
    to sternal incisional site. Following evaluation by physician, patient was
    medicated with Percocet. At 0500, on 23 May 2004, patient's telemetry monitor
    showed normal sinus rhythm.

2.  The following is a sequence of events, for this patient, during the next shift (0645-
    1915) for May 23, 2004. Note that there is no documentation to report that patient
    was symptomatic throughout any of the events, however, due to the nature of the
    disease process, the possibilities of adverse effects were high. Evidence of events
    were obtained from telemetry monitor history and documentation by the nurse
    (Ms. Riggiladez) in the patient's chart (CIS):

    645    Change of shift report given.

    0800   Nurse (Ms. Riggiladez) documents patient's heart rate 89, blood
           pressure 120/79 in a sinus arrhythmia with rare unifocal premature ventricular
           contractions.

    925    Nurse (Ms. Riggiladez) documents in a progress note, "MD ordered
           EKG, was done at 0900 Sinus Tachycardia with 2nd degree AV Block,
           Mobitz 1. HR 68." This is the exact wording taken from the
           interpretation of the EKG machine. It is very common for the
           interpretation of the machine to be incorrect. The clue for error here is
           '...sinus tachycardia...HR (heart rate) 68."

    0940   Telemetry history reports yellow alarm due to the patient's rhythm,
           which shows trigeminy. The episode lasted for 16 minutes.

148

**1150**   Telemetry history reports yellow alarm due to the patient's rhythm, which shows trigeminy. The episode lasted for 7 minutes. Heart rate at the time was in the mid 70's.

**1200**   Nurse (Ms. Riggiladez) documents vital signs for patient. Heart rate is 85, blood pressure 112/70 and rhythm is documented as "sinus arrhythmia with rare unifocal premature ventricular contractions."

**1206**   Telemetry history reports several yellow alarms up to1218 for frequent PVC's, couplets and Trigeminy with a heart rate of 80.

**1226**   Telemetry history reports yellow alarms for the next 6 minutes due to the patient's rhythm showing premature atrial contractions approximately every other beat. Heart rate is 66.

**1259**   Telemetry history reports yellow alarm for run of Trigeminy with a heart rate of 74.

**1348**   Telemetry history reports yellow alarm for run of Trigeminy with a heart rate of 86.

**1443**   Telemetry history reports yellow alarm for run of Trigeminy with a heart rate of 88.

**1456**   Telemetry history reports yellow alarm for run of Trigeminy, which lasted 14 minutes.

**1554**   Telemetry history reports yellow alarm for run of Trigeminy, which lasted 11 minutes. Heart rate recorded as 91.

**1637**   Nurse (Ms. Riggiladez) documents shift nursing assessment stating, " patient has S1, S2, and rhythm is regular and no ectopy."

**1645**   Telemetry history reports yellow alarm for run of Trigeminy, which lasted 48 minutes. Heart rate recorded in the mid 80's.

**1738**   Telemetry history reports yellow alarm for run of Trigeminy, which lasted 35 minutes. Hear rate recorded in the mid 80's.

**1744**   Nurse (Ms. Riggiladez) documents vital signs. Heart rate of 92, blood pressure of 113/72, and documents, patient in sinus arrhythmia with rare unifocal premature ventricular contractions."

**1840**   Telemetry history reports yellow alarm for run of Trigeminy, which lasted approximately 20 minutes.

149

**1845**   Night shift nurse (2LT Beam) arrives on shift and notices patient having episode of trigeminy.  He also reviews patient's alarm history and finds patient has been in and out of trigeminy numerous times throughout the day.  Night shift nurse (2LT Beam) informs ASOD of findings, Physician orders an EKG, vital and labs. Lab results are as follows: potassium 4.1, chloride 102, magnesium 2.6, phos 2.4 and calcium of 9.4.

**2108**   Night shift nurse (2LT Beam) documents in a progress note, "Patient displayed 2 episodes of bigeminy on the monitor. Although the patient has been in and out of trigeminy all day long, this was the first onset of bigeminy. The first episode was at 1954 and lasted approx. 7 seconds. The second episode was at 2008 and lasted approx 10 secs. The asod was called and Dr. Kreishman came and pushed lopressor 5mg IV. Vitals were HR 93, BP 115/73, RR 20 and O2 97%. Vitals after lopressor were HR 66, BP 110/67."

**2116**   No further ectopy was documented on telemetry history or by the nurse (2LT Beam) through 0700 24 May 04.


3.  Issues:


**Issue:** Telemetry history reports numerous yellow alarms on the patient throughout the day. Primary care nurse (Ms. Riggiladez) reports never hearing the alarm or silencing the alarms.

**Recommendation:** 1. Assess equipment for proper functioning. 2. Interview all staff working on the day shift of 23 my 2004 to investigate if alarms were heard and if any staff member is silencing screen without reviewing alarm history.

**Action:** All staff interviewed, working that day, report that alarm was not heard nor did they see any rhythm changes on the screen. Further investigation reports that when MD came to see patient in the evening, at approximately 2100, he found that the telemetry monitor's volume had been adjusted to level 1.  The default setting is level 6.  Several nurses assessed the telemetry equipment. When a patient has a yellow alarm, the monitor beeps four times and the patient's screen will turn blue. The screen will remain blue for approximately 2-3 minutes and then go back to the normal black screen. The blue screen can be taken off by silencing alarm. The telemetry pagers do not go off for yellow alarms.
The agilent technician honored our request and came to the unit to discuss our issues. It was determined that the unit was properly functioning and they recommended software upgrades.

**Issue:** Ms. Riggiladez demonstrated negligence when she did not report the dysrhythmia changes to the physician.  The patient has recently received surgery that involved her cardiovascular system and that subsequently placed her at high risk for

3

*150*

development of a life-threatening rhythm.  Ms. Riggiladez improperly reported the
patient's cardiac rhythm.  Ms. Riggiladez failed to review the patient's alarm history,
which would have revealed the multiple changes that occurred during the day.

**Recommendation:**  Ms. Riggiladez has attended the Basic Cardiac Dysrhythmia
Class and 12 Lead Interpretation for Nurses Class.  I have loaned her my personal
nursing manuals in an attempt to assist her with expansion of her nursing knowledge
base.  Ms. Riggiladez has not demonstrated the ability to grasp basic concepts
required to work on a telemetry unit.  Recommend removal from critical care nursing
section.

LILLIAN M. PETERSON
MAJ, AN
HEAD NURSE, WARD 46

4

/51

MCHL-CCNS-WARD 46                    2 June 2004

MEMORANDUM FOR RECORD

SUBJECT: SICK LEAVE REQUIREMENTS

1. On 28 May 2004, I telephoned Ms. Riggiladez RN regarding policy for sick
   leave.  I telephoned Ms. Riggiladez to instruct her that because she called out
   sick with complaints of knee problems on 25, 27, and 28 May 2004, according
   to policy when you call out sick for three working days in a row you need to
   bring documentation from a Doctor to Occupation health for clearance prior to
   working. Ms. Riggiladez stated she understood and would bring
   documentation in on Monday.

2. During the telephone conversation, Ms. Riggiladez reported to me that on the
   weekend of 22 May 2004 she stated that while helping a patient she got a
   hernia. I asked Ms. Riggiladez if she filled out an 1811 about the incident,
   notified the charge nurse, supervisor and visited the ER. Ms. Riggiladez stated
   she did not fill out an 1811, did not notify the charge nurse or supervisor and
   did not go to the ER. I than asked Ms. Riggiladez if she knew the policy and
   she stated she did know she was suppose to fill out an 1811 for job related
   injury. Ms. Riggiladez stated she would come in on 1 June 2004 with
   documentation from an MD and was coming to fill out FECA claim.

3. On 1 June 2004, Ms. Riggiladez called ward approximately 0930 and told me
   she was going to the doctor this am and would try to make it in the afternoon.
   She called out sick for the night of 1 June 2004. Ms. Riggiladez did not come
   in the afternoon of 1 June 2004.


Danielle Rodondi RN GS-12

No 1811 needed
No Witnesses needed
alit of they
feli within 45
days in which

Feca level
JUN 0 3 2004
K.a.

175

 

MCHL-CCNS-WARD 46                                                    2 June 2004

MEMORANDUM FOR RECORD

SUBJECT: TIMELINE

1. Per request of the FECA office, I am providing background timeline for
   events regarding a FECA Claim by Ms. Riggiladez RN. I am acting as Head
   Nurse from 22 May 2004- 5 June 2004. Maj. Peterson, the Head Nurse on
   Ward 46, is TDY.

2. 2 April 2004 to 17 May 2004 Ms. Riggiladez has been on a Performance
   Improvement Plan to assess Ms. Riggiladez ability to provide the level of care
   required by the patient population on Ward 46. Evaluation information can be
   obtained from Maj. Peterson upon return from TDY.

3. On 24 May 2004 I had a telephone conversation with Ms. Riggiladez about
   unnoticed rhythm changes on the patient she cared for on 23 May 2004. See
   attached Memorandum for Record for further information.

4. On 25 May 2004 Ms. Riggiladez directly spoke with me via phone and stated
   she was calling out sick for the night shift due to knee problems.

5. On 25 May 2004 Col. Edinger, Chief of CCNS, requested information
   regarding the days Ms. Riggiladez had called out sick or used leave. The
   information was obtained from old schedules. See attached Memorandum for
   Record regarding leave information.

6. On 27 May 2004 Ms. Riggiladez called out sick. I did not speak to her
   directly.

7. On 28 May 2004 I telephoned Ms. Riggiladez who informed me she would
   not be in that night. I informed her of the policy regarding sick leave and
   bringing documentation to occupation health. See attached Memorandum.
   During this conversation Ms. Riggiladez stated that while helping a patient
   she got a hernia on 23 May 2004. Although Ms. Riggiladez informed me she
   understood the measures of writing an 1811, notifying charge nurse,
   supervisor and going to the ER when hurt on the job she did not report
   incident. I instructed Ms. Riggiladez if she comes in 1 June 2004 that SSG
   Reece, the Wardmaster, and myself would direct her with filing FECA claim.

8. On 1 June 2004, Ms. Riggiladez called approximately 0930 to inform me she
   would not be working that night, she stated she had a doctor's appointment in
   the am and would try to come in the afternoon.

9. On 2 June 2004, Ms. Riggiladez and husband arrived for guidance with filing
   FECA claim. During conversation Ms. Riggiladez stated that she did tell Lt
   Pearson-Jackson that she hurt herself that day. Lt Pearson-Jackson was called
   into the office with SSG Reece, Ms. Riggiladez, her husband and myself. I
   asked Lt Pearson-Jackson if Ms. Riggiladez reported to you that she hurt
   herself at work on Sunday 23 May 2004. Lt Pearson-Jackson stated no, but at
   one point during the shift Ms. Riggiladez came out of the patient's room, sat
   down at the desk, was perspiring and stated that she was tired.

*179*

MCHL-CCNS-WARD 46                                           4 June 2004

MEMORANDUM FOR RECORD

SUBJECT: WORK STATUS

1. Ms. Riggiladez RN was to report to the FECA office on 4 June 2004 to discuss claim. I was not notified to come over to fill out the supervisory section.

2. At 1330 I called Ms. Ribas in the FECA office to ask if I was needed. Ms. Ribas informed me that Ms. Riggiladez and husband did come to the office and will wait to file a claim with Maj. Peterson on 8 June 2004.

3. Via e-mail and on during the telephone conversation, Ms. Ribas stated that at the meeting on 4 June 2004 Ms. Riggiladez "produced a note from her physician saying she will be unable to work until July 1, 2004."

4. As of 1500 4 June 2004, Ms. Riggiladez has not informed management on Ward 46 about the doctor's note. As of 1500 4 June 2004 Ms. Riggiladez has not called in sick. Ms. Riggiladez is scheduled to work 4 June 2004 at 2300.

5. Due to Ms. Riggiladez's statement to SSG Reece that she does not want me involved in the situation, I did not call her to inform her that Ms. Ebiringa from the Civilian Personal Advisory Center stated on 3 June 2004 that showing the employee their personal file is at the discretion of the supervisor. I will brief Maj. Peterson upon return from TDY 7 June 2004.

Danielle Rodondi RN GS-12

*188*

4 June 2004

MEMORANDUM FOR RECORD

Today at approx 1515, Ms. Riggadez called Ward 46 to speak to the charge nurse for the day. I spoke with her concerning her shift for tonight from 11pm-7am. She stated that she would not "be in for a while", that "she was on FICA, and would not be working for a few weeks". I asked her how long should I take her off the schedule, she said that "she figured I knew what was going on", and that she "had been to EO, JAG, and FICA today and am getting this whole mess taken care of". I repeated and asked her should I take her off the schedule for a day, a week, a month and she stated to take her off until Monday, when "Maj Peterson would return and straighten this whole mess out"

Sarah Mooney 2LT, AN

*190*

**REQUEST FOR MER INTERVENTION**          Date: 6 JULY 2004 _____

I. **Information about the Directorate and the managers involved in this intervention**

    a. Directorate and Division  WRAMC, DON, CCNS, Ward 46

    b. Employee's first-line supervisor/proposing official  *Lillian* ~~William~~ Peterson MAJ,AN

    c. His/**Her** SSN and race (for data reporting requirements          Black American

    d. His/**Her** exact title (title, series and grade) and name as it should appear in a signature block   MAJ, AN, Head Nurse, Ward 46

    e. His/**Her** telephone number, FAX number, and pager number  202-782-1446;  202- 782-8253; 877-394-0292

    f. Employee's second-line supervisor/deciding official   Rosemarie Edinger, COL,AN

    g. His/**Her** SSN and race (for data reporting requirements          Caucasian

    h. His/**Her** exact title (title, series and grade) and name as it should appear in a signature

block   COL, AN Chief, Critical Care Nursing Section

    i. His/**Her** telephone number, FAX number, and pager number 202-782-2828; 202-782-5386; 877-394-0307

II. **Information about the Employee**

    a. His/**Her** name Madeline L. Riggiladez

    b. His/**Her** SSN and race (for data reporting requirements Hispanic Origin

    c. His/**Her** title, series and grade  GS0610-11

    d. How long as **s/he** been in this organization?  1years, 7months

## MER ACTION COORDINATION LOG

Proposal draft to SJA _____

SJA coordinated draft to CPAC _____

Coordinated draft to manager _____

Decision memo draft to SJA_____

SJA coordinated decision memo to CPAC_____

Coordinated decision memo to manager_____

**REQUEST FOR MER INTERVENTION**  cont.

*192*

e. Has this employee ever been disciplined? X Yes ____No If yes, list ALL prior disciplinary episodes, with dates, including official reprimands and suspensions:

DATE        PENALTY IMPOSED              REASON FOR DISCIPLINARY ACTION

26 Oct 03    Written reprimand           Violation of professional
                                         standards of behavior + conduct

2 April 04   performance improvement     poor performance
             plan

f. Is the employee currently working within the boundaries of a proper job description? X Yes ____No If no, explain_____

_____

g. Is the employee covered under a negotiated labor agreement (i.e., AFGE, IAM&AW)?_____ Yes _____ No

h. Is the employee in a probationary period? (  ) Yes  ( X ) No

i. Does the employee have any active complaint(s) with: ____EEO ____IG

____Chief of Staff ____Commander ____ Administrative Grievance Procedures

____WRAMC Mediation Unit  x FECA Claim ____Other, Congressman, etc.

j. If yes, explain_____

_____

_____

## III. Information about the Intervention

a. Check only one of the disciplinary/adverse actions listed below. (For written reprimand, indicate the period the reprimand is to remain in the employee's Official Personnel File. For suspensions, indicate number of days the employee is to be suspended.)

_____Written Reprimand ( ) 1 Year ( ) 2 Years ( ) 3 Years
_____Suspension (   )Days
_____Demotion From Grade ____ to Grade ____
_____Removal

## REQUEST FOR MER INTERVENTION cont.

b. Give details <u>see attached memorandum</u>

_____

_____

_____

_____

_____

c. The employee's misconduct adversely affected this organization by: _ <u>see attached memorandum</u>

_____

d. This incident of misconduct was witnessed by the following people (Attach a witness statement from each witness):  See attached memorandum

NAME        JOB TITLE           DUTY PHONE      ORGANIZATION

_____

_____

_____

(Use additional sheets if necessary)

e. Other pertinent information_____

_____

_____

f. The deciding of official is aware of my planned course of action, but has not directed me to take this action.   x Yes ( ) No


SIGNATURE

DATE   7 July 2004

3

194

MCHL-CCNS-WD46                                         10 September 2004

MEMORANDUM FOR RECORD

SUBJECT:  Telephone Call  from Madeline Riggiladez.

1.  On 10 September, 2004 at approximately 1300 hours, I received a telephone call
    from Ms. Riggiladez  in regard to some official correspondence.

2.  A proposal to remove from employment was sent via certified return receipt.  Ms.
    Riggiladez informed me that her husband signed for the letter and that she was
    concerned about the contents.

3.  After informing Ms. Riggiladez that she should contact COL Edinger  if she had
    any questions or responses, she began to speak in very loud and hostile tones.
    She accused me of "ruining" her and her "whole family".  She informed me that
    she was scheduled to have surgery and asked me if her insurance would cover it.
    After I told her I did not have any knowledge of her insurance coverage, she
    began to yell again and said she did not have money for an attorney and that
    myself and Ms. Rodondi (the assistant head nurse) were "trying to destroy" her.

4.  I instructed Ms. Riggiladez to contact the references listed and COL Edinger to
    discuss her concerns.  Ms. Riggiladez  sounded like she was crying and stated,
    "God is gonna get you for this".  She continued to sound tearful and her speech
    was unclear.  She then hung up.

5.  This is another episode when Ms. Riggiladez's behavior has been inappropriate.


                                   LILLIAN PETERSON
                                   MAJ,AN
                                   HEAD NURSE, WARD 46.

*208*



**DEPARTMENT OF THE ARMY**
WALTER REED ARMY MEDICAL CENTER
WALTER REED HEALTH CARE SYSTEM
WASHINGTON, DC 20307-5001

MCHL-CCNS- WARD 46 (690-700a)

MEMORANDUM FOR Madeline L. Riggiladez, Critical Care Nursing Service, Ward 46,
Walter Reed Army Medical Center, Washington, DC 20307-5001

SUBJECT: Notice of Proposed Removal   (4134)

1. This memorandum provides you advance written notification that I am proposing to remove
you from your current position as Clinical Nurse, GS-0610-11, and from the Federal Service no
earlier than thirty (30) calendar days from the date you receive this memorandum.

2. The CHARGE AND SPECIFICATION FOR this action is:

   Negligence in Performance of Duties where safety to a patient is endangered.

SPECIFICATION:  On 23 May 2004 at Ward 46, Walter Reed Army Medical Center, you were
negligent in the performance of your duties in a manner that endangered patient safety in that
you had a duty to closely monitor the electrocardiogram (EKG) of a 72 year old female patient
for episodes of cardiac dysrhythmia in order to call for appropriate intervention. You were
negligent in the performance of that duty in that you failed to take note of more than ten
incidents of cardiac dysrhythmia resulting in yellow alarms or to call for appropriate intervention
as a result of the same, thereby placing the patient in danger of cardiac arrest, stroke, heart attack
and brain damage.

3. Because of the privacy rules related to medical information, I cannot identify the patient
referred to in the above specification by name, but I am sure you are well aware of the patient I
am referring to. Because of the nature of care provided on Ward 46, close monitoring of patients
is a necessity. This is why we keep the nurse to patient ratio as low as possible. On the day in
question you had only two patients to monitor. You were certainly aware of your responsibility
to monitor this patient and you have assured others and myself on numerous occasions that you
possess the knowledge and skills to perform this task. Nevertheless, you failed to note over ten
instances of cardiac dysrhythmia that resulted in yellow alarms and, as a result, failed to call for
appropriate intervention. As you are well aware, cardiac dysrhythmia can result in cardiac arrest
and blood clotting that can lead to heart attack or stroke and brain damage due to oxygen
deprivation to the brain. Any of these occurrences could result in the severe injury or death of
the patient. I am aware of evidence that the audible alarm on the monitoring equipment was set
to the lowest volume level, however this is no excuse for your negligence. Dysrhythmias result
in both audible and visual alarms that must be turned off manually. Moreover, you are expected
to pull and review the paper tape recording the cardiac rhythm at some time during your shift and

*210*

place it in the chart. There was no paper tape with the chart at change of shift on this occasion. With these multiple means to detect dysrhythmias, I can only conclude that you simply were not paying close enough attention to your duties on this occasion and that a patient's life and well-being were placed in jeopardy as a result.

4. Although not a basis for this proposed action, in determining the appropriate penalty, I have taken into consideration the following:

 a. Your job description, as a clinical nurse, GS-11, states that you must possess, "knowledge of a wide variety of medical disorders and surgical procedures, the normal course of treatment, anticipated complications, and indicated therapeutic interventions." You demonstrated negligence when you failed to take the necessary interventions to prevent further deterioration of the patient's cardiac condition. You failed to recognize the cardiac rhythm changes and their impact on the patient's condition. You neglected to report the dysrhythmias (abnormalities in an otherwise normal rhythmic pattern) to the physician or the nurse that assumed care of the patient following your shift.

 b. Prior experiences, listed in your resume, include 7 months on a Progressive Coronary Care Unit, and 18 months on a telemetry Unit. For both of these positions, you state that it was a requirement to read and interpret cardiac rhythm strips.

5. Your negligence and failure to correctly perform proper interventions, while this patient was in your care, is unacceptable. It has adversely affected this organization, and is believed that it is a high probability that you will endanger the life of other patients.

6. In view of the charges and specification, and in consideration of the penalty guidelines for these offenses, I have concluded that this proposed action is the appropriate penalty necessary to assure that patients receive quality and safe nursing care at all times.

7. You have the right to reply to this memorandum personally and/or in writing and to submit any and all reasons, including statements of witnesses and affidavits, why you believe this proposed removal should not be effected. You will have fifteen (15) calendar days from the date of receipt of this memorandum for preparation and return of a written reply, and/or for requesting and making a personal reply, to COL Rosemarie Edinger, Walter Reed Army Medical Center, Critical Care Nursing Service, 6900 Georgia Avenue, NW, Bldg 2, Room 3L60, Washington, DC 20307-5001. COL Edinger will issue a written decision whether or not you reply to this notice. In addition, consideration will be given to extending the reply period if your reasons for requesting such an extension are valid. However, you must make your request for an extension in writing to COL Edinger before the expiration of the reply period and give reasons for desiring more time. You have the right to select a representative of your choosing to assist you in your appeal. You may also contact a representative of the American Federation of Government Employees (AFGE), Local 2 to assist you in preparing and presenting your reply. You and your

211

MCHL-CCNS Ward 46 (690-700a)
SUBJECT: Proposed Removal (4134)

representative, if he/she is an Army employee, are entitled to reasonable amounts of official duty time in preparing and presenting your appeal if you are in an active duty status. Requests for this time will be made in advance to your respective supervisor(s). Please notify me in writing with the name of your representative, if any. You have a right to submit any and all evidence you feel is relevant to the case, including affidavits you feel should be considered prior to a final decision. You must present your response(s) to the Deciding Official, COL Rosemarie Edinger. She is located in Room 3L60, Building 2 and her telephone number is (202) 782-2828. If you wish to reply orally, you should contact COL Edinger's office to schedule an appointment. She will consider extending the time limit for submitting your response if you request the extension in writing and explain your reasons for needing more time.

8. You and/or your representative have the right to review the material used as a basis for this removal action at the U.S. Army Civilian Personnel Advisory Center, Building 11, Walter Reed Army Medical Center. Ms. Barbie Daughtry, Human Resources Specialist, will assist you by making available the pertinent regulations and material used as the basis for this action. Ms. Daughtry may be contacted at (202) 782-0967 for an appointment.

9. Counseling services are available through the Employee Assistance Program (EAP) if you wish to discuss with a trained counselor any personal problems that may be related to your actions. Your supervisor can provide you an opportunity to visit the EAP counselor on duty time or you may call the EAP Coordinator, telephone (202) 782-8013/15 to arrange an appointment for yourself.

10. You are requested to sign and date the acknowledgement copy of this letter, which will be forward to Management Employee Relations, Walter Reed Army Medical Center, for inclusion in your official records. Your signature on the acknowledgment copy of this letter in no way forfeits any of your rights as previously mentioned in this letter nor admits your agreement with its content. Your refusals to sign the acknowledgement copy in no way voids the contents of this letter.

MAJ Lillian M. Peterson
Head Nurse, Ward 46

RECEIPT ACKNOWLEDGED:

DATE:

3

212

 

MCHL-CCNS                                    21 October 2004

MEMORANDUM FOR Chief, Critical Care Nursing Section

SUBJECT: Ms. Riggiladez, telemetry case review

   1. On 23 May 2004 Ms. Riggiladez was assigned primary care of a 72
     year-old female patient s/p Bentall procedure. Patient had a
     history of medical complications and rhythm changes while in the
     SICU.  Ms. Riggiladez documented no significant rhythm
     abnormalities for this patient during the 12-hour shift. At shift
     change, the oncoming nurse noticed that the patient was in
     trigeminy and performed an alarm review. At that time it was
     noted that patient had multiple and prolonged episodes of
     Trigeminy throughout the day. Episodes ranged in duration from 6
     to 48 minutes. Upon discovery, the physician on call was notified
     and treatment was provided.

   2. When telephonically questioned by Ms. Rodandi the following day,
     Ms. Riggiladez stated that she did not see any dysrhythmia events
     on this patient and did not silence any alarms during the shift.
     She stated she was watching the monitor when she was not
     providing care to the patient. Other staff members working that
     day were also interviewed and denied seeing rhythm changes or
     hearing alarms.

   3. A subsequent review of the telemetry system revealed that the
     alarm volume had been turned down to a level of 1, which would
     have significantly affected the staff's ability to hear the
     alarms. However, when a yellow alarm (such as trigeminy) occurs
     the screen turns blue for 3 minutes initially, then for 10
     minutes with subsequent alarms. A telemetry trained nurse
     monitoring his/her patients at the central station should have
     been able to easily identify the change in patients rhythm and/or
     notice that an alarm had occurred with the color change on the
     monitoring screen and performed a review.

   4. Ms. Riggiladez's duty performance placed patient at risk and did
     not meet standard of care. Technology and unit
     processes/procedures were also a contributing factor.


              Pamela F. Godinez
              MAJ, AN
              Critical Care Clinical Nurse Specialist

**BAILEY & EHRENBERG PLLC**
CONSTITUTION CENTER WASHINGTON  •  SUITE 1109  •  WASHINGTON D.C. 20000  •  TELEPHONE 02-09 966-4720  •  FACSIMILE (202) 966-5271

Jason H. Ehrenberg
(202) 466-4720
jhe@becounsel.com

October 22, 2004

Col. Rosemarie Edinger, Deciding Officer
Department of the Army
Walter Reed Army Medical Center
Walter Reed Health Care System
Washington, D.C.  20307-5001

    Re:   Notice of Proposed Removal – Madeline L. Riggiladez

Dear Colonel Edinger:

    I left you a voicemail earlier today, but did not hear back from you, so I am following up with this letter.

    Please be advised that Madeline L. Riggiladez has retained this firm to represent her interests in the above-referenced matter. Ms. Riggiladez informs us that you were kind enough to reschedule a previous hearing on her Notice of Proposed Removal from early October until Monday, October 25, 2004. Unfortunately, despite our client's attempts to contact you in the past few days, your office has neither (1) provided Ms. Riggiladez with a designated time for the hearing on October 25, 2004, nor (2) otherwise responded to her phone calls.

    In light of the above, we ask that refrain from holding any hearing involving our client until our firm has had an opportunity to speak with you or another representative from your office. If you decide to proceed with the hearing on October 25, 2004, we would expect that someone from your office will contact us by close of business today with a specific time and location.

    Please call me at your earliest convenience.

        Sincerely,

        Jason H. Ehrenberg

        Jason H. Ehrenberg

*222*



**DEPARTMENT OF THE ARMY**
WALTER REED ARMY MEDICAL CENTER
WALTER REED HEALTH CARE SYSTEM
WASHINGTON, DC 20307-5001

REPLY TO
ATTENTION OF

22 October 2004

Madeline L. Riggiladez
5793 Burke Town Court
Burke, Virginia 22015

Dear Ms. Riggiladez

On 10 September 2004 you received a Notice of Proposed Removal. The notice
contained a deadline of 15 Days within which to submit any documents you wished me to
consider and to respond verbally and/or in writing to the Notice of Proposed Removal.
You requested and were granted and extension of this deadline until Friday October 22,
2004. You have since requested an additional extension until after your 1 November
2004 surgery and recovery. This request is denied. You have already had 5 weeks to
respond to the Notice of Propose Removal; this is ample time within which to respond. I
do grant you an extension until 29 October 2004. If you wish to submit any documents
or statements for my consideration, they must be delivered by that date. If you wish to
make a verbal reply as well, you must do so on or before that date. I have set aside 45
minutes blocks on 26 October 2004 at 8:00 or 1000, 27 Oct 2004 0800, or 1000 at
Critical Care Conference Room 3M01 (3rd floor-behind Cardiology Clinic) and to receive
your verbal presentation should you wish to make one. If you wish to make a verbal
presentation, please pick one of these times and call Dianne Long at (202) 782-6401 by
25th October 2004 before close of business to book the appointment. If you have conflict
with all of these time please call Dianne Long and she will arrange another time prior to
the deadline. Your verbal response need not be in person, but can be made over the
telephone if you wish.

Rosemarie A. Edinger
COL, AN
Chief, CCNS

224

Feb-10-05  04:20pm  From-Office Center Judge Advocate        2027820977         T-754  P.004/006  F-660

9 Feb 04

MCHL-CCNS – WARD 46 (690-700a)

MEMORANDUM FOR Madeline Riggiladez, Critical Care Nursing Services, Ward 46, Walter Reed Army Medical Center, Washington, DC 20307-5001

SUBJECT: Notice of Decision on Proposed Removal - (4134)

1.  The Notice of Proposed Removal, forwarded to you on 10 September 2004, notified you of the proposal to remove you from your current position as a Clinical Nurse, GS-0610-11, and from Federal Service, for your Negligence in Performance of Duties where safety to a patient is endangered. In addition to the formal written replies dated 22 and 29 October 2004 from your legal representative to me, I have also considered the 29 December 2004, 4 and 5 January, and 1 February 2005 correspondence from your legal representative.  Additionally, I have given consideration to the relevant Douglas Factors to include the nature and seriousness of the offense, your past work record, and the effect your Negligence in Performance of Duties where safety to a patient is endangered has on the organization. I find the charge of Negligence in Performance of Duties where safety to a patient is endangered to be warranted given the evidence, details of which were provided in the proposed removal.

2.  Accordingly, I have decided that removal from the Federal Service will serve the best interest of the Department of the Army (DA) by increasing the efficiency of the service. Your removal from Federal Service will become effective on Sunday, 20 February 2005. A copy of the Notification of Personnel Action effecting your removal will be sent to you separately. You will remain in a duty status up to the date of your removal, unless approved leave is granted at your request. You are also required to return any equipment belonging to the Federal government still in your possession immediately or face further action.

3.  You may appeal your removal directly to the Merit Systems Protection Board (MSPB) as explained in the enclosure, which includes a copy of the appeal form, and the MSPB appeal regulations.  Your appeal must be filed no later than 30 days after the effective date of this action, or 30 days after the date of receipt of this decision, whichever is later. File your MSPB appeal by personal delivery during normal business hours, or by certified mail addressed to the following office: Regional Director, Merit Systems Protection Board, Washington Regional Office, 1800 Diagonal Road, Suite 205, Alexandria, Virginia 22314.  Or, you may file electronically at the Board's website: www.mspb.gov/e-appeal.html  Where you and your employer mutually agree in writing to attempt to resolve this dispute through an alternative dispute resolution process prior to the timely filing of an appeal, the time limit for filing the appeal is extended by an additional 30 days--for a total of 60 days.

BAILEY & EHRENBERG PLLC
1155 CONNECTICUT AVENUE, N.W.  •  SUITE 1100  •  WASHINGTON, D.C. 20036  •  TELEPHONE (202) 465-4729  •  FACSIMILE (202) 318-7071

Jason H. Ehrenberg
(202) 465-4729
jhe@becounsel.com

October 29, 2004

**VIA FACSIMILE (202-782-5386)**

Col. Rosemarie Edinger, Deciding Officer
Department of the Army
Walter Reed Army Medical Center
Walter Reed Health Care System
Washington, D.C. 20307-5001

Re:   **Notice of Proposed Removal – Madeline L. Riggiladez**

Dear Colonel Edinger:

This firm represents Madeline L. Riggiladez with respect to her employment with the Walter Reed Army Medical Center (the "Hospital"). Please accept this letter as Ms. Riggiladez's formal reply to the Notice of Removal (the "Notice") you forwarded to her attention on September 10, 2004.[1]

The Notice states that you intend to remove Ms. Riggiladez from her current position as Clinical Nurse, GS-0610-11, and from the Federal Service because on May 23, 2004 at Ward 46 of the Hospital, Ms. Riggiladez allegedly was "negligent in the performance of her duties in a manner that endangered patient safety." The Notice omits several key facts and events that militate against your proposed removal. These facts and events are set forth below.

Ms. Riggiladez has worked as a Clinical Nurse, GS-0610-11, at the Hospital since she was hired by the Hospital in November 2002. From that time until February 2004, Ms. Riggiladez performed her duties at the Hospital at or above applicable standards. In February 2004, Ms. Riggiladez severely injured her knee, sustained a vitreous detachment of her left eye and an injury to

---

[1] While Ms. Riggiladez would prefer to respond to the Notice in person, she has been unable to do so, and presently is unable to do so, because she has been suffering from an ovarian tumor and is/has been heavily medicated. Ms. Riggiladez is scheduled to undergo surgery to remove the tumor at Fairfax Hospital on November 1, 2004.

*228*

BAILEY & EHRENBERG PLLC
Col. Rosemarie Edinger
October 29, 2004

her left lateral central incisor while performing her duties at the Hospital. These injuries caused her to miss fifteen days of work. Ms. Riggiladez returned to work at the Hospital immediately upon receiving clearance from her physicians. Immediately upon her return, Ms. Riggiladez was subjected to ongoing harassment and discriminatory treatment from her supervisors and other employees. This harassment and discriminatory treatment took many forms, including, among other things:

- random and unnecessary changes in her shifts (from nights to days and days to nights at two week intervals), despite the fact that she was specifically hired to work nights only;

- derogatory statements from other Hospital personnel with regard to her age (Ms. Riggiladez is 54 years old, most of her co-workers on Ward 46 are far younger than her);

- unfounded accusations of wrongdoing and poor performance, including accusations of improperly handling her duties on days/evening when she was not even present at work (Ms. Riggiladez was never officially informed and/or reprimanded for any these alleged actions/inactions and believes that proper procedures were not followed with respect to the reporting of these actions/inactions); and

- various other forms of verbal harassment and discriminatory treatment.

The aforementioned harassment and discrimination caused Ms. Riggiladez to have to see a psychiatrist and psychologist, who diagnosed her with a nervous disorder -- the onset of which was caused by the harassment and discrimination to which she was subjected to at the Hospital. Ms. Riggiladez was prescribed mediation to help her cope with this new disorder.

On May 23, 2004, the date of Ms. Riggiladez's alleged dereliction of duty at the Hospital, Ms. Riggiladez was again injured while tending to one of her patients. While attempting to help a patient sit up, Ms. Riggiladez sprained both her back and groin and re-injured her knee. These injuries forced Ms. Riggiladez to miss four months of work.

229

BAILEY & EHRENBERG PLLC
Col. Rosemarie Edinger
October 29, 2004

In September 2004, Ms. Riggiladez's doctors cleared her to return to work with a start date of October 1, 2004. Thereupon, Ms. Riggiladez immediately informed Hospital staff of this clearance and noted that she planned to return to work on October 1, 2004. Shortly thereafter, in late September 2004, Ms. Riggiladez received the Notice wherein you informed her that you intended to terminate her employment with the Hospital. This was the first communication Ms. Riggiladez received from your office concerning her alleged dereliction of duty, which took place four months earlier. The timing of the Notice, which was sent only days before Ms. Riggiladez's planned return from medical leave and a disabling injury, is suspicious -- especially when viewed in conjunction with the harassment and discriminatory treatment she was subjected to after her February 2004 injury.

Needless to say, Ms. Riggiladez denies that she was negligent in the performance of her duties in a manner that endangered patient safety on May 23, 2004. Ms. Riggiladez is an experienced nurse with no record of poor performance prior to her return from medical leave in February 2004. Upon her return from medical leave in February 2004, she was subjected to harassment and discriminatory treatment. Due to this treatment, Ms. Riggiladez believes that the purported reason for her proposed removal is pretextual and that other younger, healthier employees from different ethnic and racial groups would not have been treated in this manner. As such, Ms. Riggiladez either has or will be filing an EEO charge with the EEO office at the Hospital.

Please feel free to contact me with any questions.

Sincerely,

Jason H. Ehrenberg



# Exhibit
# F-32

**BAILEY & EHRENBERG** PLLC
1155 CONNECTICUT AVENUE, N.W. • SUITE 1100 • WASHINGTON, D.C. 20036 • TELEPHONE (202) 465-4729 • FACSIMILE (202) 318-7071

Jason H. Ehrenberg
(202) 465-4729
jhe@becounsel.com

February 1, 2005

<u>VIA FACSIMILE (202-782-0977)</u>

David Claypool, Esq.
Office of the Center Judge Advocate
North Atlantic Regional Command and
Walter Reed Army Medical Center
Washington, D.C.  20307-5001

Re:    Madeline L. Riggiladez – **Letter of Resignation**

Dear Mr. Claypool:

Please accept this letter as Madeline L. Riggiladez's formal letter of resignation. Ms. Riggiladez is resigning her position as a Clinical Nurse GS-0610-11 at the Walter Reed Army Medical Center (the "Hospital") effective February 15, 2005. We are copying the Hospitals' Civilian Personnel Office via facsimile as well. As set forth in more detail below, Ms. Riggiladez is resigning because of her belief that she has been constructively discharged from the Hospital due to the discrimination and harassment she has been subjected to on an ongoing basis since February 2004.

As noted in our previous correspondence, Ms. Riggiladez has worked as a Clinical Nurse, GS-0610-11, at the Hospital since she was hired by the Hospital in November 2002. From that time until February 2004, she performed her duties at the Hospital at or above applicable standards. Indeed, her October 2003 review indicated that her performance was nothing less than stellar and that she was a tremendous asset to the hospital.

In February 2004, Ms. Riggiladez severely injured her knee, sustained a vitreous detachment of her left eye and an injury to her left lateral central incisor while performing my duties at the Hospital. These injuries caused her to miss fifteen days of work. She returned to work at the Hospital immediately upon receiving clearance from her physicians. Immediately upon her return, she was subjected to ongoing harassment and discriminatory treatment from her supervisors and other employees based upon her

232

BAILEY & EHRENBERG PLLC
David Claypool, Esq.
February 1, 2005

age and perceived physical limitations/disabilities resulting from her work injury. This harassment and discriminatory treatment took many forms, including, among other things:

- random and unnecessary changes in her shifts (from nights to days and days to nights at two week intervals), despite the fact that she was specifically hired to work nights only;

- derogatory statements from other Hospital personnel with regard to her age (Ms. Riggiladez is 56 years old, most of her co-workers on Ward 46 are far younger than her);

- unfounded accusations of wrongdoing and poor performance, including accusations of improperly handling her duties on days/evening when she was not even present at work (she was never officially informed and/or reprimanded for any these alleged actions/inactions and believes that proper procedures were not followed with respect to the reporting of these actions/inactions); and

- various other forms of verbal harassment and discriminatory treatment (including denying her the option of selecting a 72, as opposed to 80, hour work week with full benefits – an option that was afforded to all other GS nurses).

The aforementioned harassment and discrimination caused Ms. Riggiladez to have to see a psychiatrist and psychologist, who diagnosed her with depression and a nervous disorder – the onset of which was directly caused by the harassment and discrimination to which she was subjected to at the Hospital. Ms. Riggiladez was prescribed medication to help her cope with this new disorder.

On May 23, 2004, Ms. Riggiladez was again injured while tending to one of her patients. While attempting to help the patient sit up, Ms. Riggiladez sprained both her back and groin and re-injured her knee. These injuries forced her to miss four months of work. Thus, she was forced to file a claim for benefits with the Hospital's FECA office.

In September 2004, Ms. Riggiladez's doctors once again cleared her to return to work with a start date of October 1, 2004. Thereupon, she immediately informed Hospital staff of this clearance and noted that she planned to return to work on October 1, 2004. Shortly thereafter, in late September 2004, Ms. Riggiladez received a Notice of Proposed Removal (the "Notice") from the Hospital, stating that the Hospital intended to remove her from my current position as Clinical Nurse, GS-0610-11, and from the

2    233

BAILEY & EHRENBERG PLLC
David Claypool, Esq.
February 1, 2005

Federal Service because on May 23, 2004 at Ward 46 of the Hospital, she allegedly was "negligent in the performance of her duties in a manner that endangered patient safety."

The Notice was the first communication Ms. Riggiladez received from the Hospital concerning any alleged dereliction of duty, which allegedly took place four months earlier (and, conveniently, on the same day that she suffered serious injuries that forced me to miss several months of work). The timing of the Notice, which was sent only days before her planned return from medical leave and a disabling injury, is suspicious – especially when viewed in conjunction with the harassment and discriminatory treatment to which she was subjected after her February 2004 injury.

Subsequent actions by the Hospital further support the inference that the Hospital's purported reasons for the Notice are pretextual. By letter dated October 29, 2004, Ms. Riggiladez responded to the Notice. She subsequently contacted the Hospital's EEO office in early November 2004 and filed an informal charge of discrimination against the Hospital. In response, the Hospital retaliated against Ms. Riggiladez for attempting to enforce her federally protected EEO rights, by, among other things:

- Failing to inform her of the status of my employment with the Hospital during the more than three months that have passed since she responded to the Notice on October 29, 2004;

- Failing to place her on paid administrative leave for the period October 1, 2004 to the present, even though similarly situated younger, healthier employees receiving proposed notices of removal or facing disciplinary action are routinely placed on paid administrative leave;

- Failing to pay her any salary since October 1, 2004; and

- Initially refusing to pay, and then unreasonably delaying the payment of FECA benefits, even though she was clearly entitled to the benefits.

These actions, and the prior actions of the Hospital noted above, have not only caused Ms. Riggiladez and her family to suffer tremendous emotional and physical distress (her husband recently suffered a heart attack due, at least in part, to the tremendous stress his family has undergone because of the Hospital's actions), but have also caused them to suffer tremendous financial hardship (as noted above, Ms. Riggiladez has been without pay -- without explanation from the Hospital --for the last four months; she have had to take out loans to pay her mortgage and medical bills and has been threatened with foreclosure on her home).

3                234

BAILEY & EHRENBERG PLLC
David Claypool, Esq.
February 1, 2005

Ms. Riggiladez is an experienced nurse with no record of poor performance prior to her return from medical leave in February 2004. Upon her return from medical leave in February 2004, she was subjected to harassment and discriminatory treatment based upon her age and perceived physical disability, and in retaliation for asserting her FMLA and FECA rights. This pattern of discrimination and harassment has been, and is still, of a continuing nature. To date, Ms. Riggiladez has not received any decision on the Notice – even though more than three months have passed since she responded to the allegations contained therein. Nor has she received any salary from the Hospital since this time. Due to this treatment, Ms. Riggiladez has a good faith belief that the purported reason for her proposed removal is pretextual and that other younger, healthier employees from different ethnic and racial groups who have not attempted to enforce similar rights would not have been treated in this manner. She also believes that the purported basis for the Notice is pretextual because she is aware of at least one much younger Caucasian employee of the Hospital -- who was alleged to have committed the same dereliction of duty she is alleged to have committed -- who was not provided a proposed notice of removal and who was not terminated from his employment with the Hospital.

Based on the above, Mr. Riggiladez is tendering her resignation effective February 15, 2005. The environment at the Hospital since Ms. Riggiladez's February 2004 has been intolerable and has caused her tremendous physical and emotional distress to the point where Ms. Riggiladez no longer feels that she can work in this environment. When coupled with the Hospital's failure to pay Ms. Riggiladez any salary since October 1, 2004, it is clear to Mr. Riggiladez that she has been constructively discharged. Please let us know as soon as possible what, if any, actions Ms. Riggiladez needs to take to terminate her employment with the Hospital.

Sincerely,

Jason H. Ehrenberg

4    235

Feb-10-05    04:30pm    From-Office Center Judge Advocate        2027820077        T-754   P.005/006   F-580

MCHL-CCNS – WARD 46 (690-700a)
SUBJECT: Notice of Decision on Proposed Removal - (4134)

4. If you believe that this personnel action discriminated against you on the basis of your race, color, religion, sex, national origin, age, physical or mental handicap, and/or reprisal, you may file a complaint of discrimination with the Equal Employment Opportunity (EEO) Commission, 1400 L Street N.W., Suite 200, Washington DC, 20005, or you may file an appeal with the MSPB, as previously described. You may not, however, file both. Should you elect to file a complaint of discrimination, your complaint will be processed in accordance with EEO Commission regulations at Title 29, Code of Federal Regulations (CFR), Section 1614.

5. You have the right to select a representative of your choosing to assist you in your appeal. You and your representative, if he/she is an Army employee, are entitled to reasonable amounts of official duty time in preparing and presenting your appeal if you are in an active duty status. Requests for this time will be made in advance to your respective supervisor(s). Please notify me in writing with the name of your representative, if any.

6. Please acknowledge receipt of this memorandum by signing and dating the record copy provided.

Encl
as

ROSEMARIE EDINGER
COL, AN
Chief, Critical Care Nursing Section

RECEIPT ACKNOWLEDGED:

DATE:

238



Walter Reed Army Medical Center
6900 Georgia Avenue
Washington, DC 20307-5001
NURSING

U.S. Postal Service
CERTIFIED MAIL RECEIPT

OFFICIAL USE

WALTER REED A

Postage $ 1.53
Certified Fee 2.30

WALTER REED AMC

POSTAL SECTI

POSTAL SECTION Riggledes
5793 Burke Towne Ct
Burke, Virginia 22015-3140

Madeline Riggledez
5793 Burke Towne Ct
Burke, Virginia  22015-3140

CERTIFIED MAIL

239



**DEPARTMENT OF THE ARMY**
Walter Reed Army Medical Center
6900 Georgia Ave, NW
Washington, DC 20307-4

10 February 2005

Jason H. Ehrenberg, esq.
Bailey & Ehrenberg PLLC
1155 Connecticut Avenue, NW, Suite 1100
Washington, D.C. 20036

FROM: Office of the Center Judge Advocate (Mr. Claypool)

Subject: Your Letter of Feb. 1, 2005, Re: Letter of Resignation – Madeline Riggiladez

Dear Mr. Ehrenberg

1. I am writing in response to your letter of February 1, 2005 in which you convey Ms Riggiladez's desire to resign her position with this Agency effective February 15, 2005. While the Agency certainly accepts your declaration that you represent Ms. Riggiladez, I'm sure you understand that we are not comfortable accepting a resignation from a third party but need to hear from Ms. Riggiladez herself regarding this topic.

2. Enclosed with this letter you will find a copy of a letter from COL Edinger notifying Ms. Riggiladez of COL Edinger's decision to remove Ms. Riggiladez from her position effective at the end of the current pay period. This letter has been mailed to Ms. Riggiladez by certified mail. Of Course a federal employee is free to resign at any time. If Ms. Riggiladez wishes to resign her position effective February 15, 2005, she need only communicate that desire to her immediate supervisor, MAJ Lillian Peterson, at (202) 782-9347, or to the Civilian Personnel Advisory Center (CPAC) by contacting Mr. Charles Henderson at 202-782-7724. She may communicate her resignation verbally or in writing, but it should come directly from her and, if in writing, must be signed by her. If she resigns, Ms. Riggiladez's stated reason for resigning will be documented. You should be advised, however, that if Ms. Riggiladez resigns the Standard Form 50 documenting her resignation will also contain a remark to the effect that she resigned in lieu of removal. You should also be advised that, if Ms. Riggiladez resigns and subsequently appeals her termination to the Merit Systems Protection Board, the Agency will take the position that her voluntary resignation divests the Board of jurisdiction over her appeal.

3. As I stated to you earlier, Ms. Riggiladez will be carried in an administrative leave status, which is a paid status, from January 5, 2005 until the effective date of her termination, whether that is the effective date of her removal or earlier resignation. January 5 has been picked as the beginning date for this status because it is the date on which the Agency believes Ms. Riggiladez first indicated her intention to return to work after deciding not to pursue her FECA claim. I realize that Ms. Riggiladez takes the position that she indicated a desire to return to work much earlier. I've addressed this with the CPAC and Ms Riggiladez's supervisory chain. I've been unable to verify any contact other than one or two phone calls to the FECA office, in which the

FECA office says Ms. Riggiladez sought to further pursue her FECA claim rather than communicating a desire to return to work. If Ms. Riggiladez can provide further information, for instance who she spoke with when she expressed a desire to return to work, we will investigate further and, if warranted, reconsider the beginning date of her administrative leave status.

4. Your letters indicate that Ms. Riggiladez has made claims regarding alleged discrimination, a hostile work environment and constructive discharge. In fact, COL Edinger has looked into the claims made in your letter of October 29, 2004 and found them to be unsubstantiated. Although the Agency denies these allegations, your client is free to pursue them in the EEO process or MSPB process, should the MSPB have jurisdiction, even after the effective date of her termination.

5. I appreciate your attention; if you have any questions or wish to discuss this matter further, please call me at the number below.

Sincerely,

DAVID W. CLAYPOOL
Lead Attorney Advisor
WRAMC, Office of the Center Judge Advocate
6900 Georgia Avenue
Washington DC 20307
(202) 782-5811 DSN 662
FAX (202) 782-0977

Encl. Notice of Decision to Remove

242

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| GGILADEZ, MADELINE L. | | | | 02-20-2005 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 330 | Removal | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| V6J | 5 U.S.C. 75 Postappt | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | | | | | | 15. TO: Position Title and Number | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| CLINICAL NURSE | | | | | | | | | | |
| 0050 - 364396 | | | | | | | | | | |
| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19.Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
| GS | 0610 | 11 | 05 | $59,464.00 | PA | | | | | |
| 12A. Basic Pay | | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | | 20A. Basic Pay | | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
| $58,811.00 | | $653.00 | $59,464.00 | | | | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| WALTER REED ARMY MEDICAL CENTER<br>DEPARTMENT OF NURSING<br>CRITICAL CARE NURSING SERVICE<br>STEP DOWN - WARD 46   XYQF<br>WASHINGTON, DC 20307 | |

## EMPLOYEE DATA

| 23. Veterans Preference | | | | 24. Tenure | | | 25. Agency Use | 26. Veterans Preference for RIF | |
|---|---|---|---|---|---|---|---|---|---|
| 1 - None | 3 - 10-Point/Disability | 5 - 10-Point/Other | | 0 - None | 2 - Conditional | | | YES | X | NO |
| 2 - 5-Point | 4 - 10-Point/Compensable | 6 - 10-Point/Compensable/30% | | 1 - Permanent | 3 - Indefinite | | | | |
| 1 | | | | 2 | | | | | |

| 27. FEGLI | | 28. Annuitant Indicator | | 29. Pay Rate Determinant |
|---|---|---|---|---|
| F5 | Basic + Option A + Option C (5x) | 9 | Not Applicable | 6 |

| 30. Retirement Plan | | 31. Service Comp. Date (Leave) | 32. Work Schedule | | 33. Part-Time Hours Per |
|---|---|---|---|---|---|
| K | FERS and FICA | 12-16-2002 | F | Full-Time | Biweekly<br>Pay Period |

## POSITION DATA

| 34. Position Occupied | | 35. FLSA Category | | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|---|---|
| 1 - Competitive Service | 3 - SES General | E | E - Exempt | 84770012HBB | 7777 |
| 2 - Excepted Service | 4 - SES Career Reserved | | N - Nonexempt | | |
| 2 | | | | | |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 950001 | WASHINGTON / DISTRICT OF COLUMBIA / DISTRICT OF COLUMBIA |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| U8 | PON# OA | | | TDA DATA MC/W2DHAA/463N/51 |

45. Remarks

Forwarding address: 5793 Burke Towne Ct, Burke, VA 22015-3140.

Special rate under 5 U.S.C. 5305.

Lump-sum payment to be made for any unused annual leave.

SF 2819 was provided. Life insurance coverage is extended for 31 days during which you are eligible to convert to an individual policy (nongroup contract).

Health benefits coverage is extended for 31 days during which you are eligible to convert to an individual policy (nongroup contract).You are also eligible for temporary continuation of your FEHB coverage for up to 18 months.

Reason(s) for removal: Negligence in performance of duties where safety to a patient is endangered..

Not entitled to severance pay.

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| Army Medical Command (ARMC) | Harry E. Spaulding II |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | AUTHORIZING OFFICIAL |
| ARMC | 2241 | 03-18-2005 | |

*Enclosure 4*

| | |
|---|---|
| 5-Part 50-316 | TURN OVER FOR IMPORTANT INFORMATION |

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6238

249




*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*

# MADELINE MARSHALL RIGGILADEZ, RN

*5793 Burke Towne Court, Burke • Virginia 22015 • 703-250-1677*

## OBJECTIVE

Highlights of Qualifications
- Consciously deals with a sensitive population in a professional and concerned manner.
- Able to work independently and as cooperative team member.
- Experienced and competent RN in managing long term, assisted living, and short-term sub-acute unit
- Practice included acute care with pre and post surgical patient and intravenous therapy management.
- More than ten years of Nursing experience in both Geriatric and Hospital environment
- Former American Red Cross Nurse CPR Instructor.

## EDUCATION

Associates Degree in Applied Science, Northampton College, Bethlehem Pennsylvania
May , 1992

## NURSING EXPERIENCE

FAIRFAX HOSPITAL, *Falls Church, VA  22042*                                April 1, 2001- November 1, 2001   *1yr*

*Progressive Coronary Care Unit*
- Assessing patients for acute on set of illness
- Monitoring telemetry strips and assessing for complications
- Pre and Post Op of CABG, angioplasty, pacemaker, care of Heart Transplants patient's
- Offered position of evening Charge Nurse 30 bed unit.

ARLINGTON HOSPITAL, *Arlington, Virginia 22205*                          October, 1999-  April, 2001   *1 1/2 yr*

*Telemetry Unit*
- Monitor cardiac patients, assessing telemetry stripe and IV therapy
- Pre and Post Op patients, Open Heart Surgery

ST. LUKES HOSPITAL,  *Allentown, Pennsylvania 18104*                     September 1998- March 1999   *7 yr*

*Med Surge Unit*
- Primary Nursing Care
- Acute-Care
- Orthopedic and Intravenous therapy Management

CARE CENTER OF BRAKELEY PARK, *Phillipsburg, New Jersey*                  August, 1993- December, 1997   *4 yr*

*Assisted Living, Long term, and Sub Acute Unit*
- Nursing Supervisor  (promoted to Supervisor after six months)
- Responsible for 125 residents and 17 Bed Residential Community, including Sub-Acute Unit, 30 beds.
- In charge of staffing and management of LPNs and CNAs
- Implemented Educational In-Services, i.e. CNAs programs, hire programs, OSHA programs, HIV programs.
- Communicated with Physicians and Hospital in emergency situations
- Charge Nurse: administered meds to 65 residents. Executed and implemented Physician orders.
Supervised and worked with Alzheimer's Residents, Treatments of De cub and Wound Therapy, G-Tubes, Foley, Supra-Pubic, Catheterizations, Insertion and care. Oxygen and Orthopedic Therapies .
- Supervised Nurses Aides. Assessment of Patient/Care Plans/MDS
- Acting ADON for a time frame of six months

## NURSING SEMINARS

Certification for Gerontology, Skills with difficult employees.
In-service Seminars:
Pharmacology, when to use restraints and when not to.
IV certification, HIV Train the Trainer, Survey Certification for LTC, New enforcement ruling, How to handle People with Tact and Skill, Friendly Care Provider, 1998 Positive Outcomes in Dermal Wound Management.

## OTHER EXPERIENCE

AMERICAN EXPRESS PUBLISHING CO., TRAVEL AND LEISURE MAGAZINE, *New York, NY*        1978-1982
Assistant to the  Director of Sales in the placement of Print Media. Coordinated Business Placement Functions. Directed Employee Seminars.

*260*