IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MADELINE RIGGILADEZ,                )
        Plaintiff                 )
                            )
        v.                        )        Civil Action No. 06-1337 (RJL)
                            )
FRANCIS J. HARVEY,                   )
Secretary, Department of the Army    )
        Defendant.                )

## DECLARATION OF CANDACE SCHUPAY

    I, Candace Schupay, make the following declaration pursuant to the provisions of 28 U.S.C. § 1746. I understand that this declaration is the equivalent of an affidavit.

. I currently am employed as Federal Employees Compensation Act (FECA) Coordinator at Walter Reed Army Medical Center ("WRAMC"), located in Washington, D.C. From 2002 to present, I have been the FECA coordinator at WRAMC. My duties in that position included overall management responsibility for the administration of worker's compensation claims.

2. Ms. Madeline Riggiladez filed three claims for worker's compensation benefits for alleged traumatic injury/occupational disease occurring on January 31, April 30 and May 23, 2004. Her January 31 traumatic injury claim was denied by the Department of Labor (DOL); Ms. Riggiladez appealed their decision, which resulted in the re-affirmation of the denial on September 28, 2004. The April 30, 2004 claim for an occupational disease/condition was denied and closed by DOL on September 21, 2004; to date, it has not been appealed by the claimant.

3. . The claim for a traumatic injury alleged to have occurred on May 23, 2004 was initially accepted by DOL. Ms. Riggiladez filed claim forms (CA-7) seeking disability compensation for absences related to the accepted traumatic injury claim. Based on the submission of those forms, Ms. Riggiladez received wage compensation through DOL from July 18-31, 2004 and from August 17 through September 30, 2004 related to that claim. She never returned to our office after September 2004 to file additional CA-7 forms for wage compensation. WRAMC questioned the validity of the claim. A copy of that submission is attached hereto. DOL ultimately denied the claim and terminated benefits, effective October 1, 2004. Although Ms. Riggiladez appealed DOL's decision to terminate wage compensation and/or medical care benefits, the appeal was not successful. DOL closed the case on April 11, 2005.

4. Ms. Riggiladez received a total of $7,506.60 tax free in wage compensation from DOL, and received over $5,000.00 in "continuation of pay" salary from the Agency for the absences allegedly related to the May 23, 2004 incident during the first 45 days following the alleged injury. These sums were never recouped from Ms. Riggiladez by the Agency, despite the ultimate denial of her claim. DOL eventually "charges back" to the Army all wage compensation benefits paid to claimants.

5. All three FECA claims were found to be non-valid by the DOL based on the lack of relevant medical documentation submitted by Ms. Riggiladez and/or Agency administrative situations involving the claimant. All three claims were filed as workplace

injuries or a condition occurring either on the date(s) Ms. Riggiladez received counseling regarding her absenteeism or performance concerns, or while a patient endangerment case involving her nursing care was under investigation.

6. The FECA claim process was not a contributing factor in Ms. Riggiladez' voluntary absence after FECA benefits ceased on October 1, 2004; nor were her alleged claims of injury a factor in management's decision to remove her from federal service. The claimant informed the FECA Nurse consultant, Ms. Sharon Ribas, and I, that she was having surgery in October 2004 for a condition that was not work-related. She was informed at that time that her absence for this reason was not compensable under the worker's compensation claim system.

   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. (28 U.S.C. § 1746).

Executed on: 5 Jan 07

_Candace Schupay_
Candace Schupay



**DEPARTMENT OF THE ARMY**
HEADQUARTERS, U.S. ARMY GARRISON
WALTER REED ARMY MEDICAL CENTER
6900 GEORGIA AVE NW
WASHINGTON DC 20307-5001

Civilian Personnel Office/FECA Office                    19 July 2004    FILE
6900 Georgia Avenue, N.W. Bldg. 11, Room 2-106
Washington, DC, 2030307-5001

OFFICE OF WORKER'S COMPENSATION PROGRAMS
U.S. Department of Labor
800 North Capital Street, NW, Room 800
Washington, D.C. 20211

**SUBJECT: RIGGILADEZ, Madeline          DOI 23 May 2004**

Dear Sir/Madam:

The above claimant has filed a FECA claim in which she stated she was injured while attempting to reposition a patient in bed. **This office questions the validity of the CA-1 claim based on the following reasons:**

*Supervisor's written statements*: **Major Peterson, the claimant's immediate supervisor, doubts that the claimant injured herself as stated.** She has pointed out red flags, which include the following:

- **Prior to alleged injury and investigation (referenced below) claimant was counseled on performance issues.** Supervisor's "concern is your ability to provide the level of care required . . ." and "your ability to participate as a team player and to interact, on a professional level, with all personnel . . ."—*2 Apr 04 memo; also, 20 Jan and 21 May 04 memos referenced below*;
- **Also prior to alleged injury and investigation (referenced below) claimant was counseled for inappropriate behavior**—*30 Apr 04 "Behavior Unbecoming a Professional Nurse" memo*;
- **Claimant requested, and supervisor denied, permission to seek part time instead of the full-time government position she accepted**—*9 Jun 04 "Response to Incident Report" and 10 Jun 04 "Statement to Traumatic Injury" memos*;
- Claimant has had **three unwitnessed alleged injuries** (two FECA claims filed within five months) which the supervisor links to "significant emotional events that involve other staff members" and which renders [claimant] unable to perform her duties"—*10 Jun 04 "Statement to Traumatic Injury" memo*;
- Claimant **failed to follow established policy**—*10 Jun 04 "Statement to Traumatic Injury" memo*;
- Claimant used **excessive leave**—*10 Jun 04 "Statement to Traumatic injury" memo*.

*Acting Supervisor's written statements*: **Ms. Rodondi, RN, acting in MAJ Peterson's absence, submitted** memorandums following the alleged 23 May 04 injury that were forwarded to your office. She noted:

- **Claimant's failure** to notice heart arrythmias--"trigeminy"--for 12 hours **on DOI 23 May** which jeopardized patient safety and health and **which has prompted an immediate investigation**—*25 May 04 "Unnoticed Telemetry Changes" and 2 Jun "Timeline" memo* **(claimant has been absent from work since that time);**
- **Claimant's failure to report 23 May 04 alleged injury to any supervisor and failure to seek immediate medical attention.** Five days later, after the above incident, claimant first told acting supervisor of her alleged injury by phone, on 28 May 04—*2 Jun 04 "Sick Leave Requirements" memo*;
- **Ongoing performance issues**—*25 May 04 "Unnoticed Telemetry Changes" and 2 Jun 04 "Timeline" memos*;
- **Excessive leave usage** between 26 Dec 02 and 25 May 04—*25 May 04 "Leave Used" memo*;
- **Discrepancy of statements** between claimant, who told Ms. Rodondi that she informed coworker LT Pearson-Jackson on 23 May 04 that she was injured, and co-worker's response to Ms. Rodondi that **claimant did not mention any injury**—*2 Jun 04 "Timeline" memo, and Jun 04 memo of LT Pearson-Jackson*;
- **Statement, following 23 May 04 alleged injury, from claimant to Ms. Rodondi that "I need to get paid for 6 weeks so I can find another job,"**—*15 Jun 04 "Telephone Conversation" memo*.

Printed on ♻ Recycled Paper

_**Some specific performance deficiencies**_ as noted by supervisor and coworkers are listed below:

- <u>Evaluation by Advanced Nurse/coworker at supervisor's request:</u> He noted **"errors"** committed by claimant, **patient complaints** regarding care given by claimant, **lack of competence**, and **inability to work effectively** in her assigned area even after **"repeated attempts of retraining and counseling"** —_14 Jan 04 memo of MAJ Berger;_
- **Failure to pass an essential course** (ACLS) that should have been completed within weeks of her assignment to work area—_20 Jan 04 Developmental Counseling Form on performance deficiencies;_
- <u>Prior to patient incident and alleged injury,</u> **claimant received counseling regarding excessive absences, noncompliance, and lack of follow-through on supervisor's orders**—_21 May 04 Developmental Counseling Form._

Copies of above cited documents are enclosed for your convenience.

At the same time, **the claimant has also filed a CA-2 claim for stress, which this office is challenging** based on performance issues.

_**In summary, this office agrees with the supervisor that this claim is being filed because of:**_

- The claimant's ongoing **self-generated difficulties in relating professionally to her coworkers**,
- Performance deficiencies <u>that have required that she remain in a training status for over a year</u>,
- The fact that **an adverse action is pending**.

Please do not hesitate to contact the undersigned at 202-782-1510 if you have any questions or need further clarification.


Respectfully,

_Sharon Ribas_

Sharon Ribas RN/CLNC, MBA
Legal Nurse Consultant, FECA Office


Enclosures:  14 Jan 04 memo, MAJ Sam Berger
               20 Jan 04 counseling, MAJ Peterson
               02 Apr 04 counseling, MAJ Peterson
               30 Apr 04 memo, MAJ Peterson
               21 May 04 memo, MAJ Peterson
               25 May 04 memos (2), Ms. Rodondi
               02 Jun 04 memos (2), Ms. Rodondi
               09 Jun 04 memo, MAJ Peterson
               10 Jun 04 memo, MAJ Peterson
               15 Jun 04 memo, Ms. Rodondi
               Jun 04 memo, LT Pearson-Jackson

25204 2614

# Memorandum

**To:** MAJ. LILLIAN PERTERSON, AN

**From:** MAJ. SAM BERGER, AN

**Date:** 1/14/2004

**Re:** EVALUATION OF MRS. RIGGILADEZ

---

As per our conversation, I completed my assignment of working on nights for 2 months from 22 OCT-23 DEC. 2003 in an attempt to help Ms. Riggiladez with her time management skills. After 2 months of working with Mrs. Riggiladez, I have come to realize that she continues to have many weaknesses. I have tried to help her to the best of my ability but without success.

Mrs. Riggiladez 's ability to work as the Charge Nurse has been weak due to the fact that she has made so many errors or poor decisions that the Para professions do not take her seriously. I have noticed other nurses taking on more difficult assignments to avoid problems that may arise.

Patients have complained about her way too often. For example, one young soldier who sustained a blast injury in Iraq was recovering well and was allowed to leave the hospital for a day. He was assigned to Mrs. Riggiladez that day. When he returned at midnight he requested help getting undressed. She proceeded to yell out at him that he had been out all day and could help himself. I verbally counseled her immediately. Approx 10 minutes later, the patient called me in to help him, because he was afraid to ask her for help. On another shift, she was assign to take care of a retired nurse. The nurse asked for me and complained that Mrs. Riggiladez did not wipe her picc line with alcohol prior to accessing it. She also did not believe that Mrs. Riggiladez was competent in the care of chest tubes. I assured the patient that I would bring Mrs. Riggiladez up to speed. The patient was grateful but asked that she not be assigned to her care if at all possible. I immediately gave Mrs. Riggiladez an impromptu in-service on picc lines and dry suction pluravac. I have found my self repeatedly showing and retraining her tasks she just doesn't seem to retain

I believe Mrs. Riggiladez is not competent enough to read telemetry strips for the following reasons: On one occasion, I witnessed her taking the BKAT passed on to all the nurses by you and she showed me a strip of v-fib that she labeled as a-fib. I told her jokingly that some day she was going to kill somebody. She replied by saying "that is not my final answer." When I asked her, what she would do if a patient had a symptomatic arrhythmia, she replied, "I would call the doctor and let them evaluate." When she sits by the front desk telemetry monitor, she consistently ignores the telemetry monitor when it alarms and only when told to do so, she checks and silences the alarm.

I have also witnessed, Mrs. Riggiladez to be very emotional at times. Mrs. Riggiladez has always been very defensive due to the fact that her work has been called into question time after time. I have personally witnessed her yelling and crying at work. I have made it my mission to help her as much as possible and despite repeated attempts to booster her competence she has maintained a low self-

P. 1 OF 20

1

January 14, 2004

esteem.

Having worked with Mrs. Riggiladez a total of nine months I truly believe that she should not be a staff nurse on Ward 46. Mrs. Riggiladez has not shown any indication that she will ever be able to cope or deal with the stressors when the floor becomes busy. I have come to this conclusion after repeated attempts of retraining and counseling.

Sincerely,

MAJ. SAM BERGER, AN

P. 2 OF 20

2

# DEVELOPMENTAL COUNSELING FORM
For use of this form, see FM 22-100; the proponent agency is TRADOC



## DATA REQUIRED BY THE PRIVACY ACT OF 1974

| | |
|---|---|
| AUTHORITY: | 5 USC 301, Departmental Regulations; 10 USC 3013, Secretary of the Army and E.O. 9397 (SSN) |
| PRINCIPAL | To assist leaders in conducting and recording counseling data pertaining to subordinates. |
| ROUTINE USES: | For subordinate leader development IAW FM 22-100. Leaders should use this form as necessary. |
| DISCLOSURE: | Disclosure is voluntary. |

## PART I - ADMINISTRATIVE DATA

| Name *(Last, First, MI)* RIGGILADEZ, MADELINE L. | Rank/Grade GS0610-11 | Social Security No. | Date of Counseling 20 JAN 2004 |
|---|---|---|---|

| Organization WRAMC, WASHINGTON DC. 20307 | Name and Title of Counselor LILLIAN PETERSON, MAJ/AN, HEAD NURSE WD46 |
|---|---|

## PART II - BACKGROUND INFORMATION

**Purpose of Counseling:** *(Leader states the reason for the counseling, e.g., performance/professional growth or event-oriented counseling, and includes the leader's facts and observations prior to the counseling.)*
To discuss your current level of performance on ward 46 . This is to include clinical skills and critical thinking skills. Based upon the level of care required by the patient population of this unit, certain competencies are required. At the present time, you are not performing at an acceptable level. MAJ Berger, the senior clinical nurse and the assistant head nurse, was asked to observe your performance for two months (22 Oct- 23 Dec 2004). Based upon my concerns with your performance and his evaluation, I have decided to implement a performance improvement plan. This will be the final opportunity to raise your level of performance to an acceptable level.

## PART III - SUMMARY OF COUNSELING
**Complete this section during or immediately subsequent to counseling.**

Key Points of Discussion:
   Causes that contribute to deficiency:
     * limited knowledge and experience in providing care to the patient population of ward 46
     * inability to grasp basic nursing essentials for ward 46
     * limited problem solving abilities

Identifiable areas needing improvement:
     * telementry monitoring, interpretation, intervention
     * interpersonal communications
     * self-confidence

Possible need for family/personal counseling. Personal issues that you have shared with me appear to impact your ability to react in an appropriate mature and professional manner.

**\* ACLS REFERENCE**
**NEXT PAGE →**

**P. 3 OF 20**

## OTHER INSTRUCTIONS

This form will be destroyed upon: reassignment *(other than rehabilitative transfers)*, separation at ETS, or upon retirement. For separation requirements and notification of loss of benefits/consequences see local directives and AR 635-200.

**DA FORM 4856, JUN 1999**    EDITION OF JUN 85 IS OBSOLETE    USAPA V1.00

Plan of Action: (Outlines actions that the subordinate will do after the counseling session to reach the agreed upon goal(s). The actions must be specific enough to modify or maintain the subordinate's behavior and should include an appropriate plan specified to resolve the issue(s) identified in the assessment (Part IV below).)

The plan is to raise your nursing skills, cognitive abilities and leadership skills to a level that will enhance the care provided to the patients on ward 46.

*255042614*

1. Enroll in the next ACLS class: This is a competency required by all nurses working on ward 46. You have not taking this course in the past because you stated you did not feel you were prepared. You believe that you are now ready to successfully complete this course
2. Review basic A&P of the pulmonary system.
3. Identify areas of weakness and strengths and present them to me at the next counseling session (apx 2 weeks)
4. Present performance improvement plan after completion of the preceding tasks.

Will evaluate progress before making recommendation to section supervisor.

**Session Closing:** (The leader summarizes the key points of the session and checks if the subordinate understands the plan of action. The subordinate agrees/disagrees and provides remarks if appropriate.)

Individual counseled: ☐ I agree   ☐ disagree with the information above.

Individual counseled remarks:

Signature of Individual Counseled: _____   Date: _____

**Leader Responsibilities:** ✱ (Leader's responsibilities in implementing the plan of action.)

22, 23 Jan   _ACLS Class._   _Left class without completion._
States unable to pass written test d/t poor test taking ability. Did not tell course director ( Mrs. Hartman ) about test taking problem.

Signature of Counselor: _____   Date: _____

| PART IV - ASSESSMENT OF THE PLAN OF ACTION |
|---|

**Assessment:** (Did the plan of action achieve the desired results? This section is completed by both the leader and the individual counseled and provides useful information for follow-up counseling.)

You need to complete ACLS and take responsibility for your actions. (Didn't complete course).

P. 4 of 20

Counselor: _____   Individual Counseled: _____   Date of Assessment: _____

**Note: Both the counselor and the individual counseled should retain a record of the counseling.**

REVERSE, DA FORM 4856, JUN 1999

USAPA V1.00

DEVELOPMENTAL COUNSELING FORM
For use of this form, see FM 22-100; the proponent agency is TRADOC

DATA REQUIRED BY THE PRIVACY ACT OF 1974

| AUTHORITY: | 5 USC 301, Departmental Regulations; 10 USC 3013, Secretary of the Army and E.O. 9397 (SSN) |
| PRINCIPAL | To assist leaders in conducting and recording counseling data pertaining to subordinates. |
| ROUTINE USES: | For subordinate leader development IAW FM 22-100. Leaders should use this form as necessary. |
| DISCLOSURE: | Disclosure is voluntary. |

## PART I - ADMINISTRATIVE DATA

| Name *(Last, First, MI)* RIGGILADEZ, MADELINE L. | Rank/Grade GS0610-11 | Social Security No. | Date of Counseling 2 APRIL 2004 |
| Organization WRAMC, WASHINGTON, DC. 20307 | | Name and Title of Counselor LILLIAN PETERSON, MAJ/AN, HEAD NURSE WD46 | |

## PART II - BACKGROUND INFORMATION

Purpose of Counseling: *(Leader states the reason for the counseling, e.g., performance/professional growth or event-oriented counseling, and includes the leader's facts and observations prior to the counseling.)*
Performance and professional development.  The purpose of this counseling is to discuss my expectations of your professional performance. The concern is your ability to provide the level of care required by the patient population that is typically admitted to ward 46.  It also concerns your ability to participate as a team player and to interact, on a professional level, with all personnel assigned to WRAMC and ward 46 particularly.  Initially, it was decided that you would work on ward 41 for 30 days for assessment. This was a joint decision with Ms. Riggiladez, Ms. Van Patten (HN ward 41), MAJ Peterson (HN Ward 46), and COL Edinger (C, CCNS).  Due to medical reasons, you did not report for assignment to ward 41.  It was therefore determined that you would be assessed on ward 46, with Ms. Rodondi serving as your preceptor.
(— 17 May)

This assessment will occur on the day shift for the next 45 days.  At the end of that period, a determination will be made of your ability to work independently on ward 46.

## PART III - SUMMARY OF COUNSELING
### Complete this section during or immediately subsequent to counseling.

Key Points of Discussion:
I.   AREAS OF ASSESSMENT
   A.  Basic Nursing Knowledge.  Your ability to assess your patients, document via. CIS, timeliness of providing care, etc.
   B.  Critical Thinking Skills.  Determines appropriateness of reporting critical information, follow-through, correct courses of action, etc.
   C.  Time Management.  Demonstates appropriate use of time.
   D.  Interpersonal/Communication Skills.  Your ability to interact professionally with other staff members

II.  EXPECTATIONS
   A.  To function safely, competently, and independently as a staff member for ward 46.
   B.  To take personal responsibility for self improvement and development.
   C.  To keep chain of command aware of any changes that may occur that will impact your performance.
   D.  To remain professional at all times.
   E.  To demonstrate the Army Values in your performance.

P. 5 OF 20

## OTHER INSTRUCTIONS
This form will be destroyed upon:  reassignment *(other than rehabilitative transfers)*, separation at ETS, or upon retirement.  For separation requirements and notification of loss of benefits/consequences see local directives and AR 635-200.

DA FORM 4856, JUN 1999       EDITION OF JUN 85 IS OBSOLETE       USAPA V1.0

**Plan of Action:** *(Outline actions that the subordinate will do after the counseling session to reach the agreed upon goal(s). The actions must be specific enough to modify or maintain the subordinate's behavior and include a specified time line for implementation and assessment (Part IV below).)*

252042614

I. Professional Development
  1. Identify your weaknesses and strengths. Provide this information to the Head Nurse for development and assessment. Be honest with yourself during this exercise.
  2. Develop a self-improvement journal. Document the areas that you do well in and the areas that you need to improve. This will involve a lot of in-sight on your part. It will also help to quantify an increase in self-confidence.
  3. Provide a time line ; to the head nurse, at the beginning of each shift. This will show what your plan is for each patient during your assigned shift.

II. Personal Development
  1. Demonstrate maturity when interacting with difficult personnel. I will be assessing you ability to act under stressful conditions.
  2. I will assess your ability to inteact with physicians, other staff nurses, ancillary personnel, patients and their family members, etc.

*Review job description*
*Review WDA6 requirements*

---

**Session Closing:** *(The leader summarizes the key points of the session and checks if the subordinate understands the plan of action. The subordinate agrees/disagrees and provides remarks if appropriate.)*

Individual counseled: [ ] I agree   [ ] disagree with the information above.

Individual counseled remarks:

Signature of Individual Counseled: _____   Date: _____

---

**Leader Responsibilities:** *(Leader's responsibilities in implementing the plan of action.)* *Review plan during each shift; assess plan and make adjustments as indicated. Provide feedback and encourage input from employee*

Signature of Counselor: *Allison Patim MAJ AN*   Date: *2 April '04*

---

## PART IV - ASSESSMENT OF THE PLAN OF ACTION

**Assessment:** *(Did the plan of action achieve the desired results? This section is completed by both the leader and the individual counseled and provides useful information for follow-up counseling.)*

*MOR attached*

P. 6 OF 20

Counselor: *X Patim MAJ AN*   Individual Counseled: _____   Date of Assessment: *30 Apr '04*

---

**Note:** Both the counselor and the individual counseled should retain a record of the counseling.

*REVERSE, DA FORM 4856, JUN 1999*

USAPA V1.0C

25204264

MCHL-CCNS-WD46                                            30 April 2004

MEMORANDUM FOR RECORD

SUBJECT: Behavior Unbecoming a Professional Nurse: Madeline Riggiladez, GS11

1. A portion of the performance improvement plan, for this employee, included a discussion between the employee (Ms. Riggiladez) and the Head Nurse (MAJ Peterson) at the end of each shift worked. It was used as a time for the employee to reflect on her shift and identify areas of strength and weakness and to form a plan for the next shift. It also allowed for the Head Nurse to provide input and guidance based upon personal observations. A combined effort was used to develop a daily plan for improvement.

2. During the after shift assessment on 29 April 2004, the employee asked if I thought she was ready to perform without further guidance. I explained that I believed she still had significant issues that needed to be worked on before she could handle the level of care required by the patients on ward 46. Ms. Riggiladez stated that she had been on ward 46 for a year and a half and felt that she could handle the duty requirements. I reminded Ms. Riggiladez that if that were the case, her competency would not be in question and she would not be in her current situation. She became very defensive and when that observation was addressed, she became visibly upset. She began to speak in a loud and frantic manner and would not accept responsibility for her actions as the reason her competency was in question. I became frustrated at her reactions and, due to the time, I told her that we would finish the conversation when she next came to work.

3. When Ms. Riggiladez left my office, other staff members (1LT Lewis, 1LT Mbatia, and 1LT Pearson-Jackson) noticed her stated of distress. When they attempted to speak with her, they reported that she was very inappropriate and loudly spoke of the perceived persecution she felt was being directed toward her. She spoke of harming herself and of never returning to ward 46. Before leaving the ward, Ms. Riggiladez informed me that her desire was to leave ward 46 and work somewhere else.

4. I spoke with MAJ McLaughlin, the PCLS, about my concerns. Based upon the current level of competence and the apparent emotional instability displayed by Ms. Riggiladez, I am going to recommend she be removed from the critical care nursing section of Walter Reed Medical Center.

5. I instructed those mentioned staff members to provide written memorandums describing the events of 29 April 2004.

P. 7 OF 20

252042614

LILLIAN PETERSON
MAJ, AN
HEAD NURSE
WARD 46

P. 8 OF 20

# DEVELOPMENTAL COUNSELING FORM

For use of this form, see FM 22-100; the proponent agency is TRADOC

25204 26/4

## DATA REQUIRED BY THE PRIVACY ACT OF 1974

AUTHORITY: 5 USC 301, Departmental Regulations; 10 USC 3013, Secretary of the Army and E.O. 9397 (SSN)

PRINCIPAL: To assist leaders in conducting and recording counseling data pertaining to subordinates.

ROUTINE USES: For subordinate leader development IAW FM 22-100. Leaders should use this form as necessary.

DISCLOSURE: Disclosure is voluntary.

### PART I - ADMINISTRATIVE DATA

| Name (Last, First, MI)  RIGGILADEZ, MADELINE L. | Rank/Grade  GS0610-11 | Social Security No. | Date of Counseling  21 MAY 2004 |
|---|---|---|---|

| Organization  WRAMC, WASHINGTON, DC 20307 | Name and Title of Counselor  LILLIAN PETERSON, MAJ,AN; HN WARD 46 |
|---|---|

### PART II - BACKGROUND INFORMATION

Purpose of Counseling: *(Leader states the reason for the counseling, e.g., performance/professional growth or event-oriented counseling, and includes the leader's facts and observations prior to the counseling.)*

This is a follow-up to the counseling that occured on 2 April 2004. It is to discuss my observations and evaluations of your ability to work independently on ward 46 and to provide the level of care required by the patient population of the unit. It was decided to observe and evaluate your performance for 45 days. This covered 22 scheduled shifts (264 hours), including week-end shifts and night shifts. You requested that Ms. Rodondi not precept you, so you and I met after each shift you worked to evaluate your performance for the day. During that time, you were given guidance on ways to improve your performance. We also discussed what worked well, areas that needed improvement, and you were encouraged to provide input.

During this period of evaluation, you missed 20% of your scheduled shifts D/T request for sick leave (76 hours). The essential functions of your position, as a RN on this unit, are not being met when you are not available for duty.

You also received a memorandum for record for your behavior on 30 April 2004.

You have not followed through on the recommendation to develop a self-improvement journal.

### PART III - SUMMARY OF COUNSELING

Complete this section during or immediately subsequent to counseling.

Key Points of Discussion:

1. Compliance *  *(handwritten text, illegible)* for required documentation
   - journal
   - support form

2. *(handwritten, illegible)*  *
   - SL
   - AL

P. 9 OF 20

### OTHER INSTRUCTIONS

This form will be destroyed upon: reassignment *(other than rehabilitative transfers)*, separation at ETS, or upon retirement. For separation requirements and notification of loss of benefits/consequences see local directives and AR 635-200.

DA FORM 4856, JUN 1999    EDITION OF JUN 85 IS OBSOLETE    USAPA V1.00

MCHL-CCNS-WARD 46

25 MAY 2004

952042614

MEMORANDUM FOR RECORD

SUBJECT: LEAVE USED

1. The following is the requested status of the leave used by Ms. Riggiladez RN since employment at WRAMC in November 2002:

26 Dec 2002 3 hours AL

2 Jan 2003 8 hours LWOP
2 Feb 2003 8 hours AL
28 Feb 2003 12 hours SK
22 Apr 2003 12 hours SK
22 May 2003 12 hours SK
6 June 2003 8 hours LWOP
8 June 2003 12 hours SK
10 June 2003 12 hours SK
11 June 2003 12 hours SK
3 July – 16 July 2003 AL
2 Aug 2003 12 hours SK
1 Sept 2003 8 hours SK
7 Oct 2003 12 hours SK
30 Oct 2003 8 hours SK
3 Dec 2003 12 hours SK
29 Dec 2003 12 hours AL

3 Jan 04 12 hours SK
4 Jan 04 12 hours SK
17 Jan 04 12 hours AL
31 Jan 04 fell at work at 2000
1 Feb 04 8 hours SK
4 Feb 04 12 hours SK
5 Feb 04 12 hours SK
6 Feb 04 12 hours SK
9 Feb 04 12 hours SK
10 Feb 04 12 hours SK
18 Feb 04 8 hours SK
28 Feb 04 12 hours SK
29 Feb 04 12 hours SK
3 Mar 04 8 hours SK
4 Mar 04 12 hours SK
5 Mar 04 12 hours SK
8 Mar 04 12 hours AL
17 Mar 04 12 hours SK

P.10 of 20

Fecy Record
JUN 0 3 2004
K.G.

18 Mar 04 12 hours SK
27 Mar 04 12 hours SK
16 Apr 04 12 hours SK
21 Apr 04 8 hours SK
30 Apr 04 12 hours AL
5 May 04 12 hours SK
12 May 04 12 hours SK
20 May 04 12 hours SK
25 May 04 12 hours SK

Danielle Rodondi RN GS-12

P. 11 OF 20

Fecg head
JUN 0 3 2004
K.G.



MCHL-CCNS-WARD 46                                      23 May 2004

MEMORANDUM FOR RECORD

SUBJECT: <u>UNNOTICED TELEMETRY CHANGES</u>

1. On 24 May 2004 I had a telephone conversation with Ms. Riggiladez RN about the events that transpired with a patient on the 23 May 2004. <u>Ms. Riggiladez was the primary nurse for a patient from 0645 to 1915 who had many rhythm changes throughout the day.</u> At 1830 when the night shift arrived, one of the nurses <u>immediately noticed patient was in trigeminy and the MD was notified</u>, labs obtained, EKG obtained and IV Iopressor was given by the MD to control heart rate at 2000. Upon review of the telemetry alarms, PT had approximately 20 episodes of trigeminy throughout the day. The first episode was at 0940; the runs of trigeminy lasted from 4 minutes to the longest approximately 50 minutes from 1645-1733. Trigeminy is considered a yellow alarm, which means the telemetry monitor will beep 4 times but the screen will remain blue till the alarm is silenced.

2. Via the telephone conversation, Ms. Riggiladez stated that at 0900 the MD's ordered an EKG. She stated that Dr. Leinonan saw PVC's on the monitor and wanted an EKG and labs. Her documentation did show that she obtained an EKG and she documented exactly what the machine wrote as an interpretation. I than explained to Ms. Riggiladez that her documentation of the EKG should not be obtained from the machine's interpretation and should be interpreted by an MD. Part of her note stated the patient had a heart rate of 68 and sinus tachycardia. She also <u>documented in her shift nursing assessment at 1600 that the patient was in a regular rate</u> without any ectopy. Ms. Riggiladez stated that she missed documented in the shift nursing assessment. Her documentation in the vital sign screen reported the patient was in a sinus arrhythmia with rare unifocal PVC's. I asked her if she saw any events of Trigeminy throughout the day. I also asked her if she silenced any alarms. She stated that when she was not caring for the patient she was watching the monitor and did not see any events. She also stated that she did not silence any alarms throughout the whole shift.

3. <u>I than explained to Ms. Riggiladez that the CCNS competency this month is basic dysrhythmias</u> and that I also had formulated rhythm strips for ward 46 staff to interpret. I also explained to Ms. Riggiladez that I would be talking with all staff working that shift to see if they saw any events or silenced any alarms.

<span style="margin-left:50%">Danielle Rodondi RN GS-12</span>

<span style="margin-left:55%">P. 12 OF 20</span>

Fecu head
JUN 0 3 2004
K.G.

MCHL-CCNS-WARD 46                          2 June 2004        75204264

MEMORANDUM FOR RECORD

SUBJECT: SICK LEAVE REQUIREMENTS

1.  On 28 May 2004, I telephoned Ms. Riggiladez RN regarding policy for sick
    leave. I telephoned Ms. Riggiladez to instruct her that because she called out
    sick with complaints of knee problems on 25, 27, and 28 May 2004, according
    to policy when you call out sick for three working days in a row you need to
    bring documentation from a Doctor to Occupation health for clearance prior to
    working. Ms. Riggiladez stated she understood and would bring
    documentation in on Monday.

2.  During the telephone conversation, Ms. Riggiladez reported to me that on the
    weekend of 22 May 2004 she stated that while helping a patient she got a
    hernia. I asked Ms. Riggiladez if she filled out an 1811 about the incident,
    notified the charge nurse, supervisor and visited the ER. Ms. Riggiladez stated
    she did not fill out an 1811, did not notify the charge nurse or supervisor and
    did not go to the ER. I than asked Ms. Riggiladez if she knew the policy and
    she stated she did know she was suppose to fill out an 1811 for job related
    injury. Ms. Riggiladez stated she would come in on 1 June 2004 with
    documentation from an MD and was coming to fill out FECA claim.

3.  On 1 June 2004, Ms. Riggiladez called ward approximately 0930 and told me
    she was going to the doctor this am and would try to make it in the afternoon.
    She called out sick for the night of 1 June 2004. Ms. Riggiladez did not come
    in the afternoon of 1 June 2004.

Danielle Rodondi RN GS-12

FeCa level
JUN 0 3 2004
K.C.

P. 13 of 20

DCI  5-23-04

MCHL-CCNS-WARD 46                                      2 June 2004

MEMORANDUM FOR RECORD

SUBJECT: <u>TIMELINE</u>

1. Per request of the FECA office, I am providing background timeline for events regarding a FECA Claim by Ms. Riggiladez RN. I am acting as Head Nurse from 22 May 2004- 5 June 2004. Maj. Peterson, the Head Nurse on Ward 46, is TDY.

2. 2 April 2004 to 17 May 2004 Ms. Riggiladez has been on a Performance Improvement Plan to assess Ms. Riggiladez ability to provide the level of care required by the patient population on Ward 46. Evaluation information can be obtained from Maj. Peterson upon return from TDY.

3. On 24 May 2004 I had a telephone conversation with Ms. Riggiladez about unnoticed rhythm changes on the patient she cared for on 23 May 2004. See attached Memorandum for Record for further information.

4. On 25 May 2004 Ms. Riggiladez directly spoke with me via phone and stated she was calling out sick for the night shift due to knee problems.

5. On 25 May 2004 Col. Edinger, Chief of CCNS, requested information regarding the days Ms. Riggiladez had called out sick or used leave. The information was obtained from old schedules. See attached Memorandum for Record regarding leave information.

6. On 27 May 2004 Ms. Riggiladez called out sick. I did not speak to her directly.

7. On 28 May 2004 I telephoned Ms. Riggiladez who informed me she would not be in that night. I informed her of the policy regarding sick leave and bringing documentation to occupation health. See attached Memorandum. During this conversation Ms. Riggiladez stated that while helping a patient she got a hernia on 23 May 2004. Although Ms. Riggiladez informed me she understood the measures of writing an 1811, notifying charge nurse, supervisor and going to the ER when hurt on the job she did not report incident. I instructed Ms. Riggiladez if she comes in 1 June 2004 that SSG Reece, the Wardmaster, and myself would direct her with filing FECA claim.

8. On 1 June 2004, Ms. Riggiladez called approximately 0930 to inform me she would not be working that night, she stated she had a doctor's appointment in the am and would try to come in the afternoon.

9. On 2 June 2004, Ms. Riggiladez and husband arrived for guidance with filing FECA claim. During conversation Ms. Riggiladez stated that she did tell Lt Pearson-Jackson that she hurt herself that day. Lt Pearson-Jackson was called into the office with SSG Reece, Ms. Riggiladez, her husband and myself. I asked Lt Pearson-Jackson if Ms. Riggiladez reported to you that she hurt herself at work on Sunday 23 May 2004. Lt Pearson-Jackson stated no, but at one point during the shift Ms. Riggiladez came out of the patient's room, sat down at the desk, was perspiring and stated that she was tired. P. 14 OF 20

Feca Recv'd
JUN 0 3 2004
K.G.

10. Prior to Ms. Riggiladez departure it was understood by all that she needed to return to the doctor's. Occupation health needed further information and she also needed to obtain copy of exam report for the FECA claim. Ms. Riggiladez stated she would return on 4 June 2004 approximately 1000 to file claim.

11. At 1600 on 2 June 2004 I telephoned Ms. Riggiladez after discussion with Ms. Rebus in the FECA office and left a message on the answering machine letting her know that she needs to write up a summary of the event and reminding her to bring a copy of the exam reports from the doctor.

Danielle Rodondi RN GS-12

P. 15 OF 20

Fecs Recvd
JUN 03 2004
K.G.

MCHL-CCNS-WD46                                        9 JUNE 2004

MEMORANDUM FOR RECORD

SUBJECT:  Response to Incident Report (Madeline Riggiladez)

1. The incident that Ms. Riggiladez refers to, in her report, occurred on 29 April 2004. Details of that meeting are written in the attached Memorandum of Record (MOR) dated 30 April 2004. Ms. Riggiladez was given a copy of this MOR.

2. Ms. Riggiladez was placed on a second Performance Improvement Plan on 2 April 2004. This was not a transfer. See attached DA4856. She was scheduled on day shift for me to evaluate her performance, provide input and support as needed. Ms. Riggiladez also stated that she felt working day shift was better for her. After working the day shift for a few shifts, Ms. Riggiladez stated she preferred working the day shift. She also asked if she could work 72 hours in a pay period instead of 80. I explained to her that full time meant she had to work 40 hours, however, her work schedule was not more demanding. See attachment #3- Ms. Riggiladez's schedule.

3. Regarding the comment's Ms. Riggiladez stated 1LT Lewis made, please refer to attachment #4.

4. Ms. Riggiladez states that her work environment has become increasingly hostile over the past few months. Actually, I have observed the staff making more of an effort to create a supportive environment. I believe this to be a more cohesive unit than when I arrived here in July 2003.

5. I have made every possible effort to assist Ms. Riggiladez increase her capability to work in the demands of a cardiothoracic stepdown unit. I have made myself available to assist her, offered her opportunities to expand her knowledge base, offered her encouragement and support. I have also lent her my personal nursing books and suggested methods to help her gain nursing knowledge.

6. Ms. Riggiladez comments about experience coming with age. There have been several occasions when her emotional reactions was not that of a mature individual but was more like that of the younger nurses that also work on this unit. Being in the same age category as Ms. Riggiladez, I encouraged her to remember that she was the more mature individual and that she should not digress to yelling, emotional outbursts, or losing her temper.

7. Overall, I believe that her work environment did not cause Ms. Riggiladez's increase anxiety and perceived persecution. I do not believe that her work environment had any negative impact on her level of job performance.

P. 16 OF 20

8.  The POC for this memorandum is the undersigned @ 782-9347/1446

LILLIAN M. PETERSON
MAJ/AN
HEAD NURSE, WARD 46

Encl  1  MOR
       2  DA4856
       3  Schedule
       4  1LT Lewis' statement

cc  Col Edinger, C, CCNS
    FECA Representative, WRAMC

P. 17 of 20

MCHL-CCNS-WD46

**FILE**
10 JUN 2004

25204 7614

MEMORANDUM FOR RECORD

SUBJECT: Statement to Traumatic Injury

1. This is in response to a claim for injury submitted by Ms. Madeline Riggiladez. IAW a department of Nursing policy re. Moving patients, it is a requirement that the appropriate number of personnel be utilized to move, transfer, turn, etc. patients. This is for patient as well as staff safety. The patient that Ms. Riggiladez is referring to is 64inches in height, weighs 110 pounds, and has full use of all extremities.

2. In light of the preceding administrative actions that had occurred with Ms. Riggiladez and this being her second unwitnessed injury, I donot believe that Ms. Riggiladez injured herself as she stated.

3. Ms. Riggiladez had received a Memorandum for Record (dated 30 April 2004) and a DA4856 (dated 21 May) addressing her inappropriate behavior and leave usage. She was aware that I was going to recommend she be transferred from the critical care section of Walter Reed Army Medical Center.

4. Several months earlier, in an attempt to assist Ms. Riggiladez with another work environment, I enlisted the help of Ms. Holloway, the WRAMC Nurse recruiter. An offer to work on ward 75, a medical-surgical unit was made. Ms. Riggiladez declined the offer stating that the work on that type unit would be too hard for her physically.

5. Ms. Riggiladez had asked if she could omit one of her shifts, and work only 3-12 hour shifts per week. I informed her that she was required to work 80 hours in a pay period, but that I could schedule her a mix of 8 hour and 12 hour shifts. Ms. Riggiladez declined this offer because it would involve working more days each week to get her 80 hours for the pay period.

6. It appears that whenever Ms. Riggiladez has significant emotional events to occur that involve other staff members, she has some "unwitnessed" occurrence. Since I have been the head nurse on ward 46 (July 10 2004), this had been the third time something has happened to prevent Ms. Riggiladez from performing her duties as a clinical nurse. This is the second claim she has submitted.

7. POC is the undersigned @ 782-1446

LILLIAN M. PETERSON
MAJ/AN
HEAD NURSE, WARD 46

P.18 OF 20



MCHL-CCNS-WARD 46 <u>15 June 2004</u>

MEMORANDUM FOR RECORD

SUBJECT: TELEPHONE CONVERSATION 

1. On 14 June 2004 at approximately 1830 Maj. Peterson, the Head Nurse on Ward 46, requested that I write a Memorandum for Record regarding the telephone conversation Ms. Riggiladez and I had on 28 May 2004.

2. I initiated the telephone call at noon on 28 May 2004 to remind Ms. Riggiladez about the policy for calling out sick three days in a row. It was during this conversation that Ms. Riggiladez stated she was hurt on 22 May 2004. See previous Memorandum for Record Subject: Sick Leave Requirements dated 2 June 2004 regarding this part of the conversation.

3. The telephone call lasted approximately 40 minutes. Ms. Riggiladez was quite upset through most of the phone call sobbing throughout. She stated at one point "I need to get paid for 6 weeks so I can find another job. I have to be able to support my family while I get another job." She said that she was not coming back to Ward 46 and that she had seen Lenora and Maj. Peterson and that nobody would find her another job. She stated that ward 46 was too stressful and she was going to be a school nurse. I suggested to Ms. Riggiladez during the phone conversation that she needs to look at the openings for GS employees to see what positions are available. I also told her that she could look for openings at facilities such as Fort Belvoir that have clinics, which is a less stressful environment.

4. During the conversation, while crying, Ms. Riggiladez stated several times "what have I done that was so bad." She was also stating that she knows what is said about her and has friends on the ward. She reported that Ms. Philson calls her at home and tells her what other nurses say about her. She made reference to Ms. Philson calling her about comments made by Lt. Vanderlinden and Lt. Mooney. Ms. Riggiladez stated she was going to go to the Equal Opportunity office. I explained to her that because she is so upset that it would be best if she wrote down everything so when she goes to the EO office she would not forget what she wants to say.

5. The above statement is my recollection of the phone conversation on 28 May 2004 with Ms. Riggiladez.

P. 19 of 20

Danielle Rodondi RN GS-12

252042614
CAI    DOI 5-22-04

MEMORANDUM FOR RECORD

JUN 0 8 2004

On Friday 28 May 2004 Ms. Rodondi asked myself, ILT 4Danielle Pearson-Jackson, to recall if anything happened on Sunday 23 May 2004 with Mrs. Riggiladez? I did not know what she was asking specifically so I asked what did she mean and she stated did Mrs. Riggiladez inform you that she injured herself while caring for a patient? I stated that I recalled Mrs. Riggiladez coming out of a patient's room (Mrs.————'s room 4632-1) and was sweating and she wiped her forehead and I asked her was she okay and Mrs. Riggiladez stated she was tired after working in the patient's room (Mrs. ————'s room 4632-1).

I was called into the office on Wednesday 2 June 2004 in early afternoon by Ms. Rodondi and asked again what happened Sunday 23 May 2004 with Mrs. Riggiladez. Mrs. Riggiladez and her husband, Mrs. Rodondi and SSG Reece were all present. And again I stated Mrs. Riggiladez was coming out of a patient's room (Mrs. ————'s room 4632-1) and was sweating and I asked was she okay and she stated she was tired after working in Mrs. ————'s room. I do not remember what time it was that this conversation between Mrs. Riggiladez and I had on Sunday 23 May 2004.

P. 20 of 20

MCHL-CCNS-WD46

10 JUNE 2004

FILE

MEMORANDUM FOR RECORD

SUBJECT: Statement to Traumatic Injury

CA-1

1. This is in response to a claim for injury submitted by Ms. Madeline Riggiladez. IAW a department of Nursing policy re. Moving patients, it is a requirement that the appropriate number of personnel be utilized to move, transfer, turn, etc. patients. This is for patient as well as staff safety. The patient that Ms. Riggiladez is referring to is 64inches in height, weighs 110 pounds, and has full use of all extremities.

2. In light of the preceding administrative actions that had occurred with Ms. Riggiladez and this being her second unwitnessed injury, I donot believe that Ms. Riggiladez injured herself as she stated.

3. Ms. Riggiladez had received a Memorandum for Record (dated 30 April 2004) and a DA4856 (dated 21 May) addressing her inappropriate behavior and leave usage. She was aware that I was going to recommend she be transferred from the critical care section of Walter Reed Army Medical Center.

4. Several months earlier, in an attempt to assist Ms. Riggiladez with another work environment, I enlisted the help of Ms. Holloway, the WRAMC Nurse recruiter. An offer to work on ward 75, a medical-surgical unit was made. Ms. Riggiladez declined the offer stating that the work on that type unit would be too hard for her physically.

5. Ms. Riggiladez had asked if she could omit one of her shifts, and work only 3-12 hour shifts per week. I informed her that she was required to work 80 hours in a pay period, but that I could schedule her a mix of 8 hour and 12 hour shifts. Ms. Riggiladez declined this offer because it would involve working more days each week to get her 80 hours for the pay period.

6. It appears that whenever Ms. Riggiladez has significant emotional events to occur that involve other staff members, she has some "unwitnessed" occurrence. Since I have been the head nurse on ward 46 (July 10 2004), this had been the third time something has happened to prevent Ms. Riggiladez from performing her duties as a clinical nurse. This is the second claim she has submitted.

7. POC is the undersigned @ 782-1446

LILLIAN M. PETERSON
MAJ/AN
HEAD NURSE, WARD 46

*Roc's FECA*
*7-7-04 aL*

# Memorandum

**To:**    MAJ. LILLIAN PERTERSON, AN

**From:**  MAJ. SAM BERGER, AN

**Date:**  1/14/2004

**Re:**    EVALUATION OF MRS. RIGGILADEZ

---

As per our conversation, I completed my assignment of working on nights for 2 months from 22OCT-23 DEC. 2003 in an attempt to help Ms. Riggiladez with her time management skills. After 2 months of working with Mrs. Riggiladez, I have come to realize that she continues to have many weaknesses. I have tried to help her to the best of my ability but without success.

Mrs. Riggiladez 's ability to work as the Charge Nurse has been weak due to the fact that she has made so many errors or poor decisions that the Para professions do not take her seriously. I have noticed other nurses taking on more difficult assignments to avoid problems that may arise.

Patients have complained about her way too often. For example, one young soldier who sustained a blast injury in Iraq was recovering well and was allowed to leave the hospital for a day. He was assigned to Mrs. Riggiladez that day. When he returned at midnight he requested help getting undressed. She proceeded to yell out at him that he had been out all day and could help himself. I verbally counseled her immediately. Approx 10 minutes later, the patient called me in to help him, because he was afraid to ask her for help. On another shift, she was assign to take care of a retired nurse. The nurse asked for me and complained that Mrs. Riggiladez did not wipe her picc line with alcohol prior to accessing it. She also did not believe that Mrs. Riggiladez was competent in the care of chest tubes. I assured the patient that I would bring Mrs. Riggiladez up to speed. The patient was grateful but asked that she not be assigned to her care if at all possible. I immediately gave Mrs. Riggiladez an impromptu in-service on picc lines and dry suction pluravac. I have found my self repeatedly showing and retraining her tasks she just doesn't seem to retain

I believe Mrs. Riggiladez is not competent enough to read telemetry strips for the following reasons: On one occasion, I witnessed her taking the BKAT passed on to all the nurses by you and she showed me a strip of v-fib that she labeled as a-fib. I told her jokingly that some day she was going to kill somebody. She replied by saying "that is not my final answer." When I asked her, what she would do if a patient had a symptomatic arrhythmia, she replied, "I would call the doctor and let them evaluate." When she sits by the front desk telemetry monitor, she consistently ignores the telemetry monitor when it alarms and only when told to do so, she checks and silences the alarm.

I have also witnessed, Mrs. Riggiladez to be very emotional at times. Mrs. Riggiladez has always been very defensive due to the fact that her work has been called into question time after time. I have personally witnessed her yelling and crying at work. I have made it my mission to help her as much as possible and despite repeated attempts to booster her competence she has maintained a low self-

1

*January 14, 2004*

esteem.

Having worked with Mrs. Riggiladez a total of nine months I truly believe that she should not be a staff nurse on Ward 46. Mrs. Riggiladez has not shown any indication that she will ever be able to cope or deal with the stressors when the floor becomes busy. I have come to this conclusion after repeated attempts of retraining and counseling.


Sincerely,

MAJ. SAM BERGER, AN

2